1  Gerald D.W. North, Esq. (*Pro Hac Vice Application to be Filed*)
   northlaw2@yahoo.com
2  125 S. Wacker Dr., Suite 1000
   Chicago, IL 60606
3  Telephone:   (480) 998-6990
   Facsimile:   (312) 629-0901
4
   COLT / WALLERSTEIN LLP
5    Thomas E. Wallerstein (Bar No. 232086)
     twallerstein@coltwallerstein.com
6    Kimberly I. Culp Cloyd (Bar No. 238839)
     kculp@coltwallerstein.com
7  Shorebreeze II
   255 Shoreline Drive, Suite 540
8  Redwood Shores, California 94065
   Telephone:   (650) 453-1980
9  Facsimile:   (650) 453-1980

10 Attorneys for Plaintiff Clear-View Technologies, Inc.

**ORIGINAL FILED**
JUN 1 4 2013
Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CLEAR-VIEW TECHNOLOGIES, INC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>JOHN H. RASNICK, J. BASIL MATTINGLY, WILL RASNICK, AND PARKER MATTINGLY, individuals resident in Kentucky; and M&R SOLUTIONS, LLC, a dissolved Kentucky Limited Liability Company,<br><br>Defendants. | CASE NO. CV13-02744 PSG<br><br>**COMPLAINT FOR:**<br><br>**(1) TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONSHIP**<br><br>**(2) TORTIOUS INTERFERENCE IN PROSPECTIVE ECONOMIC ADVANTAGE**<br><br>**(3) UNFAIR COMPETITION UNDER BUS.& PROF. CODE §17200**<br><br>**(4) CIVIL CONSPIRACY**<br><br>**JURY TRIAL DEMANDED**<br><br>SIGNATURE BY FACSIMILE |

By and for its Complaint against Defendants John Rasnick, J. Basil Mattingly, Parker Mattingly, Will Rasnick, and M&R Solutions, LLC, Plaintiff Clear-View Technologies, Inc. (hereinafter, "CVT") states, alleges, and avers, upon knowledge of its own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1. CVT is an information technology company formed in 2006 to develop and market a revolutionary inventory control system for the hospitality industry known as "The BarMaster"™. CVT's system answered a long-felt need in the hospitality industry to address inventory losses that average 28 percent industry-wide.

2. Defendants are shareholders of CVT who, in 2011, combined or conspired with a group of rogue employees to wrest control from CVT's then-existing management, including Paul Mula II (hereinafter, "Mula"), CVT's co-founder/CEO and majority shareholder or, in the alternative, divert capital intended for CVT to themselves and establish a competing entity, using CVT technology and other confidential business information the rogue employees had purloined from CVT and transmitted to Defendants. In emails among themselves, Defendants and the rogue employees referred to this putative competitive entity as the "Skunk Works."

3. At all times relevant hereto, with the exception of a single sale of a beta site, CVT was in a pre-revenue stage of development and was therefore highly dependent upon ongoing capital infusions from existing as well as new investors for the funds needed to pay its employees and vendors, complete its product development, and begin marketing The BarMaster™.  Prior to the formation of the above combination or conspiracy, and the wrongful acts alleged herein, CVT had been highly successful in raising capital. From its inception in late 2006, until the events alleged herein in mid-2011, CVT raised over $8.7 million, and in the year leading up to those events, raised some $400,000 in new capital each and every month as the company readied itself for market entry. After the wrongful conduct alleged herein, CVT's ability to raise new capital was severely compromised to a point where it was unable to continue as an ongoing business enterprise.

4. In late April or early May, 2011, just as Defendants were starting to put their take-over plan in play, they learned that another shareholder, Mr. Clyde Berg (hereinafter, "Berg"), then a

1  major shareholder in Mission West Properties, Inc., had agreed to invest $3.5 million in CVT and that
2  his investment was imminent.

3       5.     The Berg investment represented all of the capital CVT needed to complete the
4  "shake-out" of the BarMaster™, enter the market and begin generating revenue.

5       6.     Immediately upon learning of the prospective Berg investment, and in furtherance of
6  their plan to take-over CVT, Defendants contacted Berg by phone to dissuade him from making the
7  investment. Shortly thereafter, on or about June 17, 2011, Defendants traveled to California and met
8  with Berg. At this meeting, Defendants told Berg that CVT "does not have an actual product, just an
9  idea." That and similar statements were blatantly untrue but, based upon the fervent intervention by
10 Defendants, and the statements made by Defendants at the meeting, Berg decided not to make the
11 investment. (Berg later invested a lesser amount in an investment offered him by one of the
12 Defendants).

