1 | MATTHEW A. CROSBY, CSB #070524
MICHAEL C. CROSBY, CSB #277849
2 | CROSBY & CROSBY,
A PROFESSIONAL LAW CORPORATION
3 | 1570 The Alameda, Suite 200
San Jose, CA  95126
4 | e-mail:  matt@crosbyplc.com
Telephone:  408-370-7500
5 | Facsimile:  408-984-5063

6 | Attorneys for Defendants
JOHN H. RASNICK, J. BASIL MATTINGLY,
7 | WILL RASNICK, PARKER MATTINGLY,
and M&R SOLUTIONS, LLC

8 |

9 | UNITED STATED DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN JOSE DIVISION

12 |

13 | CLEAR-VIEW TECHNOLOGIES, INC.,   )   CASE NO.  5:13-CV-02744-BLF
a California Corporation,                        )

14 |                                                       )
                           Plaintiff,              )   **DEFENDANTS AND**
15 |                                                       )   **COUNTERCLAIMANTS'**
vs.                                                   )   **OPPOSITION TO PLAINTIFF'S**
16 |                                                       )   **MOTION FOR SANCTIONS AND**
JOHN H. RASNICK, J. BASIL MATTINGLY, )   **COSTS, AND RENEWED MOTION**
17 | WILL RASNICK, and PARKER          )   **FOR EXPENSES AND ATTORNEYS'**
MATTINGLY, individuals residing in    )   **FEES UNDER FED. R. CIV. P.**
18 | Kentucky; and M&R SOLUTIONS, LLC, a )   **37(a)(5)(A)**
Kentucky Limited Liability Company,     )

19 |                                                       )
                           Defendants.           )

20 |                                                       )   **Hearing Date:        February 10, 2015**
                                                           )   **Hearing Time:        10:00 a.m.**
21 |                                                       )   **Dept. No.:              5, 4th Floor**
                                                           )   **Judge:                  Hon. Paul S. Grewal**
22 |                                                       )   **Date Action Filed:   June 14, 2013**
                                                           )   **Trial Date:            June 8, 2015**
23 |                                                       )

24 |                                                       )   [Accompanying Documents:  Declaration of John
                                                           )   Rasnick; Declaration of J. Basil Mattingly;
25 |                                                       )   Declaration of Parker Mattingly; Declaration of
                                                           )   Will Rasnick; Declaration of Clyde Berg;
26 | _____ )   Declaration of Attorney Michael C. Crosby; and
                                                              Proposed Order]

27 |

28 |

# TABLE OF CONTENTS

I.    STATEMENT OF THE CASE     **2**

II.    INTRODUCTION TO MOTION     **3**

III.    SUMMARY OF REASONS TO DENY MOTION     **4**

IV.    SUMMARY OF FACTS RELATED TO MERITS OF CASE     **5**

V.    SUMMARY OF FACTS RELATED TO THIS MOTION     **9**

VI.    LEGAL ARGUMENT     **14**

    A.    General Legal Principles and Burden of Proof
         Applicable to Motions Re Spoliation of Evidence.     **14**

    B.    Defendants' Duty to Preserve Evidence Did Not
         Arise Until CVT Filed its Complaint in July 2013.     **15**

    C.    Terminating Sanctions and Adverse Inference
         Sanctions are Unjustified and Unwarranted.     **16**

        1.    No Terminating Sanctions Warranted.     **16**
        2.    No Adverse Inference Sanctions Warranted.     **17**
        3.    CVT Confuses "Potentially Relevant" With
            "Relevant".     **17**

    D.    Even Assuming, Arguendo, Evidence Was Destroyed,
         Spoliation Sanctions Cannot Be Obtained Where the
         Destruction Was A "Matter of Routine With No
         Fraudulent Intent".     **18**

        1.    "Ccleaner Use Was Routine, Good-Faith
            System Operation.     **18**
        2.    No Fraudulent Intent Re Old Media Lost,
            Stolen, or Discarded.     **19**

    E.    Monetary Sanctions Cannot Be Awarded, and Are
         Unjustified and Unwarranted     **19**

VII.    OBJECTIONS TO EVIDENCE     **19**

VIII.    CONCLUSION     **25**

# **TABLE OF AUTHORITIES**

## **Cases**

Apple Inc. v. Samsung Electronics Co., Ltd.
    (N.D. C.A. 2012) 881 F.Supp.2d 1132, 1136        **15**

Bull v. UPS, Inc.
    (3rd Cir. 2012) 665 F.3d 68, 79        **15, 17, 19**

Byrnie v. Town of Cromwell, Board of Education
    (3rd Cir. 2001) 243 F.3d 93, 107-08        **15**

Hayman v. Block
    (1986) 176 Cal.App.3d 629, 638-639        **20-25**

Hoover Comm. Hotel Corp. v. Thomson
    (1985) 167 Cal.App.3d 1130, 1136-1137        **20-25**

Leon v. IDX Corp.
    (9th Cir. 2006) 464 F.3d 951, 958        **16**

Scalera v. Electrograph Systems, Inc.
    (E.D. N.Y. 2009) 262 F.R.D. 162, 171        **15**

Snider v. Snider
    (1962) 200 Cal.App.2d 741, 751        **20-25**

Zubulake v. UBS Warburg LLC
    (S.D. N.Y. 2004) 229 F.R.D. 422, 430        **14-15, 17**


## **Statutes**

California Northern District Civil Local Rules - Rule 54-5        **4, 19**

California Northern District Civil Local Rules - Rule 7-5(a)-(b)        **4, 19-25**

Code of Civil Procedure §2031.300(d)(1)        **4, 18**

Code of Civil Procedure §2031.310(j)(1)        **4, 18**

Evidence Code §§401-403        **20-21**

Evidence Code §701        **20-25**

Evidence Code §801        **20-24**

1  MATTHEW A. CROSBY, CSB #070524
   MICHAEL C. CROSBY, CSB #277849
2  CROSBY & CROSBY,
   A PROFESSIONAL LAW CORPORATION
3  1570 The Alameda, Suite 200
   San Jose, CA  95126
4  e-mail:  matt@crosbyplc.com
   Telephone:  408-370-7500
5  Facsimile:  408-984-5063

6  Attorneys for Defendants
   JOHN H. RASNICK, J. BASIL MATTINGLY,
7  WILL RASNICK, PARKER MATTINGLY,
   and M&R SOLUTIONS, LLC

8

9              UNITED STATED DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12

13  CLEAR-VIEW TECHNOLOGIES, INC.,      )   CASE NO.  5:13-CV-02744-BLF
    a California Corporation,           )
                                        )
14              Plaintiff,              )   DEFENDANTS AND
                                        )   COUNTERCLAIMANTS'
15  vs.                                 )   OPPOSITION TO PLAINTIFF'S
                                        )   MOTION FOR SANCTIONS AND
16  JOHN H. RASNICK, J. BASIL MATTINGLY, )  COSTS, AND RENEWED MOTION
    WILL RASNICK, and PARKER            )   FOR EXPENSES AND ATTORNEYS'
17  MATTINGLY, individuals residing in  )   FEES UNDER FED. R. CIV. P.
    Kentucky; and M&R SOLUTIONS, LLC, a )   37(a)(5)(A)
18  Kentucky Limited Liability Company, )
                                        )
19              Defendants.             )
                                        )
20                                      )   Hearing Date:    February 10, 2015
                                        )   Hearing Time:    10:00 a.m.
21                                      )   Dept. No.:       5, 4th Floor
                                        )   Judge:           Hon. Paul S. Grewal
22                                      )   Date Action Filed:  June 14, 2013
                                        )   Trial Date:      June 8, 2015
23                                      )
                                        )   [Accompanying Documents:  Declaration of John
24                                      )   Rasnick; Declaration of J. Basil Mattingly;
                                        )   Declaration of Parker Mattingly; Declaration of
25                                      )   Will Rasnick; Declaration of Clyde Berg;
                                        )   Declaration of Attorney Michael C. Crosby; and
26  _____)   Proposed Order]

27       Defendants  and  counterclaimants  JOHN  H.  RASNICK ("JOHN"),  J.  BASIL

28  MATTINGLY ("BASIL"), WILL RASNICK ("WILL"), PARKER MATTINGLY ("PARKER"),

1  and M&R SOLUTIONS, LLC ("M&R") [collectively, "Defendants"] , hereby submit the following

2  points and authorities in opposition to the *Motion For Sanctions And Costs, And Renewed Motion*

3  *For Expenses And Attorney's Fees Under Fed. R. Civ. P. 37(a)(5)(A)* (the "Motion") filed by

4  plaintiff CLEAR-VIEW TECHNOLOGIES, INC. ("CVT").

