**Doug Tilley**

| | |
|---|---|
| **From:** | Mike Crosby <Mike@crosbyplc.com> |
| **Sent:** | Tuesday, March 17, 2015 11:31 PM |
| **To:** | Doug Tilley |
| **Cc:** | Doug Colt; Renee Bea; Matt Crosby |
| **Subject:** | Re: CVT v. Rasnick, et al. --- Expert Witness Report of James A. Turner |
| **Attachments:** | CertificateofServiceByEmail-MCC-031715.pdf; ExpertWitnessReport-JamesATurner-031715.pdf |

Counsel,

Attached to this email you will find the following documents served today (March 17, 2015) in the above-referenced matter:

1. Rebuttal Expert Witness Report of James A. Turner, MBA, CPA (dated March 17, 2015); and
2. Certificate of Service (dated March 17, 2015).

BCC: Clients

Michael C. Crosby, Esq.
Crosby & Crosby, A Professional Law Corporation
1570 The Alameda, Suite 200
San Jose, CA 95126
Tel: (408) 370-7500
Fax: (408) 984-5063
Email: mike@crosbyplc.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | | |
|---|---|---|
| CLEAR-VIEW TECHNOLOGIES, INC, a California Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 13-CV-02744-BLF (PSG) |
| vs. | ) ) | |
| JOHN H. RASNICK, J. BASIL MATTINGLY, WILL RASNICK AND PARKER MATTINGLY, individuals residing in Kentucky; and M&R SOLUTIONS, LLC, a dissolved Kentucky Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

REBUTTAL EXPERT WITNESS REPORT

OF

JAMES A. TURNER, MBA, CPA

March 17, 2015

**TABLE OF CONTENTS**

I. ASSIGNMENT ................................................................................................1

II. QUALIFICATIONS ........................................................................................2

III. DAMAGES METHODOLOGY ......................................................................2

IV. VALUATION OF CVT AS OF JUNE 17, 2011 ...........................................3

    A. Description of CVT ................................................................................3

    B. Valuation Model Data and Assumptions ..............................................4

    C. Discount Rate .........................................................................................7

    D. The Valuation of CVT as of June 17, 2011 ..........................................8

V. QUANTIFICATION OF ALLEGED DAMAGES .........................................16

    A. Prejudgment Interest ............................................................................16

    B. Current Value of CVT ..........................................................................16

    C. CVT's Failure to Mitigate Alleged Damages .......................................16

CONCLUSION ....................................................................................................17

**EXHIBITS**

**Exhibit 1**      Curriculum Vitae of James A. Turner

**Exhibit 2**      Analysis of Failed Technology Utilized by Clear-View Technologies, Inc**.**

                   -Prepared by Earl McCune, Ph.D., Technology consultant to James A. Turner

**Exhibit 3**      Documents and Data Reviewed and Considered

## I.    ASSIGNMENT

1.    My name is James A. Turner.  I have been asked by counsel for defendants and counterclaimants in this matter to review and comment in the capacity of a rebuttal expert on the subject matter set forth in plaintiff's Expert Witness Report of Jonathan A. Neuberger (Neuberger) dated February 17, 2015.[1]

2.    Defendants and counterclaimants John Rasnick and Basil Mattingly are shareholders of plaintiff clear-view technologies, Inc. ("CVT", "the Company").  CVT was formed in 2006 to develop a product (the "BarMaster™"), that utilizes a radio frequency identification ("RFID") label/weight displacement measurement system, along with video, to monitor the use of bottles of alcohol for the bar and nightclub industry. Defendants and counterclaimants Parker Mattingly, Will Rasnick, and M&R Solutions, LLC, agreed to assist in distributing the BarMaster™. Defendants allege that as a result of gross mismanagement, CVT does not have a working product (despite raising nearly $9 million in investor funds), is without capital, and is essentially defunct. Defendants further allege that after an unsuccessful attempt in January 2011 to install the BarMaster™ at an investor's restaurant in Virginia, CVT, and its Chairman, Paul Mula, Jr., solicited investor Clyde Berg ("Berg") for additional investment in CVT.  Berg declined.  Berg testified under oath at his deposition in this matter that nobody influenced his decision to not make a further investment in CVT.  Defendants allege that they did not dissuade Berg from making an additional investment in CVT.[2]

3.    Defendant's counsel has asked me to review and assess the subject matter set forth in Neuberger's report and to prepare a written response.

4.    I am being compensated at a rate of $425 per hour for my work in this case; I will be compensated at the same rate if I am asked to testify at deposition or trial.  My compensation does not depend in any way on the outcome of this matter.

---

[1] FRCP 26(a)(2)(D)(ii)

[2] Defendants and Counterclaimants' Opposition to Plaintiff's Motion for Sanctions and Costs, and Renewed Motion For Expenses and Attorney's Fees Under Fed. R. Civ. P. 37(a)(5)(A) [Dkt No. 134 at p. 2] filed in Clear-View Technologies, Inc. v. John H. Rasnick, et al., U.S. District Court, Northern District of California, Case No. 5:13-CV-02744-BLF.

## II.     QUALIFACTIONS

I am the Managing Director of Forensic Solutions, LLC, a forensic & investigative accounting firm located in San Jose, California.  My current *curriculum vitae* is attached at **Exhibit 1** which contains my licensure, certifications, qualifications, academic achievements, prior testimony and a narrative of certain cases that describe my past experience in similar cases germane to this matter.