13 **JURISDICTION AND VENUE**

14      7.     These claims arise and are brought under the tort laws of the State of California, where
15 the Defendants' acts either occurred or were directed and caused harm, and where Defendants knew
16 the impact of their conduct would be felt.

17      8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 inasmuch as there is
18 complete diversity of citizenship between Plaintiff, a corporation organized under the laws of the
19 State of California, whose principal place of business was at all times relevant hereto in California,
20 on the one hand; and the Defendants, each of whom is either an individual citizen of the State of
21 Kentucky, or a business entity organized under the laws of the State of Kentucky; and whereas the
22 amount in controversy exceeds $75,000, exclusive of interest and costs.

23      9.     Venue in this action is proper pursuant to 28 U.S.C. §1391(b)(2), inasmuch as the
24 wrongful acts alleged herein occurred, in whole or in part, within this District and were committed by
25 one or more of the Defendants, acting in concert each with the others.

26 //
27
28

## INTRADISTRICT ASSIGNMENT

10. Pursuant to Civil Local Rule 3-2(c) and 3-5(b) this action should be assigned to the San Jose Division, pursuant to Civil Local Rule 3-2(e), because a substantial part of the events or omissions which give rise to the claim occurred in San Jose.

## THE PARTIES

11. Plaintiff Clear-View Technologies, Inc. ("CVT") is a now largely-defunct California corporation, previously headquartered at 1722 Ringwood Ave., San Jose, California 95131.

12. Defendant John H. Rasnick (hereinafter, "Rasnick") is a single individual who resides in Kentucky. He is a promoter in the oil and gas industry, a shareholder in CVT, and a principal, together with Defendant J. Basil Mattingly, in Defendant M&R Solutions, LLC through which he, Mattingly, and their respective sons proposed to acquire a large distributorship for CVT's products. He directed communications to California designed to interfere with CVT's existing contractual relationships or prospective economic advantage and to divert investments intended to CVT to himself or his own investment vehicles, and personally traveled to and attended meetings in California for these same purposes.

13. Defendant J. Basil Mattingly (hereinafter, "Mattingly") is a married individual who resides in Kentucky. He is President of Diretech Holding Company, Inc. and a co-founder of Multi-Band (a nationwide, 10,000+ employee, company with which CVT was then negotiating to serve as its nationwide installation subcontractor), and a principal in M&R.

14. Defendant M&R Solutions, LLC (hereinafter, "M&R"), was a Kentucky limited liability company with its principal place of business in Lexington, Kentucky that was jointly owned or controlled by Defendants Mattingly and Rasnick. M&R was dissolved in November 2011, after the events alleged herein.

15. Defendant Parker Mattingly (hereinafter, "Mattingly Jr.") is a single individual who resides in Kentucky. He is the son of J. Basil Mattingly and an employee in either M&R Solutions or the proposed distributorship or both. He was a prime recipient of confidential corporate information that was leaked by the rogue employees and personally attended meetings in California.

16. Defendant Will Rasnick (hereinafter, "Rasnick Jr.") is a single individual who resides in Kentucky. He is the son of Defendant Rasnick, an employee of M&R, the proposed distributorship, or both.

**FACTUAL ALLEGATIONS**

17. CVT was founded in 2006. Over the course of four years, it developed a beverage inventory control system for nightclubs, restaurants, casinos and hotel and restaurant chains in the hospitality market, known as The BarMaster™.

18. The BarMaster™ was designed to be a total beverage management, inventory control, and loss prevention system. It allowed the tracking of every ounce of alcohol from stockroom to point-of-sale in a restaurant or bar, using radio frequency identification technology and a tracking system that used intelligent bar codes, providing improved accountability and profitability for alcohol inventory and control in a sector of the economy that suffers an industry-wide loss rate of 28 percent per year.

19. CVT's product relied on highly confidential proprietary software ("source code"), developed independently by CVT, for which CVT had or claimed copyright protection, especially with respect to its accessible "check my bar" website where users would be able to monitor sales activity and replenish inventory online. In developing The BarMaster™, CVT used a unique combination of software programs, digital hardware, devices, including RFID technology, methods, and techniques that, used together as an integrated whole, constituted a unique and proprietary method of doing business that had economic value.