**I.**

**STATEMENT OF THE CASE**

7  Defendants and counterclaimants JOHN and BASIL are shareholders of plaintiff

8  CVT. CVT was formed to develop a system (the "BarMaster™"), that utilizes a radio frequency

9  identification ("RFID") label/weight displacement measurement system, along with video, to

10  monitor the use of bottles of alcohol for the bar and nightclub industry. Defendants and

11  counterclaimants PARKER, WILL, and M&R agreed to assist in distributing the BarMaster™.

12  As a result of gross mismanagement, CVT does not have a working product, is

13  without capital, and is essentially defunct. CVT raised nearly $9 million of investor money,

14  including over $500,000.00 from JOHN and BASIL, and frittered it away, with no accounting

15  provided as to where and how the $9 million was spent.

16  After an unsuccessful attempt in January 2011 to install the BarMaster™ at an

17  investor's restaurant in Virginia, CVT, and its Chairman, Paul Mula, Jr. ("Mula"), solicited investor

18  Clyde Berg ("Berg") for additional investment in CVT. Berg declined. Berg testified that nobody

19  influenced his decision.

20  Around the same time, employees of CVT approached Defendants to seek

21  Defendants' assistance in bringing a working BarMaster™ product to market. Defendants stated

22  they wanted no part in the day to day operations of CVT, but would assist CVT and its Chairman,

23  Paul Mula, Jr. ("Mula") as best they could. In response to Mula's repeated requests for additional

24  investment, JOHN and BASIL stated that an independent audit of CVT had to be performed first so

25  the investors would know how their $9 million investment was used.

26  Two years later, CVT filed this frivolous lawsuit in which it makes the absurd

27  *allegation* that Defendants: (i) dissuaded Berg from making an additional investment in CVT; and

28  (ii) conspired with others to take control of CVT and/or misappropriate its trade secrets. Defendants

1   did not conspire against CVT or dissuade Berg from making an additional investment.  In the words

2   of Mula, the purpose of this lawsuit is to "unleash very powerful litigation against some very deep

3   pockets with the likelihood of bringing the company back to life rather quickly and force an early

4   settlement once the pleadings are on file with the court."

5                                              **II.**

6                              **INTRODUCTION TO MOTION**

7                 CVT's Motion is a *tour de force* in misrepresentation of material facts to this Court.

8   CVT's Motion is a desperate attempt to evade the consequences of its spectacular failure in

9   squandering $9 million in investor money with no working product and no sales to show for it.  In

10  an incredibly inflammatory and conclusory Motion, CVT claims that Defendants willfully destroyed

11  evidence, and the alleged destruction of evidence has "denied CVT any chance to discover the full

12  extent of Defendants' unlawful conduct".  CVT's assertion is ludicrous in light of the undisputed

13  fact that nearly ***100,000 pages of documents have been produced in this matter***, including

14  Defendants' production of over 12,000 pages of documents stored in an online database that can be

15  searched by keyword and/or filtered by sender, recipient, date, etc.

16                The truth is that Defendants took steps to preserve the data.  Defendants produced

17  media and devices containing documents dated as far back as 1998.  Tellingly, Stroz Freidberg, the

18  consultant firm that performed the forensic examination of Defendants' media, issued a report —

19  the very same report upon which CVT's Motion relies — stating it found no evidence suggesting any

20  wiping or similar software was installed or used to target specific files.

21                Defendants' production of documents was due on Friday, December 12, 2014. Due

22  in part to discussions over the format of production, Defendants' production occurred on Monday,

23  December 15, 2015, i.e., the next business day.  A supplemental production was made on Friday,

24  December 19, 2015.  CVT cannot reasonably argue that it was prejudiced in any way.  Based on the

25  evidence — which conclusively establishes that Defendants did not destroy any relevant information

26  and, in fact, produced numerous communications dating back years — there is simply no basis to

27  award sanctions of any kind against Defendants.

28                CVT's motion is pure fiction, contrary to the evidence, and unsupported by the Stroz

---

Freidberg report on which CVT (mystifyingly) relies.  Simply put, no evidence was destroyed, relevant or otherwise.

**III.**

**SUMMARY OF REASONS TO DENY MOTION**

1. CVT's counsel did not meet and confer with Defendants' current counsel prior to filing CVT's Motion for attorney's fees, in violation of CAND Civil Local Rules - Rule 54-5. Therefore, monetary sanctions must be denied.

2. The virtual entirety of the Declaration of Doug Tilley in support of the Motion: (i) is conclusory and argumentative (in a blatant attempt to circumvent the Court's 25 page limit on briefs); and (ii) contains exhibits that are not properly authenticated, in violation of CAND Civil Local Rules - Rule 7-5(a)-(b).  See Paragraph VII below for a complete list of objections.

3. CVT produced nearly 80,000 pages of documents in discovery.  Defendants produced over 12,000 pages of documents in discovery.  All relevant, responsive documents have been produced.  It is unreasonable for CVT to argue that it lacks relevant, responsive documents. Therefore, CVT's request for terminating and/or instruction sanctions must be denied.

4. No sanctions may be imposed for failure to produce electronically stored information that was lost as a result of the routine, good faith operation of an electronic information system.  See CCP §§2031.300(d)(1) and 2031.310(j)(1).  Here, no relevant evidence was lost as a result of a third party's use of "Crap Cleaner" to clean temporary internet files and increase the performance of BASIL's computer.  However, even assuming, arguendo, relevant evidence was lost, BASIL and Defendants cannot be sanctioned for the routine, good faith use of said electronic system.

5. No relevant evidence was destroyed by Defendants, and certainly not with a "culpable state of mind".  Therefore, spoliation sanctions must be denied.

6. Defendants incurred over $125,000.00 in expenses in producing all media for forensic examination (phones, computers, iPads, email accounts, etc.).  As a result of the forensic examination, CVT was presented with over 12,000 pages of documents contained in an online database that can be easily filtered (by sender, recipient, date, etc.) and searched (keyword terms and phrases).  It would be unjust, inequitable, and unsupported by authority to sanction Defendants for

1   their compliance and production.

2          7.     CVT's request for monetary sanctions in the amount of nearly $200,000.00

3   is absurd. CVT cannot reasonably expect this Court to believe that its counsel incurred this amount

4   of fees in the span of only six (6) months for what amounts to a motion to compel production of

5   documents (which Defendants produced).

6   **IV.**

7   **SUMMARY OF FACTS RELATED TO MERITS OF CASE**

8          CVT's Memo PA and the Declaration of Doug Tilley devote pages to the purported

9   merits of the underlying case, which is irrelevant to CVT's Motion. In response thereto, Defendants

10  address the merits as follows:

11  **Misrepresentations By CVT and Mula**

12         CVT and Mula represented to Defendants and fellow investor Clyde Berg ("Berg")

13  that CVT had developed this system, <u>i.e.</u>, The BarMaster™, and that it was an innovative system.