Also listed is my professional experience and qualifications in the areas of:

- Business Valuation
- Economic Damages
- Forensic and Investigative Accounting
- Private Equity Due Diligence Investigations
- Financial Fraud Investigations
- Post Acquisition Disputes Neutral
- Court-appointed Neutral

## III.     NEUBERGER'S DAMAGES METHODOLOGY

Neuberger makes the following threshold assumptions in his report, which significantly limit the factors he considered and the reasoning relied upon.  Neuberger assumes:

a.     That the alleged economic harm to the valuation of CVT occurred on June 17, 2011; and

b.     That CVT had enterprise value prior to June, 17 2011; and

c.     That the economic harm CVT allegedly experienced resulted solely from the personal decision of one investor not to make additional investment in CVT and for no other reasons; and

d.     That the decision of one investor (out of 65)[3] not to increase the size of his investment in CVT was caused solely by defendants, and for no other reasons; and

e.     That the loss of value calculations were performed with reasonable certainty based on facts, not speculation, and considered all of the best available evidence; [4] and

---

[3] CVT016039

f.      That each and every "non-binding sales order" gathered at the 2011 Las Vegas Trade Show "materializes" into real sales.[5]

When a loss of value claim is based on the opinion of an expert witness, the value of that opinion rests not in the conclusions reached based on rote, mechanical calculations, but in the factors considered and reasoning relied upon.[6]  When an expert bases his or her opinion on assumptions not supported by the record, or upon factors which are speculative, remote or conjectural, the conclusion has no evidentiary value.[7]

Neuberger's damages methodology simply skips over and fails to consider several threshold issues that require inquiry, investigation and risk analysis by any competent valuation expert.

Based on my review, Neuberger's damage assessment is essentially a narrative on how to perform a calculation for which there is no foundation.

## IV. VALUATION OF CVT AS OF JUNE 17, 2011

### A. Description of CVT

Clear-View Technologies, Inc. (CVT, the Company) was formed on December 1, 2006 by Kenneth S. Bailey (Incorporator) in Newport Beach, California[8] and was allegedly capitalized on the same date with intellectual property ("IP") allegedly owned and contributed by Paul S. Mula, II in exchange for 1,000,000 shares of "Founders Stock" and 7,788,138 additional shares of "Common Stock". [9]

On September 15, 2009, Mr. Mula purportedly contributed additional intellectual property ("IP") in exchange for an additional 4,666,271 shares of "Common Stock" of CVT.[10]

---

[4] <u>Warner Constr. Corp. v. City of Los Angeles</u> (1970) 2 Cal. 3d 285, 302; and <u>S.C. Anderson, Inc. v. Bank of America</u> (1994) 24 Cal. App. 4th 529, 536.
[5] Expert Witness Report of Jonathan A. Neuberger, February 17, 2015; p. 9
[6] Pacific Gas & Electric v. Zuckerman (1987) 189/Cal. App. 3rd 1113, 1135.
[7] *Id.*.
[8] Articles of Incorporation of Clear-View Technologies filed with the California Secretary of State.
[9] See Clear-Technology, Inc. "Cap Table" dated 4-21-2011 (CVT002950)
[10] *Id.*.

Finally, Mr. Mula purportedly contributed additional intellectual property ("IP") in exchange for an additional 3,113,500 shares of "Common Stock" of CVT.[11]

In total, Mr. Mula received 16,567,909 shares of CVT stock, representing 61.60% ownership of the Company[12], in exchange for capitalizing the Company with intellectual property he allegedly owned.

A search of the U.S. Patent Office (USPTO) patent application portal on March 3, 2015 revealed no patent applications pending or patents granted to either Paul S. Mula, Paul S. Mula, II, Paul S. Mula, Jr., Paul Mula, or Kenneth S. Bailey as of December 1, 2006.

**B. Valuation Model Data and Assumptions**

At the core of Neuberger's valuation model is his unfounded reliance on the March 11, 2011 "Las Vegas NCB Trade Show Sales Report" which consists of 31 pages of nothing more than names and contact information and referring to them as "sales orders". [13]

A sample "Sales Report" and "Show Summary" are reproduced below.[14]

### LAS VEGAS 2011 SHOW SUMMARY

| | |
|---|---|
| TOTAL SALES ORDERS | 93 |
| TOTAL ADDITIONAL HOT LEADS | 8 |
| | |
| TOTAL, NON-DISCOUNTED ORDERS, UPSIDE INCLUDED | $23,038,750 |
| TOTAL DISCOUNTED ORDERS, UPSIDE INCLUDED | $18,431,000 |
| | |
| TOTAL DISCOUNTED ORDERS, INITIAL LOCATION (no upside) | $5,803,000 |
| TOTAL DISCOUNTED POTENTIAL UPSIDE ORDERS | $12,628,000 |
| | |
| POTENTIAL ORDERS FROM HOT LEADS | $416,000 |
| POTENTIAL UPSIDE FROM HOT LEADS | $608,000 |

---

[11] *Id.*.
[12] *Id.*.
[13] CVT058569
[14] *Id.*.

The "sales order" summary, above, reflects purported "sales" totaling $23,038,750. However, not a single bonafide sale to a non-related customer actually materialized.

Nevertheless, Neuberger relies on these so called "sales" figures in support of his valuation, stating:  "I limit 2012 sales to those customers that had placed preliminary [sales] orders at the March 2011 Las Vegas Nightclub and Bar Trade Show…"

**Sample "Sales Report" from the March 2011 Las Vegas trade show. [15]**

**LAS VEGAS NCB TRADE SHOW SALES REPORT**

3/11/2011

| SALESPERSON | INITIAL AMOUNT | ADDITIONAL LOCATIONS | NOTES |
|---|---|---|---|
| Ramon Marogi | $60,000.00 | | |
| Ronny | $60,000.00 | | |
| Remon | $60,000.00 | $120,000.00 | 3 locations, need complete contact info from Remon (guessed on address based on google search) |
| Remon | $68,000.00 | $272,000.00 | 5 locations, need complete address information from Remon |

Even the most cursory review of these "sales reports" reveals that these are not bonafide sales orders.