20. Many aspects of CVT's system were not generally known to, or readily ascertainable by, others, and CVT made significant efforts, reasonable under the circumstances, to maintain the confidentiality of its trade secrets and all employees and all investors are required to execute confidentiality agreements or NDAs.

21. In March 2010, CVT introduced The BarMaster™ to the public at the 2010 Nightclub & Bar Trade Show in Las Vegas. The BarMaster™ was well-received and CVT assimilated over $4 million in pre-orders. At the time of the 2010 Nightclub & Bar Trade show, CVT had not completed the beta version of The BarMaster,™ but anticipated finishing its development shortly. After the 2010

1 trade show, CVT had as many as sixty orders in the pipeline, to be installed following its first successful installation, and CVT management was confident that The BarMaster™ would be market ready in 2010.

22. In preparation for the market introduction of The BarMaster,™ CVT entered into an agreement with M&R whereby M&R was to become CVT's exclusive distributor for six southern states. M&R's principals include Rasnick and Mattingly. Rasnick and Mattingly were also meaningful investors in CVT. Each involved his son in the proposed exclusive distributorship's operation.

23. Over the next 12 months, CVT raised some $400,000 per month in new investment capital and made plans to enter the market. Although the new investment inflows were large, CVT's burn rate was high and, in the absence of actual revenue at this point, CVT was dependent upon continued investor support.

24. In late summer, 2010, after it announced that the system was complete, CVT faced certain minor, but unexpectedly intractable, technological issues with the first version of its system, known as "Version V.1.0." As a result of the nagging technical issues it was facing, CVT began to restructure its development operation in the later summer of 2010 and commenced the development of "Version V.1.5." Notwithstanding these issues, however, CVT made its first sale of The BarMaster™ to a large hospitality establishment in Roanoake, Virginia, owned by another CVT distributor, Beverage Control Systems, LLC. CVT ultimately installed the system in December, 2010. The installation, as installed, was a functioning system, but reliability and other problems soon thereafter plagued the installation.

25. Commencing in or about December 2010, shortly after the Roanoake installation, Defendants entered into a combination or conspiracy with a group of disaffected CVT employees, including CVT's then Vice President for Business Development. The essential purpose of the combination or conspiracy was to oust Mula and other senior executives, and take control of the company. The conspiracy actively continued through at least June, 2011.

26. In February, 2011, all but one of the individual Defendants participated in a conference call with a group of disgruntled employees. On the call were Rasnick, Mattingly and

Mattingly, Jr., all of whom were principals in, or employees of, M&R, and Hugh Simpson (hereinafter, "Simpson"), Pam Beam (hereinafter "Beam"), Bruce Reynolds (hereinafter, "Reynolds"), Joy Mackell (hereinafter, "Mackell"), Brian Donnelly (hereinafter, "Donnelly"), and Joe Myerchin (hereinafter, "Myerchin"), all of whom were employees, or former employees, of CVT. At the time, Simpson was Vice President of Business Development and was being considered for the position of Chief Operating Officer. Another CVT vice-president, Remon Daniel, was invited to join the call but, after learning its purpose, declined.

27.  On information and belief, the purpose of the February 2011 call was to discuss how to either usurp the management of CVT or thwart the development of CVT and foster a competing company, using CVT's technology. Upon information and belief, the plan developed at the February, 2011 conference call was to tell potential customers and investors in CVT that CVT "did not have an actual product, just an idea" and discourage them from buying systems or shares, or from otherwise doing business with or investing in CVT. Upon information and belief, the conspirators who participated in the February 2011 conference call planned on preventing CVT from successfully introducing The BarMaster™ system by discouraging potential customers and investors.

28.  In March, 2011, CVT attended the 2011 Nightclub & Bar Trade Show in Las Vegas. The show was a huge success for CVT and resulted in pre-orders that represented over $22 million in potential future installations. During the trade show, Rasnick, Mackell, Reynolds, Behm and Simpson met and laid further plans to usurp the management of CVT or establish a competing entity. Following this meeting, Simpson made an internal bid for management control of CVT and, when rebuffed, resigned.

29.  After Simpson's departure, Rasnick, Mattingly and M&R, in furtherance of the conspiracy, began agitating for a greater role in CVT's management. A few weeks after Simpson resigned on April 1, 2011, M&R tendered a bid on behalf of M&R to inject money into CVT, establish 20 beta sites utilizing CVT's inventory, and inject the management consultants employed by M&R into CVT management.  In addition to obtaining management control, M&R would have received options to purchase millions of additional shares of CVT, for a few cents per share. The Rasnick/Mattingly/M&R plan would have shifted control of CVT from Mula and existing

1 management to a rouge group of disaffected former employees and shareholders.  CVT rejected
2 M&R's offer.