14  They also represented that CVT had patented business logic technologies and the most integrated

15  solutions that can be utilized in a wide range of industries with high-value, diminishing-weight/item

16  inventories. They also represented that CVT had the only comprehensive, fully-integrated, web-

17  enabled business management, inventory and loss prevention systems for the hospitality industry.

18  In short, CVT and Mula represented that CVT's product worked. These representations were untrue.

19  (Berg Decl. at ¶5; John Decl. at ¶4; and Basil Decl. at ¶4)

20         CVT and Mula failed to disclose, and suppressed the fact, that in 2009 CVT's total

21  liabilities exceeded its total assets by $1,878,181, in 2010 CVT's total liabilities exceeded its total

22  assets by $4,793,491, and in 2011 CVT's total liabilities exceeded its total assets by $6,645,204.

23  CVT and Mula misrepresented the financial condition of CVT. (Berg Decl. at ¶6 and Ex. "C")

24         CVT does not have a working product, and never had a working product. CVT never

25  made a single sale of the BarMaster. (Berg Decl. at ¶7)

26  **No Agreement For Additional Investment**

27         JOHN invested one hundred sixty thousand dollars ($160,000.00) in CVT. BASIL

28  invested three hundred sixty thousand dollars ($360,000.00) in CVT. Berg invested one hundred

1     fifty thousand dollars ($150,000.00) in CVT.  They never received any return on their investment

2     in CVT.  Not one cent.  (John Decl. at ¶3; Basil Decl. at ¶3; and Berg Decl. at ¶8)

3           Berg never agreed to make an additional investment in CVT.  Berg never gave CVT,

4     Mula, or anyone a commitment that he would make an additional investment in CVT.  Berg certainly

5     never agreed to make an additional investment of $3.5 million.  In fact, Mula offered to sell Berg a

6     potion of his shares of CVT for five (5) cents per share.  Mula stated that he was offering to sell Berg

7     a portion of his shares of CVT in order to finance his lifestyle.  Berg declined Mula's offer.  (Berg

8     Decl. at ¶9-10)

9           Mula solicited Berg for additional investment in CVT.  Berg declined.  Berg told

10    Mula that if CVT ever had a working product and sales, Berg might consider an additional

11    investment.  Again, Berg made no agreement, commitment, or promise to further invest in CVT.

12    Berg told JOHN and BASIL on numerous occasions that he never agreed, promised, or committed

13    to make any additional investments in CVT.  JOHN and BASIL made no effort to dissuade Berg

14    from making an additional investment in CVT.  (Berg Decl. at ¶11; John Decl. at ¶¶17-18; Basil

15    Decl. at ¶¶15-16)

16           CVT's own documentation admits that Berg made no agreement to provide additional

17    investment funds to CVT. Mula authored a July 14, 2011 letter to all CVT shareholders stating that

18    "one major investor", i.e., Berg, "was close to a decision to commit $3 million".  While Berg was

19    never "close to a decision to commit $3 million", CVT does admit that there was no commitment.

20    The amount of Berg's purported commitment, according to CVT, varies, i.e., $3 million, $3.5

21    million, $5 million ... Said letter repeats the falsehood that Berg "held off" his additional investment

22    "after receiving some of the false information being circulated by the ex-employees." Said letter also

23    references a layoff of two-thirds of CVT's staff, $1.2 million in unpaid wages, and $1 million in past

24    due account payables, all of which exhibit the financial woes of CVT.  (Berg Decl. at ¶12 and Ex.

25    "D" at p. 2)

26           One CVT investor, Linda Pokarney, asked Berg if it was true that he would consider

27    investing more into CVT.  Berg responded: "I may have said I'd consider if he [Mula] ever got a

28    working system.  Never talked about 3 or 5 mil.!!!!!!!!!!!!"  (Berg Decl. at ¶13 and Ex. "E")

### No "Conspiracy"

Defendants did not "conspire" with any individuals to overthrow CVT's management and/or start a competing entity.  Defendants are unaware of the existence of any "conspiracy".  Defendants are passive investors in CVT.  Their investments in CVT are one of dozens of other investments.  Defendants have, and had, no interest in managing the day-to-day operations of CVT.  Defendants have, and had, no interest in starting a competing entity. This was stated clearly to Joy Mackell ("Mackell"), a CVT employee and the alleged "ringleader of the conspiracy", in JOHN's email to her dated May 16, 2011 at 8:09 a.m.  (John Decl. at ¶8 and Ex. "A"; and Basil Decl. at ¶5)

Defendants did not misappropriate any trade secrets or confidential business information of CVT.  Defendants did not disclose any confidential information of CVT to third parties.  Defendants did not disseminate to any third parties any confidential and proprietary information of CVT.  Defendants did not misuse any confidential and proprietary information of CVT. Defendants did not have access to CVT's financial information, and Defendants did not, and do not, have access to any technical aspect of The BarMaster™, including the software thereto. (John Decl. at ¶9; and Basil Decl. at ¶6)

Defendants did not communicate with any individuals unaffiliated with CVT about CVT matters.  As stated above, Defendants did not have access to any confidential and proprietary information of CVT.  Defendants committed no wrongful acts.  Defendants never agreed to commit any wrongful acts.  (John Decl. at ¶10; and Basil Decl. at ¶7)

Mula constantly complained about CVT's lack of funds and disgruntled employees.  Mula told Defendants that CVT did not have the funds to pay employees.  Later, Mula bragged to Defendants about his exotic car collection, including a Ferrari he says he purchased from a professional athlete.  (John Decl. at ¶11; and Basil Decl. at ¶8)

JOHN and BASIL were contacted by Mackell regarding a possible gathering of CVT employees and/or investors for the purpose of formulating strategies to get a working product to market.  JOHN and BASIL told Ms. Mackell that any actions and/or ideas had to be presented to Mula and CVT.  BASIL had a regular dialogue with Mula via telephone, email, and text messages. (John Decl. at ¶12; and Basil Decl. at ¶9)

1    JOHN was present at a meeting at Berg's office.  Mackell and Rich Hempel, a

2    consultant, were present, as well.  BASIL participated by telephone.  BASIL and JOHN personally

3    retained Mr. Hempel's firm to examine the business operations of CVT.  The purpose of the meeting

4    was to discuss generic business ideas to strengthen CVT.  (John Decl. at ¶13; and Basil Decl. at ¶10)

5    Prior to retaining Mr. Hempel, JOHN and BASIL spoke to Mula about Mr. Hempel's

6    potential involvement. They were candid with Mula, as shareholders talking to the Chairman of the

7    Board.  BASIL expressed his concerns, and those of other shareholders, to Mula, i.e., CVT did not

8    have a working product, CVT was in poor financial condition, and shareholders were unaware as to

9    how their investment was spent by CVT. JOHN and BASIL told Mula that they would not make an

10   additional investment in CVT, and would not participate in raising new funds, until Mr. Hempel and

11   his firm had the opportunity to examine CVT's business operations to determine strengths,

12   weaknesses, and viability going forward.  (John Decl. at ¶14; and Basil Decl. at ¶11)

13   Mula welcomed the idea of Mr. Hempel examining the business operations of CVT.

14   In fact, Mula hosted Mr. Hempel during Mr. Hempel's visit to CVT's corporate offices. Mula

15   provided Mr. Hempel with access to CVT employees.  Mula participated in a lengthy interview with

16   Mr. Hempel.  Mula was well aware of, and approved of, the aforementioned actions taken by

17   investors to assist CVT in bringing a working product to market.  At the conclusion of Mr. Hempel's

18   visit, Mr. Hempel sent JOHN an email dated April 8, 2011 in which he summarized his "very

19   productive day at CVT".  (John Decl. at ¶15 and Ex. "B"; and Basil Decl. at ¶12)

20   JOHN and BASIL take seriously their fiduciary obligation to their fellow investors.

21   The sole goal with regard to CVT was to assist Mula in bringing a working product to market for the

22   benefit of CVT shareholders.  This goal is embodied in JOHN's email to Berg dated January 9, 2012

23   at 5:21 p.m., in which he stated that "Joy and one or two other former employees wanted to propose

24   ways to 'fix' the product.  That was fine with Bas and me if they could work out an arrangement with

25   Paul [Mula, Jr.] and the CVT stockholders".  (John Decl. at ¶16 and Ex. "C"; and Basil Decl. at ¶13)

26   The individuals referred to as "SkunkWorks", i.e., the alleged conspirators, did not

27   include Defendants.  The list of individuals referred to as "Skunkworks" is set forth in Mackell's

28   email to Berg dated April 28, 2011 at 1:53 p.m., i.e., three (3) CVT engineers, Joy, and her partner,

1   "Joe". Mackell also stated in said email that she would approach Mula with the "SkunkWorks" idea.