Neuberger also relies on the CVT 2011 Business Plan in support of his valuation.  On page 9 the Business Plan[16], CVT reports the so-called "sales orders" received from the March 2010 Las Vegas Trade Show, as follows:

---

[15] CVT058569
[16] CVT016045

*Sales Orders*

During the Las Vegas Nightclub and Bar Convention, March 9th and 10th 2010, The BarMaster product received 22 sales orders for a total of 62 establishments. Sales orders amounted to $4,422,789, and eight strong leads combined with signed interests account for an additional $422,430.

Under Generally Accepted Accounting Procedures (GAAP), a "sale" does not take place until all of the following criteria are met:

- Evidence of the <u>final</u> understanding between the parties to the transaction exists, and

- The sales price is fixed or determinable, and

- Delivery has occurred or services have been performed, and

- Collectability is reasonably assured.[17]

Once again, not a single bonafide sale actually materialized out of $4.4 million so-called "sales orders". In fact, these purported "sales orders" were "non-binding".[18]

In spite of the overwhelming evidence that not a single bonafide sale had materialized from either the 2010 <u>or</u> the 2011 Las Vegas Trade Show, Neuberger (incredibly) relies on these data to support the grossly over-stated sales projections in his expert report and then, with no foundation what-so-ever he reports to the court that his assumptions were "conservative" (see paragraph immediately below).

Under the caption **"Valuation Model Data and Assumptions"** Neuberger states:

"According to CVT's management, the company planned to begin generating sales revenues before the end of 2011. This is reflected in CVT's 2011 business plan and pro forma financial projection. **I assume conservatively**, however, that CVT would have booked no revenue during the latter part of 2011 had Defendants' alleged conduct not taken place, and instead would have focused its efforts on finalizing and improving the product and having it ready for sales to begin in 2012. **I limit 2012 sales to those customers that had placed preliminary orders at the March 2011 Las Vegas Nightclub and Bar trade show**…"[19] (emphasis added)

---

[17] FASB ASC 605-10-S99
[18] CVT000182
[19] Expert Witness Report of Jonathan A. Neuberger, February 17, 2015; p. 9

The CVT 2011 Business Plan continues with more unfounded claims:

**"CVT is also currently closing sales for two location in Los Gatos, CA for an estimated $130,000 in revenue."[20]**

Neither one of these so-called "sales" materialized either.

Neuberger's unfounded sales assumptions did not hold true in 2010 or in 2011. Nevertheless, his "sales" projections which rely on bogus 2011 Las Vegas "sales order" data go from zero in 2011, to an astronomical $488,207,000[21] over the following 5 years (2012 – 2016)[22]. These projections are not supported by the record that is, and was, readily available to Neuberger and hence any conclusions drawn from these flawed data are speculative and have no evidentiary value.[23]

## C. Discount Rate

Neuberger utilizes a discount rate that is too low for the risks associated with a company that does not have a working product, fatally flawed technology, poor management, no patents, and has never made a bonafide sale from inception in 2006 through June of 2011, approximately 5 years.

If we turn to venture capital required rates of returns, we are taught a more realistic risk adjusted rate of return for small start-up companies still in the R&D capital stage of development which better informs the required risk adjusted rate for CVT.

---

[20] CVT016045
[21] CVT Revenue Projections Spreadsheet, Expert Witness Report of Jonathan A. Neuberger, February 17, 2015;
[22] *Id.*.
[23] Pacific Gas & Electric v. Zuckerman (1987) 189/Cal. App. 3rd 1113, 1135.

There are several studies on this subject that demonstrate my critique of this section of Neuberger's report.  I summarize them below:

| | |
|---|---|
| QED Research: | 50% - 70% [24] |
| Harvard Business School: | 50% - 70% [25] |
| Oregon Graduate Institute: | 70% - 100% [26] |
| Babson College and HVA Studies: | 60% - 125% [27] |

Here, a series of academic/expert studies support a risk adjusted rate of at least 50% - 70%.

## D. The Valuation of CVT as of June 17, 2011

Neuberger values CVT as of June 17, 2011 at $88,699,000.  This valuation is severely flawed for several reasons already discussed elsewhere in this report.  However, conspicuously absent from Neuberger's valuation report is an independent and objective analysis of the Bar & Nightclub industry other than to simply rehash CVT's marketing materials.  Also missing is a critical analysis of the Company's management (even the best laid business plans can run afoul when incompetent or inexperienced senior management do not execute skillfully).  Further, Neuberger completely avoids any discussion of the fatally flawed technology and design that prevented both the San Jose installation the Roanoke, VA installing from functioning.  All of these analyses are required in any competently prepared business valuation as they have a direct bearing on the value of any company.

### Failure to Analyze the Risk of Technology & Design Failure

Neuberger ignores the impact of repeated technology & design failures and their affects on the value of the Company.

---

[24] Plummer, James L. QED Research Inc.: 1987.
[25] Scherlis, Daniel R. and William A. Sahlman. Harvard Business School: 1989.
[26] Kusler, Darien. Oregon Graduate Institute: 2005
[27] Keehan, Paul. InterFinancial Ltd. Data from Babson College and HVA Studies.

Neuberger also ignores the undisputed fact that the BarMaster failed in every attempted installation.

All of these product defect issues directly impair the ability of the Company to scale its only product and has a material adverse affect on the value of the Company.  Every bar is configured differently and each location will require expensive custom analysis and RF signal configuration.  See the Analysis of Failed Technology Utilized by Clear-View Technologies, Inc. at **Exhibit 2**.