3       30.     During this entire time period, from late 2010 through mid-2011, the rogue employees
4 had been working behind the scenes for Defendants. Mackell, apparently ringleader of the group after
5 Simpson's departure, recited in an email to Rasnick how the rogue employees had for months
6 engaged in "reconnaissance" and "reporting" activities on Defendants' behalf, culling confidential
7 "technical, financial and management information" and transmitting the purloined information to
8 Defendants in Kentucky "with the intention of preventing" investment into CVT.

9       31.     In May 2011, about the same time CVT rebuffed the Rasnick/Mattingly plan, a well-
10 known Silicon Valley investor, Clyde Berg, already an investor in CVT, orally committed to make an
11 additional investment in the amount of $3.5 million.  When Rasnick and his co-conspirators learned
12 of Berg's prospective investment, Rasnick immediately contacted Berg by telephone and, in
13 furtherance of the conspiracy, urged him not to invest.

14       32.     A few weeks later, on or about June 17, 2011, Rasnick and other of his co-conspirators
15 attended a meeting at the offices of Mission West Properties (Carl and Clyde Berg's investment
16 vehicle) in Cupertino, California. Rasnick, together with Richard Hempel, a senior partner in the
17 management consultant firm employed by M&R, Mackell, Reynolds and Myerchin sought to
18 discourage Berg from further investing in CVT.  Also in attendance, at Berg's request, was Robert
19 Comes (hereinafter, "Comes"), a CVT shareholder who reported what transpired at the meeting to
20 CVT's management. At this meeting, Rasnick falsely stated to Berg that CVT only had an idea, not a
21 product, attacked CVT's management as incompetent, and encouraged Berg to assist them in either
22 forcing Mula to surrender management control to them or else to invest his money in their competing
23 company (code-named "Skunk Works") instead of CVT.

24       33.     As a result of the above-described interference by Defendants, Berg not only withdrew
25 his offer to invest $3.5 million in CVT but subsequently republished some or all of the false
26 statements that had been made by Rasnick to yet other investors and potential investors.

27       34.     Berg's decision not to invest deprived CVT of needed capital at a crucial time and,
28 within a month, spawned a capital crisis. By late June, 2011, CVT's Board of Directors was

conducting a rolling board meeting to address the crisis, ultimately appointing Gerald North (lead counsel herein), a long-standing outside director, to serve as interim President to evaluate various restructuring and recapitalization options, including the possibility of filing a chapter 11 reorganization case.

35. Each of the above-identified co-conspirators, including Rasnick and Mattingly, had confidentiality, non-compete, non-circumvent, and/or similar forms of covenants or agreements with CVT in addition to their common law duties of loyalty, good faith, and fair dealing as employees and/or distributors. Individually, or as members of the conspiracy, they instead interfered in CVT's existing contractual relations and/or prospective economic advantage, usurped its confidential information and trade secrets, and made preparations to compete with it in violation of their duties as employees, ex-employees or distributors. The above conduct included the transportation, receipt and/or sale of purloined trade secrets and other corporate information having a value exceeding $5,000.

## COUNT ONE

### (Tortious Interference with Existing Contractual Relationship)

36. CVT incorporates herein by reference the allegations set forth in paragraphs 1 through 35 above as though fully set forth herein.

37. CVT seeks to recover damages based upon Defendants' tortious interference is an existing contractual relationship.

38. CVT had an existing contractual relationship with Berg based upon his oral promise from Berg to make the $3.5 million investment described above.

39. Defendants were aware of the existence and importance to CVT of the forgoing relationship.

40. Defendants engaged in wrongful acts or conduct intended to disrupt or destroy CVT's relationship with him and prevent performance by Berg of his oral promise.

41. As the direct and proximate result of Defendants' conduct, CVT's contractual relationship with Berg was, in fact, disrupted and CVT lost a capital infusion of $3.5 million at a crucial time, depriving it of needed capital, delaying its ability to proceed with the development of

1 the technology, and ultimately leading to the demise of a business entity valued at $35 million at the time.

42. Defendants' conduct was willful or malicious, constituted intentional fraudulent conduct, or manifested a knowing and reckless indifference to CVT's rights, thereby entitling CVT to an award of punitive damages.