2   (Berg Decl. at ¶19 and Ex. "F")

3                      **CVT's Plan to Pursue "Deep Pockets"**

4           On or about March 14, 2013, Mula drafted an email to all CVT shareholders,

5   dishonestly stating as follows:

6           "The fact of the matter is that if we pool together as a team right now,
             we can unleash very powerful litigation against some very deep
7           pockets with the likelihood of bringing the company back to life
             rather quickly and force an early settlement once the pleadings are on
8           file with the court." (Berg Decl. at ¶26 and Ex. "I" at pp. 2, 5, and 6)

9                             **V.**

10           **SUMMARY OF FACTS RELATED TO THIS MOTION**

11      **Duty to Preserve Evidence Arose in July 2013 Upon Filing of Complaint**

12           CVT's Motion asserts that Defendants had a duty to preserve evidence dating back

13   to at least January 2012 when CVT attorney Gerald North issued an "evidence preservation letter"

14   to all CVT shareholders.  However, on September 11, 2012, Mula sent BASIL two (2) emails in

15   which he stated "I had a lawyer in my ear everyday, influencing me to be someone I am really not."

16   The lawyer to which Mula was referring was Gerald North (his current lawyer).  Mula also stated,

17   "I do remember how things fell apart last, especially after Gerald continued to throw rocks in the

18   sandbox."  Mula finished that email by stating, "FYI, Gerald's term is up in December."  At that

19   time, Defendants had no reason to believe, nor did they believe, CVT was going to file this lawsuit.

20   (Basil Decl. at ¶23 and Ex. "B")

21                 **Stroz Freidberg Forensic Examination**

22           The office of Crosby & Crosby, A Professional Law Corporation, substituted in as

23   counsel of record for Defendants on November 14, 2014.  See Dkt Nos. 115-119.  Upon substituting

24   in as counsel, attorney Michael Crosby immediately began review of the forensic examination

25   requirements and process.  Mr. Crosby advised Defendants of the December 12, 2014 deadline for

26   production of documents.  (Crosby Decl. at ¶4)

27           Defendants submitted all media and devices in their possession, custody, and/or

28   control to Stroz Freidberg for forensic examination.  Stroz Freidberg then extracted all

1  documentation from Defendants' devices.  The protocol for forensic examination is set forth in the

2  *Stipulation And [Proposed] Order Regarding Independent Forensic Examination Of Defendants'*

3  *Records, Files, And Media* (the "Forensic Inspection Order").  (Crosby Decl. at ¶5 and Ex. "A")

4          The Forensic Inspection Order at ¶6 sets forth the search terms used by Stroz

5  Freidberg to extract "potentially" relevant documents.  The search terms include keywords such as:

6  "clear", "view", "bar", "new", "works", "big", "Paul", "Mark", "mission", "west", "Joe", "Joy", etc.

7  A document containing any one of these generic keywords was deemed "potentially relevant" for

8  purposes of extraction by Stroz Freidberg.  (Crosby Decl. at ¶6 and Ex. "A")

9          The Forensic Inspection Order at ¶¶16-17 sets forth a deadline of Friday, December

10 12, 2014 for: (i) Defendants' production of documents; (ii) Defendants' production of a privilege

11 log; and (iii) Stroz Freidberg's final report on the forensic examination.  (Crosby Decl. at ¶7 and Ex.

12 "A")

13         Stroz Freidberg extracted over 78,000 "potentially relevant" documents from

14 Defendants' media.  Mr. Crosby personally viewed "potentially relevant" documents dating as far

15 back as *1998* (Defendants did not know of CVT until late 2010).  (Crosby Decl. at ¶8)

16         On December 11, 2014, Defendants completed their review of "potentially relevant"

17 documents.  On December 12, 2014, Mr. Crosby received an email at 1:48 p.m. from Samuel Rubin

18 of Stroz Freidberg stating the December 12, 2014 production would be delayed by one (1) business

19 day, in part "because of ongoing discussions with parties' regarding the format of productions ..."

20 However, Mr. Rubin went on to state, "We anticipate having Defendant's initial production pursuant

21 to paragraph 16 of the Forensic Inspection Order available for Plaintiffs on Monday, December

22 15th."  (Crosby Decl. at ¶9 and Ex. "B")

23         Also on December 12, 2014, Mr. Crosby served on counsel for CVT the *Second*

24 *Amended Inventory Of Media Produced By Defendants For Forensic Examination* (the "Inventory").

25 The Inventory sets forth all media and devices submitted by Defendants to Stroz Freidberg for

26 forensic examination.  Along with the Inventory, Mr. Crosby also served Defendants' declarations

27 regarding media not produced.  (Crosby Decl. at ¶10 and Ex. "C")

28         On Monday, December 15, 2014, Defendants' initial production of over 6,000 pages

DEFENDANTS' OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS  [5:13-CV-02744-BLF]          PAGE 10

1  of documents was made available by Stroz Freidberg to CVT.  A supplemental production of over

2  6,000 pages of documents was made on Friday, December 19, 2014.  All documents are hosted in

3  an online database that can be searched by keyword and/or filtered by date, recipient, sender, etc. The

4  majority of the documents are duplicative of documents previously produced by Defendants because

5  of the number of different devices and media containing the same documents.  (Crosby Decl. at ¶11)

6  <u>**No "Wiping" of Devices - Stroz Freidberg Report**</u>

7  On December 18, 2014, Stroz Freidberg submitted to the parties its *Report Pursuant*

8  *To Order Regarding Independent Forensic Examination Of Defendants' Records, Files, And Media*

9  (the "Forensic Report").  The Forensic Report contains all findings of Stroz Freidberg relating to the

10  Forensic Inspection Order.  (Crosby Decl. at ¶12 and Ex. "D")

11  Contrary to CVT's contention that BASIL "wiped over 50,000 files" from his laptop

12  computer, the Forensic Report states the 50,000 files were located in a "temporary directory" and

13  their removal "appears to be connected to the use of system optimization and computer cleaning

14  programs".  See the Forensic Report at ¶V(A), pp.4-5.  (Crosby Decl. at ¶13 and Ex. "D")

15  The entirety of the Forensic Report at ¶VIII(A), pp. 10-11, is devoted to discussion

16  regarding "CCleaner", <u>i.e.</u>, "Crap Cleaner".  "CCleaner can be used to target and wipe individual

17  files; however Stroz Freidberg did not identify evidence to suggest that the program was used in this

18  way."  See the Forensic Report at ¶VIII(A), p. 10.  The Forensic Report goes on to state as follows:

19  "1.  <u>CCleaner</u>: CCleaner is an optimization and cleaning tool that
       can be used to wipe specific files and folders.  The software is
20     designed to programmatically identify and delete files and system
       settings on a computer that relate to how a computer was used.  In
21     order to accomplish these tasks CCleaner will, for example, identify
       and delete different categories of information, <u>including temporary</u>
22     <u>Internet files, information regarding recently accessed files, and</u>
       <u>Internet cookies</u>, (among other operating system and application-
23     specific items).   The specific operating system and application
       components targeted for "cleaning" are selected by the user; however,
24     <u>by default the items targeted will be deleted, not wiped, and the</u>
       <u>settings will not include any specific user-created files or folder</u>
25     <u>locations.  In order for CCleaner to wipe user-selected files or folders,</u>
       <u>a user must change settings in the program and select which files or</u>
26     <u>folders to target for wiping</u>."  (Emphasis added)
       (Crosby Decl. at ¶14 and Ex. "D")

27

28  The Forensic Report at ¶VIII(A), p. 11 states that "CCleaner was not used to wipe

1    specific files or folders."   None of the media submitted by Defendants "contained evidence

2    suggesting any wiping or similar software was installed or used."  See the Forensic Report at

3    ¶VIII(A), pp. 11-12.  (Crosby Decl. at ¶15 and Ex. "D")

4                                  **No Withholding of Exemplary Communications**

5              CVT's Motion claims that Defendants are currently withholding responsive

6    documents.  CVT's Motion references the Forensic Report at Paragraph VI.  However, all exemplary

7    communications have been produced as follows below.  (Crosby Decl. at ¶16)

8              The Forensic Report at ¶VI(B), item 1, is a purported exemplary communication

9    Exhibit "D", i.e., an email chain including, JOHN, attorney Dhaivat Shaw, and a number of

10   individuals dated June 24, 2011.  Said exemplary communication was produced as documents Bates

11   Stamped "RASNICK0001715-17".  (Crosby Decl. at ¶17 and Ex. "D")

12             The Forensic Report at ¶VI©, items 7-8, is, again, a purported exemplary

13   communication Exhibit "D", i.e. an email chain including, JOHN, attorney Dhaivat Shaw, and a

14   number of individuals dated June 24, 2011.  Said exemplary communication was produced as

15   documents Bates Stamped "RASNICK0001715-17".  (Crosby Decl. at ¶18 and Ex. "D")

16             The Forensic Report at ¶VI©, item 12, is a purported exemplary communication

17   Exhibit "H", i.e. a June 13, 2011 email from Joy Mackell to JOHN.  Said email was produced by

18   Defendants as document Bates Stamped "RASNICK0008154".  (Crosby Decl. at ¶19 and Ex. "D")

19             The Forensic Report at ¶VI©, items 18-19, is a purported exemplary communication

20   Exhibit "K", i.e. a May 6, 2011 text from Paul Mula, Jr. to JOHN stating "And so does the rest of

21   Cvt  agree".  Said  text  was  produced  by  Defendants  as  document  Bates  Stamped

22   "RASNICK00081169".  (Crosby Decl. at ¶20 and Ex. "D")

23             The Forensic Report at ¶VI(D), items 3-4, is, again, a purported exemplary

24   communication Exhibit "D", i.e., an email chain including, JOHN, attorney Dhaivat Shaw, and a

25   number of individuals dated June 24, 2011.  Said exemplary communication was produced as

26   documents Bates Stamped "RASNICK0001715-17".  (Crosby Decl. at ¶21 and Ex. "D")

27             The Forensic Report at ¶VI(D), items 5-7, is a purported exemplary communication

28   Exhibit "F", i.e., an email from JOHN to WILL and PARKER dated January 6, 2012.  Said

1    exemplary communication was produced as documents Bates Stamped "RASNICK0000205".

2    (Crosby Decl. at ¶22 and Ex. "D")

3                        **No Meet and Confer**

4            On December 12, 2014, Defendants served the Inventory and declarations thereto.

5    Defendants' initial production of documents was December 15, 2014. A supplemental production

6    of documents was made on December 19, 2014. Prior to CVT's filing of the Motion on January 6,

7    2015, which includes a request for attorney's fees, CVT's counsel did not contact Defendants'

8    counsel to meet and confer on any issues presented in CVT's Motion. (Crosby Decl. at ¶23)

9                 **Cost of Defendants' Production: $127,347.82**

10           On December 31, 2014, Mr. Crosby received a copy of Stroz Freidberg's Invoice No.

11   84454 to Defendants in the amount of $127,347.82 for conducting the forensic examination of

12   Defendants' media and devices (the "Invoice"). (Crosby Decl. at ¶24 and Ex. "E")

13           On January 5, 2015, Defendants received CVT's document production in this matter,

14   i.e., nearly 80,000 pages of documents Bates Stamped CVT002821 through CVT079729. Unlike

15   Defendants' production, CVT's production cannot be searched by keyword and/or filtered in any

16   way. (Crosby Decl. at ¶25)

17                    **No "Spoliation" of Evidence**

18           Defendants did not remove any information from their media and devices, i.e., email

19   accounts, phones, iPads, computers, etc., for the purpose of destroying evidence pertaining to this

20   matter. Defendants provided all media in their possession, custody, and/or control for forensic

21   examination. (John Decl. at ¶19; Basil Decl. at ¶17; Parker Decl. at ¶2; and Will Decl. at ¶2)

22           Defendants' declarations set forth the media not produced for forensic examination,

23   and the straightforward, simple reasons said media were unavailable for production. There is

24   nothing nefarious or sinister as to why certain media were not available for production. (John Decl.

25   at ¶¶20-21 and Ex. "D"; Basil Decl. at ¶18 and Ex. "A"; Parker Decl. at ¶¶3-5 and Ex. "A"; and Will

26   Decl. at ¶3 and Ex. "A")

27           Defendants did not intentionally delete any communications relating to CVT for

28   purposes of preventing production thereto. Defendants did not intentionally destroy any documents

---

1  that have any relation to CVT.  Defendants are not aware of any lost or destroyed documents

2  pertaining to CVT.  Defendants certainly did not intentionally destroy any documents relating to this

3  matter for the purpose of preventing the production of relevant, responsive documents.  Defendants

4  have committed no wrongful acts, and Defendants have nothing to hide from CVT and/or the Court.

5  (John Decl. at ¶22; Basil Decl. at ¶19; Parker Decl. at ¶7; and Will Decl. at ¶5)

6        Stroz Freidberg found that "CCleaner" was used on BASIL's laptop computer.  The

7  laptop computer was used by BASIL for business purposes relating to Multiband USA, a company

8  to whom BASIL sold a business.  BASIL submitted the laptop computer to Multiband USA for

9  general cleaning.  Multiband USA informed BASIL that prior to cleaning the laptop computer,

10  everything on the laptop computer was saved to the backup storage drive BASIL later submitted to

11  Stroz Freidberg for forensic examination. Further, BASIL's mobile phone is linked to his laptop

12  computer, and his mobile phone was also submitted for forensic examination.  (Basil Decl. at ¶20)

13        BASIL did not install "CCleaner" on his laptop computer.  BASIL never personally

14  performed any use of "CCleaner" on his laptop computer.  He had never heard of "CCleaner" until

15  Stroz Freidberg issued its report on forensic examination of his media.  The laptop computer is over

16  eight (8) years old, and Multiband USA informed him that it was merely cleaning up his laptop to

17  improve speed and performance.  (Basil Decl. at ¶21)

18        Stroz Freidberg found no evidence of any "wiping" devices used on JOHN,

19  PARKER, or WILL's media.  Stroz Friedberg found no evidence that "Crap Cleaner" was used to

20  target specific files and/or for "wiping" of files on BASIL's computer.  Defendants have not "wiped"