**No Analysis of the Bar & Nightclub industry and trends**.

"Like many other small businesses, 80.0% of bars and taverns fail financially within the first five years." [28]

"Over the next five years, the industry is expected to continue to experience competition from nonindustry establishments, such as restaurants, as well as from people opting to stay at home. This will result in industry employment declining 1.8% per year to 355,481 persons and the number of industry establishments falling 1.1% per year to 63,474. [29]

**Key attitudinal changes on alcohol consumption**

Changes in society's attitude toward the consumption of alcohol, including changes in the type of alcohol being consumed and where (i.e. at home or at a pub/tavern), is occurring.  Also, stricter drunk driving laws and enforcement are also having a direct impact on this industry. [30]

With the onset of the recession in 2008, the Bars, Nightclubs and Drinking Establishments industry witnessed its revenue contract for the first time in more than 10 years. [31]

As the economy fell deeper into a recession and unemployment numbers rose, consumers became more selective about how they spent their disposable income. In

---

[28] IBISWorld Industry Report 72241; Bars, Nightclubs & Drinking Establishments in the U.S. (July 2010)
[29] *Id.*.
[30] *Id.*.
[31] *Id.*.

2009, personal consumption declined 0.6%, and leisure activities like visiting bars, nightclubs and drinking establishment were on the chopping block. Some consumers opted to drink in their homes instead of visiting bars.[32]

After peaking in 1981, alcohol consumption has slowly declined over time, reflecting increased awareness of the harmful effects of overdrinking, "zero tolerance" laws in some states in relation to underage drinking and the overall changing perception of alcohol. Stricter alcohol consumption regulations regarding drunk driving and being intoxicated in public places have influenced consumption patterns[33]

Profit margins will continue to be tight due to ongoing competition within and from other licensed premises that sell alcoholic beverages. The number of industry establishments is forecast decline at an average annual rate of 1.1% to 63,474 during the five years to 2015.[34]

Gradual aging of the population will result in a continuing fall in overall alcohol consumption.

The Bars, Nightclubs and Drinking Establishments industry operates in a market where alcohol consumption is declining overall as a proportion of total household expenditure.[35]

Excise and other taxes at the Federal, State and Local level are estimated to account for between 44% and 55% of the retail price of alcohol.   Given the government's reliance on alcohol taxes as a revenue source, the industry is vulnerable to significant tax increases, especially when economic growth slows and governments seek to raise more revenue. [36]

---

[32] *Id..*
[33] *Id..*
[34] *Id..*
[35] *Id..*
[36] *Id..*

**Industry is slow to adopt technology**

| Barriers to Entry checklist | Level |
|---|---|
| Competition | High |
| Concentration | Low |
| Life Cycle Stage | Mature |
| Capital Intensity | Medium |
| Technology Change | Low |
| Regulation & Policy | Heavy |
| Industry Assistance | Low |

SOURCE: WWW.IBISWORLD.COM

**The numbers of drinking establishments are shrinking and revenue growth is barely keeping up with inflation.**

**Annual Change**

| | Revenue (%) | Industry Value Added (%) | Establish-ments (%) | Enterprises (%) | Employment (%) |
|---|---|---|---|---|---|
| 2002 | 4.0 | 3.3 | 1.3 | 1.3 | 3.6 |
| 2003 | 6.7 | 6.5 | -2.0 | -2.0 | 1.2 |
| 2004 | 3.1 | 3.0 | 0.7 | 0.6 | 2.7 |
| 2005 | 4.0 | 3.5 | -1.0 | -1.0 | -2.4 |
| 2006 | 8.9 | 8.4 | -0.8 | -0.9 | 2.7 |
| 2007 | 5.1 | 4.7 | -1.1 | -1.0 | -1.1 |
| 2008 | -1.2 | -2.4 | -1.6 | -1.1 | -1.2 |
| 2009 | -9.3 | -10.2 | -2.1 | -1.9 | -2.3 |
| 2010 | 1.1 | 0.6 | -1.1 | -0.9 | -1.6 |
| 2011 | 3.5 | 4.2 | -1.0 | -1.0 | 2.0 |
| 2012 | 3.2 | 3.0 | -1.1 | -1.1 | -1.1 |
| 2013 | 2.2 | 1.9 | -1.2 | -1.0 | -1.0 |
| 2014 | 2.3 | 1.9 | -1.1 | -1.1 | -1.0 |
| 2015 | 2.4 | 2.0 | -1.0 | -1.0 | -1.0 |
| Sector Rank | 9/12 | 9/12 | 7/12 | 8/12 | 10/12 |
| Economy Rank | 352/702 | 372/703 | 419/700 | 368/689 | 501/703 |

37

---

[37] *Id..*

11

**CVT itself identifies several risk factors that Neuberger ignores in his valuation of the Company** [38]

"Our products have not gained broad market acceptance, and there is no assurance that such will develop."  CVT000176

"There is no assurance that we will have significant proof of performance demonstrations that will lead to sales of our products and services."  CVT000176

"One of our founding shareholders has significant voting power and could take actions that may not be in the best interest of other stockholders. A single shareholder controls in excess of 50% of the voting rights associated with our outstanding common stock (prior to this offering) and can therefore exert significant control over our management and affairs requiring stockholder approval, including approval of significant corporate transactions. This concentration of ownership may not be in the best interests of all our stockholders."  CVT000177

"As of June 30, 2011, we had negative working capital of $2.6 million and a cumulative net loss of $9.5 million. Such factors raise substantial doubt about our ability to continue as a going concern."  CVT000178

"Management arbitrarily determined the offering price of the shares.  The price bears no relationship to our assets, book value, net worth or other economic or recognized criteria of value."  CVT000178

"We have broad discretion in the use of the net proceeds from this offering and may not use them effectively.

"...the broad discretion it affords entails increased risks to the investors in this offering." CVT0000178

"We face direct competition from companies with far greater financial, technological, manufacturing and personnel resources."

---

[38] CVT Offering Memorandum, December 5, 2011Common Stock Offering; December 19, 2011 Warrants Offering; and December 19, 2011Convertable Preferred Offering; Collectively:  CVT000170-281.