## COUNT TWO

**(Tortious Interference with Prospective Economic Advantage)**

43. CVT incorporates herein by reference the allegations set forth in paragraphs 1 through 42 above as though fully set forth herein.

44. CVT seeks to recover damages based upon Defendants' tortious interference with CVT's prospective economic advantage.

45. An economic relationship existing between CVT and Berg containing probable future economic benefits or advantages to CVT.

46. Defendants knew of the existence of the relationship.

47. Defendants engaged in wrongful conduct with the intent of interfering in, or disrupting, CVT's economic relationship with Berg, or with the knowledge that interference or disruption was certain or substantially certain to occur as a result of their conduct.

48. As a direct and proximate result of Defendants' conduct, CVT's economic relationship with Berg was, in fact, interfered with or disrupted and CVT lost a capital infusion of $3.5 million at a crucial time, depriving it of needed capital, delaying its ability to proceed with the development of the technology, and ultimately leading to the demise of a business entity valued at $35 million at the time.

49. Defendants' conduct was willful or malicious, constituted intentional fraudulent conduct, or manifested a knowing and reckless indifference to CVT's rights, thereby entitling CVT to an award of punitive damages.

//

- 9 -
COMPLAINT
CASE NO.

## COUNT THREE

### (Unfair Competition Under Bus. & Prof. Code §17200)

50. CVT incorporates herein by reference the allegations set forth in paragraphs 1 through 49 above as though fully set forth herein.

51. CVT had existing and prospective business and/or economic relationships with Berg, with other existing and prospective investors, and with the investment community as a whole.

52. Defendants knew of these relationships.

53. Defendants engaged in wrongful conduct intended to interfere with or disrupt these business relationships, make is less likely that CVT would benefit from them, or be able to establish new business relationships with new investors, and divert at least some of the capital intended for CVT to themselves.

54. Defendants wrongful conduct did, in fact, interfere with and disrupt these business relationships and reduced the likelihood that CVT would be able to obtain additional capital from existing, prospective or new investors.

55. Defendants' acts constitute unfair business practices or unfair competition under Business and Professions Code Section 17200.

56. As a direct and proximate result of Defendants acts, CVT was harmed in an amount to be proved at trial.

## COUNT FOUR

### (Civil Conspiracy)

57. Plaintiff CVT incorporates herein by reference the allegations set forth in paragraphs 1 through 56 above as though fully set forth herein.

58. Defendants intentionally and willfully conspired with employees and former employees of CVT to oust then-existing management of CVT and take over control of the company's affairs, or, in the alternative, to misappropriate its trade secrets and confidential business information for the benefit of a new ("Skunk Works") entity to be established to take advantage of CVT's technology.

59. In furtherance of this conspiracy, Defendants interfered in specific existing contractual relationships, of which they had knowledge, and specific prospective advantageous relationships, as well as generally disrupting CVT's prospective relationships in the investment community as a whole, effectively "starving CVT out." The purpose of Defendants' conspiracy was to force CVT's founder and existing management to capitulate to their demand that they be given control of CVT.

60. Each of the Defendants agreed to join in the conspiracy and each Defendant was aware of its central purpose.

61. As a direct and proximate result of Defendants' conspiracy, CVT was harmed in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

1. That, pursuant to Cal. Civ. Code §3426.2(a), the Defendants be permanently enjoined from using or transferring CVT's trade secrets and other confidential information, and affirmatively be required to return all information they acquired;

2. That a judgment be entered against all Defendants granting Plaintiff such actual damages to which it may be entitled;

3. That Plaintiff be awarded such punitive damages to which it may be entitled;

4. That Plaintiff be awarded pre-judgment interest;

5. That Plaintiff be awarded reasonable attorney's fees pursuant to Section 17200 and the cost of suit herein;

6. That Plaintiff be awarded interest after judgment at the maximum legal rate until the date the judgment is paid; and

7. For such other and further relief to which Plaintiff may be entitled.

Date: June 14, 2013

Submitted By,

COLT / WALLERSTEIN LLP

By:_____
Thomas E. Wallerstein
Attorneys for Plaintiff Clear-View Technologies, Inc.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable in this action.

Date: June 14, 2013    COLT / WALLERSTEIN LLP

By:_____
Thomas E. Wallerstein
Attorneys for Plaintiff Clear-View Technologies, Inc.