21  any media in their possession, custody, and/or control.  (John Decl. at ¶23; Basil Decl. at ¶22; Parker

22  Decl. at ¶6; and Will Decl. at ¶4)

23  **VI.**

24  **LEGAL ARGUMENT**

25  A.    **GENERAL LEGAL PRINCIPLES AND BURDEN OF**
        **PROOF APPLICABLE TO MOTIONS RE**
26          **SPOLIATION OF EVIDENCE.**

27        The elements CVT must, but cannot, prove to procure any sanctions against

28  Defendants are set forth by the court in <u>Zubulake v. UBS Warburg LLC</u> (S.D. N.Y. 2004) 229 F.R.D.

422, 430:

> "A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

"[A] finding of bad faith is pivotal to a spoliation determination." See <u>Bull v. UPS, Inc.</u> (3d Cir. 2012) 665 F.3d 68, 79. Terminating sanctions and adverse inference sanctions based on spoliation are considered to be extreme sanctions, which "should not be imposed lightly." See <u>Scalera v. Electrograph Systems, Inc.</u> (E.D. N.Y. 2009) 262 F.R.D. 162, 171. A spoliation inference is inappropriate when the circumstances indicate evidence was lost or accidentally destroyed. See <u>Bull v. UPS, Inc.</u>, supra, 665 F.3d at 79. A spoliation inference "does not arise where the destruction was a matter of routine with no fraudulent intent." See <u>Bull v. UPS, Inc.</u>, supra, 665 F.3d at 79.

"[T]he burden of proof on a spoliation claim lies with the party asserting that spoliation of evidence has taken place." See <u>Byrnie v. Town of Cromwell, Bd. Of Educ.</u> (3d Cir. 2001) 243 F.3d 93, 107-08.

CVT cannot meet its burden to obtain any form of sanctions against Defendants.

## B. DEFENDANTS' DUTY TO PRESERVE EVIDENCE DID NOT ARISE UNTIL CVT FILED ITS COMPLAINT IN JULY 2013.

The obligation to preserve evidence arises when litigation is reasonably anticipated. See <u>Apple Inc. v. Samsung Electronics Co., Ltd.</u> (N.D. C.A. 2012) 881 F.Supp.2d 1132, 1136. CVT's Motion asserts that Defendants' duty to preserve evidence arose as early as May 2011 and/or when CVT attorney Gerald North sent a "preservation notice" to all CVT shareholders on January 6, 2012.

However, as of at least September 2012, CVT's Chairman, Mula, was still contacting BASIL on a regular basis seeking an additional investment from him. On September 11, 2012, Mula sent BASIL two (2) emails in which he stated "I had a lawyer in my ear everyday, influencing me to be someone I am really not." The lawyer to which Mula was referring was Gerald North (his

1   current lawyer). Mula also stated, "I do remember how things fell apart last, especially with Gerald

2   continued to throw rocks in the sandbox." Mula finished that email by stating, "FYI, Gerald's term

3   is up in December." BASIL shared Mula's emails with the other Defendants.

4          At that time, Defendants had no reason to believe, nor did they believe, CVT was

5   going to file this lawsuit. How could they? Mula told Defendants to essentially disregard Gerald

6   North because he would be out by the end of 2012, and Mula apologized for his and Mr. North's

7   behavior in the same email. Mula filed this lawsuit in July 2013 — after he was unable to obtain

8   additional investments from Defendants and Berg. That is when the preservation duty arose.

9          **C.     TERMINATING   SANCTIONS   AND   ADVERSE
               INFERENCE SANCTIONS ARE UNJUSTIFIED AND
10             UNWARRANTED.**

11             **1.     No Terminating Sanctions Warranted.**

12          A court may only dismiss a party's claims and/or render judgment

13  against a party as a spoliation sanction if it makes a finding of "willfulness, fault, or bad faith." See

14  <u>Leon v. IDX Corp.</u> (9th Cir. 2006) 464 F.3d 951, 958. Before imposing such a harsh penalty, the

15  court must consider: (1) the public's interest in expeditious resolution of litigation; (2) the court's

16  need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public

17  policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

18  See <u>Leon v. IDX Corp.</u> (9th Cir. 2006) 464 F.3d 951, 958.

19          Here, there is absolutely no basis to dismiss Defendants' claims and/or render

20  judgment against Defendants prior to the trial of this matter. Defendants did not "wipe" any media

21  and/or willfully destroy any relevant evidence. In fact, there is nothing to support CVT's assertion

22  that any relevant evidence has not been produced. Defendants produced over 12,000 pages of

23  documents (much of it duplicative) that can be easily searched and filtered for CVT's convenience.

24          CVT suffered no prejudice. No media was wiped and no evidence was destroyed.

25  CVT received everything they requested from the forensic examination inspections, including over

26  12,000 pages of searchable, filterable documents. Moreover, as the <u>IDX</u> court noted, there is a

27  strong public policy favoring the disposition of cases on the merits. CVT is using every conceivable

28  tactic to avoid having their claims (and those of Defendants) decided on the merits. This witch-hunt

1    must stop.  CVT received a complete forensic examination of all media in Defendants' possession,

2    custody, and/or control, and all relevant documents thereto.  Defendants have the right to submit the

3    case to a trier of fact.

4             In light of the foregoing, there can be no serious contention that Defendants acted

5    willfully, in bad faith, or otherwise intentionally destroyed evidence.  In fact, Stroz Friedberg's

6    Forensic Report indicates just the opposite.  All relevant evidence is in CVT's possession.  There

7    is simple no basis to impose terminating sanctions.

8                              **2.       No Adverse Inference Sanction Warranted.**

9             In order issue an adverse inference sanction, the court must find that

10   relevant evidence was destroyed with a culpable state of mind. See <u>Zubulake v. UBS Warburg LLC</u>,

11   supra, 229 F.R.D. at 430.  "[A] finding of bad faith is pivotal to a spoliation determination."  See

12   <u>Bull v. UPS, Inc.</u>, supra, 665 F.3d at 79.

13            Lesser sanctions are also unjustified given that ***absolutely no evidence was destroyed***,

14   let alone relevant evidence, with a "culpable state of mind", <u>i.e.</u>, in bad faith.  The record makes clear

15   there was no intent to destroy evidence, and thus no spoliation.  The Stroz Freidberg Forensic Report

16   noted that none of Defendants' media was "wiped", and only temporary internet files were removed

17   from BASIL's computer as part of "system optimization and computer cleaning".  CVT was not

18   prejudiced by the removal of irrelevant, temporary internet files from BASIL's company computer.

19   In fact, BASIL's computer was backed up to a storage drive prior to its cleaning — and the storage

20   drive was provided for forensic examination.

21            CVT's conclusory statements that Defendants "destroyed evidence" are insufficient

22   for a finding of spoliation.  Defendants did not destroy any evidence.  None of the evidence suggests

23   fraudulent intent or bad faith on the part of Defendants.  All media was submitted to Stroz Freidberg,

24   12,000 pages of searchable, filterable documents were produced to CVT, and the Forensic Report

25   found no evidence of "wiping".  There is simply no basis to impose an adverse inference sanction.

26                              **3.       CVT Confuses "Potentially Relevant" with "Relevant".**

27            CVT's Motion conveniently omits the fact that all documents allegedly

28   deleted by Defendants were deemed "potentially relevant" and not actually "relevant".  Due to the

---

1   search terms, virtually every document on Defendants' devices were deemed "potentially relevant".

2   The search terms include keywords such as: "clear", "view", "bar", "new", "works", "big", "Paul",

3   "Mark", "mission", "west", "Joe", "Joy", etc. A document containing any one of these generic

4   keywords was deemed "potentially relevant" for purposes of extraction.  In fact, Defendants

5   reviewed "potentially relevant" documents extracted from their media dating as far back as 1998

6   (Defendants did not know of CVT's existence until 2010).  "Potentially relevant" is not "relevant".