"Many of the current and potential future competitors have substantially more engineering, sales and marketing capabilities and broader product lines than we have." CVT000178

"...some of our intellectual property is not covered by any patent or patent application, and, despite precautions, it may be possible for third parties to obtain and use our intellectual property without authorization." CVT000179

"We do not know whether any patents will be issued from pending or future patent applications or whether the scope of the issued patents is sufficiently broad to protect our technologies or processes. Moreover, patent applications and issued patents may be challenged or invalidated. We could incur substantial costs in prosecuting or defending patent infringement suits. Furthermore, the laws of some foreign countries may not protect intellectual property rights to the same extent, as do the laws of the U.S. Some of our intellectual property may lapse, or may already have lapsed, due to non-payment of fees."  CVT000179

"If third parties claim that our products infringe upon their intellectual property rights, we may be forced to expend significant financial resources and management time litigating such claims and our operating results could suffer."  CVT000179

"Identifying third-party patent rights can be particularly difficult..."

**[In rejecting all of CVT's BarMaster patent applications, the USPTO has already informed CVT that their patent applications were "anticipated" by at least 5 other patent filers.]**

"Our solution, The BarMaster™, utilizes inexpensive RFID labels that are attached to alcohol bottles which allow for their movement from local storage (in some cases from local distributor) to consumption. The RFID labels identify a bottle through a wireless network based, in part, on the bottle's own unique Universal Product Code ("UPC"). This information is captured by our proprietary software and is returned with respect to the type of alcohol and the weight of the bottle.  Once the bottle of alcohol is "tagged" with the RFID label, advanced and rugged weighing platforms located inside speed-

rails measure the precise pour amount, the specific server, and the point-of-sale transaction, while also providing a detailed history of when the brands were served, by which bartender, and the accuracy of the related financial transaction recorded "or not recorded through the ("POS") system."  CVT000180

**[see Report of Earl McCune, Ph.D., an expert in RFID technology, who reviewed the above claims and opined that the BarMaster is "fatally flawed".]**

"The March 2011 trade show in Las Vegas was a singular success and we came away from it with 96 sales orders, representing a potential of over $22 million in revenue. These orders were non-binding and subject to financing; however, we reasonably expected to close a substantial number of them.  CVT000182

*"Risks Related to Our Financial Condition"*

"As of June 30, 2011, we had negative working capital of $2.6 million and a cumulative net loss of $9.5 million. Such factors raise substantial doubt about our ability to continue as a going concern.  Management has developed plans, which it believes will permit us to continue as a going concern, there is no assurance that these plans will succeed or that we will succeed in our business."  CVT000177

*"Forward Looking Statements"*  CVT000175

"You should not place undue reliance on forward-looking statements in this memorandum. This memorandum contains forward-looking statements that involve risks and uncertainties."

"Our actual results could differ materially from those anticipated in these forward-looking statements for many reasons, including the risks we face as described in "Risk Factors" and elsewhere in this offering memorandum."

"The forward-looking statements are based on our current expectations and are subject to risks, uncertainties and assumptions.  We base these forward-looking statements on information currently available to us..."

14

"Our actual results may differ materially from the results anticipated in these forward-looking statements..."

"As a new enterprise, our operating and financial results are unpredictable."

"Investors should not rely on financial results for any fiscal period as an accurate basis for predicting or an indication of future financial results."

"Our future revenues and results of operations may significantly fluctuate due to a combination of factors, many of which are outside of management's control. Our operating results for any particular quarter may not be indicative of future operating results. Prospective investors should not rely on quarter-to-quarter comparisons of results of operations as an indication of future consolidated or segment performance. It is possible that results of operations may be below the expectations of investors."

**The most important of these factors include:**

- Customer acceptance of our products and services

- Ability to obtain contracts on favorable terms from our customers

- Ability to service the systems on a timely basis

- General economic conditions

- Timing and effectiveness of customer selection, and technologies utilized

- Availability of binding or financing in a timely manner and on affordable terms

- Timing and effectiveness of capital expenditures.

During periods of economic decline in the markets in which we operate, we are exposed to basic economic risks including a decrease in the demand for the products and services that we offer...

15

## V. QUANTIFICATION OF ALLEGED DAMAGES

### A. Prejudgment Interest

It is my opinion that plaintiff's damage claims are so speculative, remote or conjectural that no supportable claim for damages can be made with reasonable certainty in this matter.  Accordingly, prejudgment interest is moot.

### B.  Current Value of CVT

Neuberger's assignment of $600,000 as the current value of CVT is once again baseless and without foundation.

Neuberger's states in his report:

**"I understand that CVT has not been dissolved and there remain approximately 60 million shares outstanding.  These shares are potentially valuable if the company is able to restart its operations.  Based on recent sales transactions, these outstanding shares maintain a nominal market value of $0.01 per share."[39]**

"Potentially valuable" based on what?  A few shares sold at $.01/share?  The Company itself correctly admits that this is junk science and has no relationship to "fair market value"; particularly in this case.

**"Management arbitrarily determined the offering price of the shares.  The price bears no relationship to our assets, book value, net worth or other economic or recognized criteria of value."**  CVT000178 (emphasis added)

**In my opinion, the current value of CVT is zero ($0.00).**

### C.  CVT's Failure to Mitigate Alleged Damages

Neuberger completely ignores the duty of CVT's controlling shareholder, President and CEO to mitigate the Company's alleged damages.