7   "Relevant" documents were not destroyed, and certainly not in bad faith.

8          Evidence that has been produced cannot be deemed "spoliated".  ***CVT is in***

9   ***possession of the very documents it claims were destroyed by Defendants***.  CVT has every relevant

10  document (over 12,000 pages, some of which is duplicative of earlier productions) extracted from

11  Defendants' media pursuant to a rigorous forensic examination.

12          **D.   EVEN ASSUMING, ARGUENDO, EVIDENCE WAS**
             **DESTROYED, SPOLIATION SANCTIONS CANNOT**
13           **BE OBTAINED WHERE THE DESTRUCTION WAS A**
             **"MATTER OF ROUTINE WITH NO FRAUDULENT**
14           **INTENT".**

15          **1.   "Ccleaner" Use Was Routine, Good-Faith System Operation.**

16          CCP §§2031.300(d)(1) and 2031.310(j)(1) provide as follows:

17          "Notwithstanding subdivision (c), absent exceptional circumstances,
             the court shall not impose sanctions on a party or on any attorney of
18           a party for failure to provide electronically stored information that has
             been lost, damaged, altered, or overwritten as a result of the routine,
19           good-faith operation of an electronic information system."

20          CVT's Motion makes the misrepresentation that BASIL "wiped" over 50,000 files

21  from his computer by using "Crap Cleaner".  Of course, that notion is easily dispelled by Stroz

22  Freidberg's Forensic Report, which stated the files were located in a "temporary directory" and

23  "appears to be connected to the use of system optimization and computer cleaning programs", i.e.,

24  a routine, good faith operation of an electronic information system.  The Forensic Report also stated

25  that "Crap Cleaner" targets temporary internet files and internet cookies, which cannot possibly be

26  construed by CVT as "relevant" to this matter.

27          Further, BASIL did not install or operate "Crap Cleaner" on his company computer.

28  Multiband installed and performed the system optimization to speed up BASIL's eight (8) year old

---

DEFENDANTS' OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS  [5:13-CV-02744-BLF]          PAGE 18

1  laptop.  Moreover, there is not one shred of evidence that any relevant information was lost.  Clearly,

2  no sanctions can be imposed for the generic use of "Crap Cleaner" on BASIL's computer.

3         **2.     No Fraudulent Intent re Old Media Lost, Stolen, or Discarded.**

4               A spoliation inference "does not arise where the destruction was a

5  matter of routine with no fraudulent intent."  See Bull v. UPS, Inc., supra, 665 F.3d at 79.  As set

6  forth in Defendants' declarations regarding media unavailable for production, there is nothing

7  nefarious or sinister as to why certain media was unavailable, e.g., old email accounts with long-

8  forgotten passwords, previous mobile phones discarded upon receipt of a new mobile phone, a work

9  iPad returned to the company, a stolen iPad, etc.

10              Defendants produced all media in their possession, custody, and/or control.  There

11  is no evidence that any relevant documentation was not produced by Defendants, let alone destroyed

12  with a fraudulent intent.  Even assuming, arguendo, relevant evidence was lost, it would have been

13  due to a matter of routine (old passwords, discarded phones upon receipt of a new phone, etc.).  No

14  sanctions can be imposed against Defendants in this matter.

15

16  **E.     MONETARY SANCTIONS CANNOT BE AWARDED,
        AND ARE UNJUSTIFIED AND UNWARRANTED.**

17              For the reasons set forth above, CVT's request for monetary sanctions is

18  unjustified and unwarranted.  Further, CVT's counsel did not meet and confer with Defendants'

19  current counsel prior to filing CVT's Motion for attorney's fees, in violation of CAND Civil Local

20  Rules - Rule 54-5.  Moreover, Defendants incurred over $125,000.00 in expenses in producing: (i)

21  their media for forensic examination; and (ii) documents to CVT in a format that can easily be

22  searched and filtered.  CVT was not prejudiced by waiting one (1) additional business day for

23  Defendants' production. The imposition of any monetary sanctions would be unconscionable, let

24  alone the outrageous amount of nearly $200,000.00 sought by CVT.

25                                    **VII.**

26                          **OBJECTIONS TO EVIDENCE**

27              It is unfathomable that CVT would violate CAND Civil Local Rules - Rule 7-5(a)-(b)

28  by submitting a declaration containing a multitude of both argumentative and conclusory statements,

1  and unauthenticated documents.  Yet, that is exactly what CVT did.  Defendants object to the

2  following evidence set forth by CVT in support of the Motion:

3  **Objections to Declaration of Doug Tilley, Esq.**

4  **Objection Number 1**

5  Defendants object to the entirety of the Tilley Declaration at ¶3, and any exhibits

6  thereto, especially the portion of ¶3 pertaining to "sworn statements" obtained by CVT and alleged

7  contents of said "sworn statements".

8  **Grounds for Objection 1:**   Irrelevant [Evid. Code §§401-403] because it does not

9  pertain to this Motion, i.e., purported "spoliation"; argumentative and conclusory [CAND Rule 7-5];

10  lack of foundation; inadmissible and impermissible opinion [Evid. Code §701; Hayman v. Block

11  (1986) 176 Cal.App.3d 629, 638-639; and Hoover Community Hotel Corp. v. Thomson (1985) 167

12  Cal.App.3d 1130, 1136-1137]; conclusion of law; conclusion of fact [Snider v. Snider (1962) 200

13  Cal.App.2d 741, 751]; and inadmissible hearsay [Evid. Code §801].

14  **Objection Number 2**

15  Defendants object to the entirety of the Tilley Declaration at ¶4, and Exhibits "A" and

16  "B" thereto, especially the portions of ¶4 stating "after discovering what Rasnick had done" and

17  "Defendants continued to call and meet with Berg to turn him against CVT".

18  **Grounds for Objection 2:**   Irrelevant [Evid. Code §§401-403] because it does not

19  pertain to this Motion, i.e., purported "spoliation"; lack of personal knowledge; argumentative and

20  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; inadmissible and

21  impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law;

22  conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

23  **Objection Number 3**

24  Defendants object to the entirety of the Tilley Declaration at ¶5, and Exhibit "C"

25  thereto, especially the portions of ¶5 stating "Given Defendants' ongoing efforts to interfere with

26  CVT's relationship with Berg", "Defendants' co-conspirators", and "proprietary CVT information

27  for the benefit of Skunk Works

28  **Grounds for Objection 3:**   Irrelevant [Evid. Code §§401-403] because it does not

1  pertain to this Motion, i.e., purported "spoliation"; lack of personal knowledge; argumentative and

2  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; inadmissible and

3  impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law;

4  conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

**Objection Number 4**

6        Defendants object to the entirety of the Tilley Declaration at ¶6, and Exhibit "D"

7  thereto.

8        **Grounds for Objection 4:**     Irrelevant [Evid. Code §§401-403] because it does not

9  pertain to this Motion, i.e., purported "spoliation"; lack of personal knowledge; argumentative and

10  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; inadmissible and

11  impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law;

12  conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

**Objection Number 5**

14        Defendants object to the entirety of the Tilley Declaration at ¶7, and Exhibit "E"

15  thereto, especially the statement, "Rasnick further advised his co-conspirators to misrepresent facts

16  in order to ward off a lawsuit by CVT."

17        **Grounds for Objection 5:**     Irrelevant [Evid. Code §§401-403] because it does not

18  pertain to this Motion, i.e., purported "spoliation"; lack of personal knowledge; argumentative and

19  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; inadmissible and

20  impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law;

21  conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

**Objection Number 6**

23        Defendants object to the entirety of the Tilley Declaration at ¶8, and Exhibit "F"

24  thereto, especially the statement, "Rasnick tried to marshal CVT's shareholders ... against CVT."