CVT is a company that was fraught with problems from the day it was formed and capitalized with "IP" that not only did not exist, but patent applications had not even

---

[39] Expert Witness Report of Jonathan A. Neuberger, February 17, 2015; p. 14

been applied for.[40]   From the beginning, CVT had the elements of a ponzi scheme, i.e., by manufacturing the appearance of enterprise value that never existed and selling it to investors.[41] [42]

The Company's President, CEO, and controlling shareholder had no patentable "IP" at any time before, during or after the formation of CVT on December 1, 2006.  All nine (9) patent applications brought by Mula and Bailey were rejected and the official rejection notices informed Mula of each of these pre-existing patents. [43]

**CONCLUSION**

In summary, Neuberger failed to follow generally accepted standards of appraisal practice which resulted in his arriving at an erroneous conclusion of value.  He failed to accurately assess and analyze the market risks, industry risks, technology risks, management risks, and the numerous risks inherent in the Company and its intellectual property.  Neuberger took CVT's sales and marketing projections at face value without any independent inquiry and analysis.  He bases his opinion on assumptions not supported by the record and on factors which are speculative, remote or conjectural.  Accordingly his opinion has no evidentiary value.

**Based on all of the forgoing, my opinion of the value of CVT as of June 17, 2011 is zero ($0.00) and accordingly CVT's alleged damages are also zero ($0.00).**

---

[40] The first patent application was applied by Mula and Bailey for on September 27, 2007 (Application No. 11/862347), which was rejected by the International Patent office on March 20, 2008 and later by the USPTO on April 7, 2010.

[41] "A **Ponzi scheme** is a fraudulent investment operation where the operator, an individual or organization, pays returns to its investors from new capital paid to the operators by new investors… Ponzi schemes occasionally begin as legitimate businesses, until the business fails to achieve the returns expected.  The business becomes a Ponzi scheme if it then continues under fraudulent terms." - Wikipedia

[42] "According to the Securities Exchange Commission (SEC) and the North American Securities Administrators Association (NASAA), scammers pitching phony securities cost U.S. investors between $10 and $15 billion a year – more than a million dollars an hour. Many of these scams use the Ponzi method – paying off a few early investors with other investors' money – to stir up business."  -Association of Certified Fraud Examiners

[43]  See Report of Earl McCune, Ph.D. (Exhibit D) at Exhibit 2 of this report for a listing of all CVT's patent applications and rejections.

I declare that the foregoing Rebuttal Expert Witness Report is true and correct.

Executed on this date of March 17, 2015.


_____
James A. Turner, CPA

**Exhibit 1**

Curriculum Vitae of James A. Turner

# JAMES A. TURNER

**Address:**

> Forensic Solutions, LLC
> 333 W. Santa Clara Street, Suite 900
> San Jose, CA  95113
> (408) 883-4000

**Education:**

> MBA Finance, Pepperdine University, *summa cum laude*, 1996
> (Adjudicated Thesis:  Economic Analysis of China's Repatriation of Hong Kong)
>
> B.S. Accounting, San Jose State University, *with distinction*, 1979

**Licenses and Certifications:**

> **Certified Public Accountant (CPA)** - State of California (1983)
> Regulated by the State Department of Consumer Affairs and the State
> Board of Accountancy.   Requires 40 hours of continuing education +
> Ethics per year, peer review, and recertification every 2 years.  Discipline,
> including loss of license, for professional misconduct.
>
> **Accredited in Business Valuation (ABV)** – American Institute of CPA's (1998)
> Requires a 7 hour written examination + annual continuing education
> requirements and recertification every 3 years to maintain the ABV
> credential.
>
> **Certified in Financial Forensics (CFF)** – American Institute of CPA's (2008)
> Requires a 4 hour examination including case studies.  Certificate
> holders must recertify every 3 years to maintain the CFF credential.
>
> **Certified Fraud Examiner (CFE)** – Assoc. of Certified Fraud Examiners (1994)
> Requires an 8 hour examination covering:  Fraud Examination &
> Investigation, Criminology and Ethics, Financial Transactions, and Legal
> Elements of Fraud.  Requires 20 hours continuing education per year.
> Recertification required every year.

**Areas of Expertise:**

- Business Valuations
- Economic Damages
- Forensic and Investigative Accounting
- Private Equity Due Diligence Investigations
- Financial Fraud Investigations
- Post Acquisition Disputes Neutral
- Court-appointed Neutral

**Professional Experience:**

Managing Director, Forensic Solutions, LLC  (2008 – Present)

Managing Director, BDO Consulting -a division of BDO Seidman, LLP (2007-08)

Principal / Testifying Expert (economic damages), LECG, Inc.  (2006 – 2007)

Bankruptcy Fraud Analyst, U.S. Department of Justice (2005 – 1 year)

Principal, Turner Consulting, contract litigation consultant (1993 – 2004)

Senior Manager, Hemming Morse litigation practice group (1990 – 1992)

James A. Turner, CPA - private CPA practice to small & medium sized
                             businesses in Silicon Valley (1982 – 1989)

Senior Auditor, Arthur Andersen & Co (1978 – 1981)

**Qualifications:**

***Business Valuation as Damages in Litigation***

- Appointed by Santa Clara County Superior Court to perform a business valuation of a silicon wafer technology company under California Corporations Code Section 2000.  Valuation was accepted by both parties without appeal.

- Calculated loss of goodwill damages under the California Eminent Domain Act for over 30 relocated businesses on behalf of the City of San Jose and was

able to settle all but 2 cases with claimants. Testified as business valuation expert witness in the remaining 2 cases at jury trial where the City prevailed.

- Performed a business valuation of a large Bay Area refuse and recycling company in a pre-litigation dispute that arose after the founder and majority shareholder suddenly passed away.  Both sides and their advisors accepted the valuation as the basis for settlement.

- A minority shareholder in a sperm bank / fertility medical group filed a minority shareholder lawsuit for dissolution, valuation and accounting.  On behalf of defendants, performed a full written valuation of the minority shares on a going concern basis.  Provided expert testimony at deposition resulting in a comprehensive settlement by all parties.

- Performed multiple complex valuations for the owner of several Bay Area car dealerships for estate and gift tax purposes.  The IRS has accepted the valuations without further adjudication.

- Performed a business valuation for Defendants & cross-complainants related to a shareholder dispute involving a pre-school academy.