25        **Grounds for Objection 6:**     Irrelevant [Evid. Code §§401-403] because it does not

26  pertain to this Motion, i.e., purported "spoliation"; lack of personal knowledge; argumentative and

27  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; inadmissible and

28  impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law;

1  conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

2  **Objection Number 7**

3  "In light of obvious deficiencies in Defendants' discovery responses and document

4  productions", and "Defendants' steadfast refusal to meet and confer with CVT regarding the same

5  ..." (Tilley Decl. at ¶11)

6  **Grounds for Objection 7:**   Argumentative and conclusory [CAND Rule 7-5];

7  inadmissible and impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra];

8  conclusion of law; and conclusion of fact [Snider, supra].

9  **Objection Number 8**

10  "... or any of the hundreds of incriminating emails CVT obtained from third parties

11  and produced to defendants." (Tilley Decl. at ¶12)

12  **Grounds for Objection 8:**   Argumentative and conclusory [CAND Rule 7-5]; lack

13  of authentication [CAND Rule 7-5]; lack of foundation; inadmissible and impermissible opinion

14  [Evid. Code §701; Hayman, supra; and Hoover, supra]; conclusion of law; conclusion of fact

15  [Snider, supra]; inadmissible hearsay [Evid. Code §801].

16  **Objection Number 9**

17  "... confirming, among other admissions, that Defendants failed to take a single step

18  to preserve relevant information ...", and the portions of ¶13 pertaining to when Mula allegedly

19  advised Defendants of litigation in 2011 and Defendants' alleged communications with purported

20  counsel in 2011 (Tilley Decl. at ¶13)

21  **Grounds for Objection 9:**   Lack of personal knowledge; argumentative and

22  conclusory [CAND Rule 7-5]; lack of authentication [CAND Rule 7-5]; lack of foundation;

23  inadmissible and impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra];

24  conclusion of law; conclusion of fact [Snider, supra]; and inadmissible hearsay [Evid. Code §801].

25  **Objection Number 10**

26  Defendants object to the portions of the Tilley Declaration in ¶16 pertaining to the

27  alleged "failure" to search and preserve evidence, and alleged "discarded" devices and documents.

28  (Tilley Decl. at ¶16)

1    **Grounds for Objection 10:**  Argumentative  and  conclusory [CAND Rule 7-5];

2    inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra];

3    conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

4                                    **Objection Number 11**

5            "... declined to appear for Court-ordered deposition ..."  (Tilley Decl. at ¶17)

6            **Grounds for Objection 11:**    Argumentative and conclusory [CAND Rule 7-5]; lack

7    of foundation; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and

8    <u>Hoover</u>, supra]; conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

9                                    **Objection Number 12**

10           Defendants object to the portions of the Tilley Declaration in ¶18 pertaining to the

11   alleged "failure" to search and preserve evidence, and alleged "deleted" relevant materials.  (Tilley

12   Decl. at ¶18)

13           **Grounds for Objection 12:**  Argumentative  and  conclusory [CAND Rule 7-5];

14   inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra];

15   conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

16                                   **Objection Number 13**

17           Defendants object to the portions of the Tilley Declaration in ¶19 pertaining to the

18   alleged "failure" to search and preserve evidence.  (Tilley Decl. at ¶19)

19           **Grounds for Objection 13:**  Argumentative  and  conclusory [CAND Rule 7-5];

20   inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra];

21   conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

22                                   **Objection Number 14**

23           Defendants object to the entirety of the Tilley Declaration at ¶19.

24           **Grounds for Objection 14:**    Argumentative/conclusory [CAND Rule 7-5]; lack of

25   foundation; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>,

26   supra]; conclusion of law; conclusion of fact [<u>Snider</u>, supra]; inadmiss. hearsay [Evid. Code §801].

27                                   **Objection Number 15**

28           "... (ii) eliminate from the scope of production several relevant email accounts and

media ... and (iii) block investigation into critical communications CVT had identified as missing from Defendants' production." (Tilley Decl. at ¶26)

**Grounds for Objection 15:** Argumentative and conclusory [CAND Rule 7-5]; lack of foundation; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra]; conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

**Objection Number 16**

Defendants object to the portions of the Tilley Declaration at ¶29 that pertain to alleged statements made by Jim KempVanee.

**Grounds for Objection 16:** Argumentative/conclusory [CAND Rule 7-5]; lack of foundation; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra]; conclusion of law; conclusion of fact [<u>Snider</u>, supra]; inadmiss. hearsay [Evid. Code §801].

**Objection Number 17**

"... during which time Defendants were actively seeking to delay enforcement of the Court's Orders regarding forensic examination", and "... including many of their co-conspirators ..." (Tilley Decl. at ¶32)

**Grounds for Objection 17:** Argumentative and conclusory [CAND Rule 7-5]; lack of foundation; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra]; conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

**Objection Number 18**

Defendants object to the entirety of the Tilley Declaration at ¶44.

**Grounds for Objection 18:** Argumentative and conclusory [CAND Rule 7-5]; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra]; conclusion of law; and conclusion of fact [<u>Snider</u>, supra].

**Objection Number 19**

"... Rasnick admits ...", and "... a document that Defendants have steadfastly denied existed." (Tilley Decl. at ¶45)

**Grounds for Objection 19:** Argumentative and conclusory [CAND Rule 7-5]; inadmissible and impermissible opinion [Evid. Code §701; <u>Hayman</u>, supra; and <u>Hoover</u>, supra];

1    conclusion of law; and conclusion of fact [Snider, supra].

2                            **Objection Number 20**

3          "As a direct result of Defendants' discovery abuses ...", "... in seeking to secure

4    Defendants' compliance with the Federal Rules and this Court's Orders ...", and "... in the absence

5    of Defendants' misconduct ..." (Tilley Decl. at ¶¶46, 47, and 48)

6          **Grounds for Objection 20:**  Argumentative and conclusory [CAND Rule 7-5];

7    inadmissible and impermissible opinion [Evid. Code §701; Hayman, supra; and Hoover, supra];

8    conclusion of law; and conclusion of fact [Snider, supra].

9                                   **VIII.**

10                                **CONCLUSION**

11         CVT's Motion, much like its entire case, is analogous to The Wizard of Oz — one

12   quick peak behind the curtain, and the sham is revealed.  All relevant documents were produced;

13   there is no evidence to the contrary.  Defendants accounted for all media in their possession, custody,

14   and/or control.  Defendants timely produced over 12,000 pages of documents that can be easily

15   searched and filtered through an accessible online database.  Defendants incurred fees in excess of

16   $125,000.00 (not including attorney time) for the forensic examination of their media. Defendants

17   got a clean bill of health from Stroz Freidberg, i.e., no evidence of any "wiping" of media. Moreover,

18   the production of nearly 100,000 pages of documents in this matter negates CVT's ridiculous

19   "spoliation" claim.  For the reasons set forth above, the Court should deny the Motion in its entirety,

20   and decline to sanction Defendants.  Considerations of law, equity, and common sense all dictate so.

21   Dated: January 20, 2015                    CROSBY & CROSBY,
                                                A PROFESSIONAL LAW CORPORATION
22
23                                       By:    /s/ Michael C. Crosby

24                                              _____
                                                MICHAEL C. CROSBY
                                                Attorney for Defendants
25                                              JOHN H. RASNICK, J. BASIL MATTINGLY,
                                                WILL RASNICK, PARKER MATTINGLY,
26                                              and M&R SOLUTIONS, LLC

27

28   OppositionToMotionForSpoliation-MemoPA-rev012015.wpd