- Performed a business valuation for estate and gift tax purposes for the owner of a highly profitable silk tie manufacturer, including the intellectual property licensed by the company involving rights to the Cat-In-The-Hat logo and images.

- For the bankruptcy trustee of a chapter 7 liquidating estate, assessed the costs of remediation for a contaminated lumber mill in the Pacific Northwest taking into consideration that the property was also located in a tidal wave zone.  After significant investigation, it was determined that the costs to remediate exceeded the fair market value of the property at its highest and best commercial use.  Assisted the U.S. Trustee and 11 state, regional and local governmental and environmental agencies establish a plan to transfer the property to commercial real estate developer.  The settlement was approved by the U.S. Bankruptcy Court, closing the oldest case remaining on the docket in the Northern District of California.

- Calculated the diminution in value in 5 non-operating gas stations with leaking underground storage tanks and related ground water plumage for property tax purposes.

### *Analysis of Economic Damages*

- Served as testifying expert for the California Department of Justice acting as counsel for the State Water Resources Board in several environment damages cases, including "remediation costs" and "ability to pay" investigations of private companies.

- Served as an arbitrator in post acquisition disputes between two high-tech companies.  Binding contractual arbitration of damage clauses, earn-outs, etc.

- Calculated lost profit damages for both plaintiffs and defendants in the capacity of consultant and/or testifying expert witness in several cases.

- Served as expert witness at deposition and trial on royalty damages in a rare case where the City of San Jose was the plaintiff in a claim of royalty fraud against a national cable network.  Investigated the cover-up and fraud over a 10 year period and testified at a jury trial on damages where the City prevailed.

- Served as an expert witness at deposition and trial on behalf of Plaintiff (a neurosurgeon) in a tortious interference claim for lost profit damages against a public agency.   The Plaintiff prevailed after a jury trial.

- An international Silicon Valley chip manufacturer alleged millions of dollars of lost profits when a new stepper unit was damaged during delivery to its wafer fabrication facility.  Plaintiff filed a lost profits claim with its insurance carrier who adjusted and paid the claim and then proceeded against the manufacturer of the stepper unit.  On behalf of defendants, a complete review and financial analysis of the adjusted lost profits claim was performed and an expert report was issued along with extensive expert witness testimony.  The defense expert analysis and testimony revealed that the lost profits claim paid by the insurance carrier was defective and grossly overstated the loss, which was upheld at arbitration and two appeals.

- A California homeowners association sued over 25 developers and the general/sub contractors for defective construction of 154 homes.  On behalf of plaintiffs, prepared financial analysis of scheduled vs. as-built conditions and the related cost to remediate defects.  Provided deposition testimony and appeared at trial.  Case settled on second day of trial resulting in a multi-million dollar stipulated judgment for plaintiffs.

***Fraud Investigations***

- For a large investment bank and hedge fund in New York (plaintiff), reviewed over 40,000 loan servicing documents of originator/servicer (defendant) who filed for Chapter 11 bankruptcy protection.  Discovered several violations of the repurchase agreement, blocked account agreement, and servicing agreement.

- For a prominent hotel in San Francisco, performed a complex and confidential (under cover), investigation of cash shortages, including imaging certain employee hard drives and careful chain of custody documentation.  After discovering the cause and identifying the suspects, assisted in filing a detailed report with the San Francisco Police Department and District Attorney's Office.

- For the U.S. Department of Justice, investigated a bankruptcy fraud/money-laundering scheme involving the organized use of credit card bust-outs.  The cash was traced to South Africa and ultimately invested in real estate purchased in Canada.  The perpetrators were denied discharge by the Bankruptcy Court and turned over to the U.S. Attorney for criminal prosecution.  During the course of the investigation, it was discovered that this same fraud, involving the same people, was successfully carried out 8 years earlier on the East Coast and went undiscovered.

- An 80 year-old client of a broker-dealer/investment advisor alleged that she was sold highly speculative investments unsuitable for her age and risk tolerance.  On behalf of plaintiff, calculated damages and presented testimony at NASD arbitration where the Plaintiff prevailed.

- Served as an accounting expert witness on behalf of a California Special Needs Trust that was being looted by a professional fiduciary.  Provided expert testimony in deposition and trial in Santa Clara County Superior Court. Case was appealed by Defendants to the 6th Circuit Court of Appeals and then to the California Supreme Court over a 3 year period.  Plaintiff prevailed at trial and through all appeals brought by Defendants.  This case resulted in new legislation being passed by the California Legislature to prevent future abuse by fiduciaries to defenseless beneficiaries with special needs.  [All services on behalf of Plaintiff in this matter were provided on a pro-bono basis]

23

Received appointment in 1995 to the Panel of Resolution Advocates, Bankruptcy Dispute Resolution Program (BDRP) by Chief Bankruptcy Judge Edward D. Jellen and Dennis Montali

Served as either arbitrator or mediator for the Bar Association of San Francisco in over 50 attorney/client fee dispute matters.  [pro bono]

**Testimony**

**2014**     LIL, Inc. v. TriValley Academy; YFA, Inc.; Amy Mi, et.al. (on behalf of Defendants/Cross Complainants; ongoing)
Alameda County Superior Court No. RG11602685

People v. Ivy Lai  (on behalf of Defendant;  ongoing)
San Francisco County Superior Court No. 14018088

**2013**     The Danny Reed Special Needs Trust v. Thomas Thorpe, Dragomir Fiduciary Services, Inc.  (on behalf of Plaintiff Danny Reed)
Santa Clara County Superior Court No. 1-08-PR162201

**2011**     Zieglelman v. AZ Custom Smart Homes, LLC  (on behalf of Defendants)
Santa Clara County Superior Court No. 1-09-CV-148131

**2010**     People v. Golden Gate Petroleum (on behalf of the California Department of Justice and California State Water Resources Board)

Page Mill Properties  (Internal Investigation Report – Confidential)

Greater Sonoma Partnership v. B-Squared, Inc. (on behalf of Defendants)
Sonoma County Superior Court No. SCV-242484

**Prior:**     People v. E2C Remediation  (Served as sole Arbitrator on the issue of environmental damages / ability to pay)

Tecumseh Products Co. vs. Snowstorm Acquisition Co.; Platinum Equity Advisors (Arbitrator – Post Acquisition Dispute)

Ryan DeKeyser, Thomas Cooper, Harley Granius, and Carlos Lantz, on behalf of themselves and other similarly situated v. ThyssenKrupp Waupaca, Inc.  (Class Action; Donning and Doffing - U.S. District Court, Eastern District of Wisconsin)

BA Chub Cay, LLC v. McCrory, Moss and Kaye

BLIA Developers, Ltd, North Miami Land Holdings, Ltd, BLIA GP, LLC, North Miami Land Holdings, Inc., Paradigm Design And Construction, Inc., Brian Street And James H. Cohen v. Madeleine, LLC; Cerberus Capital Management, LP  (construction development dispute on behalf of defendants)

BA Chub Cay, LLC v. McCrory, Moss and Kaye (creditor dispute on behalf of plaintiff/creditor)

Group1internet Corporation, a California corporation v. McAfee, INC.

Ryan Gutierrez and Jamie Gutierrez, on behalf of themselves and others similarly situated, v. Auto West, INC.; Autonation USA Corporation; Wells  Fargo Bank, LTD.; AN Dealership Holding Corp., Wells Fargo Auto Finance, INC.  (auto financing class action case on behalf of plaintiffs)

Employee Misconduct Investigation on behalf of Employer (confidential)

In re: New Century TRS Holdings, Inc.  Debtors Motion for Adequate Protection  (sub-prime mortgage servicing dispute on behalf of Creditors Committee)

Irene Pastor Trustee v. Northern Trust Bank of California  (investment suitability dispute on behalf of defendant)

Sevilla, et al, v. Autonation USA Corp.  (class action "loan packing" case on behalf of Plaintiffs)

Bayfront Court Homeowners Association vs. MSM Development (construction defects case on behalf of plaintiffs)

Chellino v. Skalisky  (Trustee embezzlement case on behalf of Plaintiffs)

City of San Jose v. Telecommunications, Inc. (TCI) (royalty fraud case on behalf of City)

B&L Carpets v. Lovemark (fraudulent insurance claim on behalf of
defendant/carrier)

Robert Half v. Browning Grace

Lucas Signatone Corporation v. Chapman  (Section 2000 shareholder dispute –
court appointed arbitrator)

Commercial Bank of Fremont v. G.E. Stephens, et al

Biehl v. North Coast Medical, Inc. (minority shareholder/wrongful termination
case on behalf of plaintiff)

State of Montana v. Atlantic Richfield Company (Environmental damages case on
behalf of plaintiff)

Morton v. Phipps Ranch

Oungoulian v. Tommy's Transportation, Inc.

City of San Jose v. Engineering Consulting Services, Inc. (eminent domain
valuation case on behalf of City)

Moore v. Rollins Hudig Hall, et al

Arnold Jacobson, M.D.; Arnold Jacobson, M.D., Inc.; Donald I. Galen, M.D.;
Doanls I. Galen, M.D., Inc.  v.  Gary J. Shaprio, Esq.

Estate of James W. Kent v. L&K Debris Box, Inc. (valuation arbitrator)

City of San Jose, et al  v. Taylor Bradford, et al

Manuel P. Pinto v. Andrew J.Armanino, Jr. Accountancy Corporation,
Thomas M. Jones, Thomas M. Jones Accountancy Corporation; J. Richard
Lombardi, individually;  J. Richard Lombardi Accountancy Corporation;
Josheph F. Moore; Nancy W. Koo;  Jeffrey Soulages.  (Partnership dissolution &
wrongful termination case on behalf of defendant)

Burruss v. Anderson Desk, et al (personal injury/product defect case on behalf of defendant/manufacturer)

Quigley Construction Company v. San Francisco Carpenter's Union (wage & hour case on behalf of defendant carpenter's union)

Dorcich v. Dorcich (family law, on behalf of wife)

Moore v. Moore (Special Master)

City of San Jose v. Millcreek  (eminent domain cases on behalf of City)

Goldstone v. Research Cotrel

Calendar v. Lee

Guadalupe Rubbish Corporation v. Laidlaw, Inc.  (royalty dispute on behalf of plaintiff)

McCoy Supertread, Inc. v. Yokohama Tire Company, Inc.

Westinghouse v. Asea Brown Boveri - ABB  (Neutral Disputes Auditor selected by the parties)

Zana Murphy v. County of Santa Clara  (employment case on behalf of County)

Trip v. Shearson Lehman Hutton / Reinhart, et al  (securities case on behalf of Plaintiff)

Com Systems v. Telecom Plus

Alameda Manor v. Stewart, et al

Pacific Western Bank v. Eaton Estates

Hughes Aircraft v. Intelsat  (internal investigation on behalf of Hughes Aircraft)

Hoopa Indian Tribe v. Bank of America (fiduciary case on behalf of BofA)

Rawlings v. Test Equipment et al

Kennedy v. Shearson Lehman Hutton  (suitability case on behalf of plaintiff)

Vanderson Construction Company v. Taldon Investment Co. (predatory lending case on behalf of defendant)

Smokers Paradise v. City of San Jose (lost profits case on behalf of City)

LSI Logic, Inc. v. Ultratech Stepper, Inc.  (lost profits case on behalf of defendant)

Lewis v. Philpott Crane Company  (personal injury case on behalf of defendant)

Patterson v. California Car Wash, Inc., Larry Schadt

Western Transplantation Bone Bank v. Valley Medical Center (tortious interference case on behalf of plaintiff)