1  MATTHEW A. CROSBY, CSB #070524
   MICHAEL C. CROSBY, CSB #277849
2  CROSBY & CROSBY,
   A PROFESSIONAL LAW CORPORATION
3  1570 The Alameda, Suite 200
   San Jose, CA  95126
4  e-mail:  matt@crosbyplc.com
   Telephone:  408-370-7500
5  Facsimile:   408-984-5063

6  Attorneys for Defendants
   JOHN H. RASNICK, J. BASIL MATTINGLY,
7  WILL RASNICK, PARKER MATTINGLY,
   and M&R SOLUTIONS, LLC

8

9               UNITED STATED DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                   SAN JOSE DIVISION

12

13  CLEAR-VIEW TECHNOLOGIES, INC.,          )   CASE NO.  5:13-CV-02744-BLF
    a California Corporation,               )
                                            )
14                    Plaintiff,            )   DEFENDANTS AND COUNTER-
                                            )   CLAIMANTS' OPPOSITION TO
15  vs.                                     )   PLAINTIFF'S MOTION TO STRIKE
                                            )   AND EXCLUDE DEFENDANTS'
16  JOHN H. RASNICK, J. BASIL MATTINGLY,    )   EXPERT TESTIMONY, AND FOR
    WILL RASNICK, and PARKER               )   ATTORNEYS' FEES UNDER FED. R.
17  MATTINGLY, individuals residing in      )   CIV. P. 37(C)(1)
    Kentucky; and M&R SOLUTIONS, LLC, a     )
18  Kentucky Limited Liability Company,     )
                                            )
19                    Defendants.           )
                                            )   _____
20                                          )
                                            )   **Hearing Date:        May 28, 2015**
21                                          )   **Hearing Time:        2:30 p.m.**
                                            )   **Dept. No.:            3, 5th Floor**
22                                          )   **Judge:                Hon. Beth L. Freeman**
                                            )   **Date Action Filed:   June 14, 2013**
23                                          )   **Trial Date:           June 8, 2015**
                                            )
24  _____    )   [Accompanying Documents:  Declaration of
                                                Attorney Michael C. Crosby; and Proposed Order]

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE EXPERT TESTIMONY  [5:13-CV-02744-BLF]

**TABLE OF CONTENTS**

I.    **STATEMENT OF THE CASE** ........................................................................ **2**

II.   **INTRODUCTION** ........................................................................................... **3**

III.  **SUMMARY OF REASONS TO DENY MOTION** ...................................... **4**

IV.  **SUMMARY OF FACTS** ................................................................................ **6**

V.   **LEGAL ARGUMENT** .................................................................................. **8**

     A.     General Legal Principles Re Admissibility of Expert
            Testimony under FRE - Rule 702 and <u>Daubert</u>. ........................ **8**

     B.     The Turner Report, and the McCune Findings Therein, Are
            Undoubtedly Within the Permissible Scope of Rebuttal. ........... **9**

           1.     The Scope of Rebuttal Includes Facts and Data Not
                    Considered. ........................................................................ **9**

           2.     Neuberger Sets Forth Multiple Applicable
                    Methodologies. .................................................................. **10**

           3.     Neuberger Makes Repeated Assumptions Re the
                    BarMaster. .......................................................................... **12**

           4.     The McCune Findings Are Properly Relied Upon by
                    Turner. ............................................................................... **13**

     C.     Cano, Wyatt, and Simpson Were Not Required to be
            Disclosed Under FRCP - Rule 26(a)(1)(A)(i) because Their
            Testimony is Solely To Impeach CVT's Assertions That the
            BarMaster Was "Fully Functioning". ....................................... **15**

           1.     Testimony of Roanoke Installers Solely for
                    Impeachment. ..................................................................... **15**

            2.     Defendants Can Dismiss Counterclaims. .........................

           3.     No Prejudice to CVT. ........................................................ **17**

     D.     CVT Bears the Burden of Proof With Respect to the     **17**
            Viability of the BarMaster. .......................................................

           1.     CVT Cannot Shift Its Burden to Defendants. ..................  **17**
           2.     Defendants Can Dismiss Counterclaims. .........................

     E.     No Portions of the Turner Report Should Be Stricken      **17**
            ............................................................................................... **18**

     F.     No Basis for Sanctions. ............................................................. **19**

VI.  **CONCLUSION** ........................................................................................... **20**

                                                                     **20**

# TABLE OF AUTHORITIES

**Cases**

City of Los Angeles v. Cole ........................................................................................... 15
    (1946) 28 Cal.2d 509

County of Santa Clara v. Ogata .................................................................................... 15
    (Ct. App. 1966) 240 Cal.App.2d 262

Crowley v. Chait ............................................................................................................ 10
    (D. N.J. 2004) 322 F.Supp.2d 530

Daubert v. Merrell Dow Pharm., Inc. ............................................................................ 9
    (1993) 509 U.S. 579

Deseret Mgmt. Corp. v. United States ...................................................................... 10-11
    (2011) 97 Fed. Cl. 272

Glass v. Anne Arundel County ...................................................................................... 13
    (D. Md. 2014) 38 F.Supp.3d 705

Hangarter v. Provident Life & Accident Ins. Co. .......................................................... 9
    (9th Cir. 2004) 373 F.3d 998

Hellmann-Blumberg v. Univ. of Pac. ............................................................................ 18
    (E.D. Cal. 2013) 2013 WL 3422699

In re Genetically Modified Rice Litig. ........................................................................... 10
    (E.D. Mo. 2010) 2010 WL 4483993

In re REMEC Inc. Sec. Litig. ........................................................................................ 10
    (S.D. Cal. 2010) 702 F.Supp.2d 1202

Kirola v. City & County of S.F. .................................................................................... 10
    (N.D. Cal. 2010) 2010 WL 373817

Laflamme v. Safeway, Inc. ............................................................................................ 10
    (D. Nev. 2010) 2010 WL 3522378

Mannino v. Int'l Mfg. Co. ............................................................................................. 13
    (6th Circ. 1981) 650 F.2d 846

Ohio Envtl. Dev. Ltd. P'ship v. Envirotest Sys. Corp. .............................................. 13-15
    (N.D. Ohio 2007) 478 F.Supp.2d 963

Pakootas v. Teck Cominco Metals, Ltd. ................................................................... 10, 18
    (E.D. Wash. 2012) 2012 WL 1833390

People ex rel. Dept. of Pub. Works v. Flintkote Co. ...................................................... 14
    (Ct. App. 1968) 264 Cal.App.2d 97

Perez v. State Farm Mut. Auto Ins. Co. ........................................................................ 10
    (N.D. Cal. 2011) 2011 WL 8601203

1   PG&E v. W. H. Hunt Estate Co.                                         **15**
         (1957) 49 Cal.2d 565

2

3   T.C. Sys. Inc. v. Town of Colonie                                      **9**
         (N.D. N.Y. 2002) 213 F.Supp.2d 171

4   United States v. Alatorre                                              **9**
         (9th Cir. 2000) 222 F.3d 1098

5

6   United States v. Armstrong                                             **10**
         (9th Cir. 1981) 654 F.2d 1328

7   United States v. Hankey                                                **9**
         (9th Cir. 2000) 203 F.3d 1160

8

9

10   **Statutes**

11   Federal Rules of Civil Procedure - Rule 26                   **15-16, 20**

12   Federal Rules of Civil Procedure - Rule 37                         **20**

13   Federal Rules of Evidence - Rule 702                                **8**

14   Federal Rules of Evidence - Rule 703                               **13**

15   Federal Rules of Evidence - Rule 704                               **20**

16

17   **Texts**

18   American Institute of Certified Public Accountants (AICPA) - Statements on     **14**
     Standards For Valuation Services
19         Valuation of a Business, Business Ownership Interest, Security, or
               Intangible Asset - Section 100.20

20

21

22

23

24

25

26

27

28

1   MATTHEW A. CROSBY, CSB #070524
    MICHAEL C. CROSBY, CSB #277849
2   CROSBY & CROSBY,
    A PROFESSIONAL LAW CORPORATION
3   1570 The Alameda, Suite 200
    San Jose, CA  95126
4   e-mail:  matt@crosbyplc.com
    Telephone:  408-370-7500
5   Facsimile:  408-984-5063

6   Attorneys for Defendants
    JOHN H. RASNICK, J. BASIL MATTINGLY,
7   WILL RASNICK, PARKER MATTINGLY,
    and M&R SOLUTIONS, LLC
8

9              UNITED STATED DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                    SAN JOSE DIVISION

12

13  CLEAR-VIEW TECHNOLOGIES, INC.,      )   CASE NO.  5:13-CV-02744-BLF
    a California Corporation,           )
                                        )
14                Plaintiff,            )   DEFENDANTS AND COUNTER-
                                        )   CLAIMANTS' OPPOSITION TO
15  vs.                                 )   PLAINTIFF'S MOTION TO STRIKE
                                        )   AND EXCLUDE DEFENDANTS'
16  JOHN H. RASNICK, J. BASIL MATTINGLY, )   EXPERT TESTIMONY, AND FOR
    WILL RASNICK, and PARKER            )   ATTORNEYS' FEES UNDER FED. R.
17  MATTINGLY, individuals residing in  )   CIV. P. 37(C)(1)
    Kentucky; and M&R SOLUTIONS, LLC, a )
18  Kentucky Limited Liability Company, )
                                        )
19                Defendants.           )   _____
                                        )
20                                      )   **Hearing Date:**      **May 28, 2015**
                                        )   **Hearing Time:**      **2:30 p.m.**
21                                      )   **Dept. No.:**         **3, 5th Floor**
                                        )   **Judge:**             **Hon. Beth L. Freeman**
22                                      )   **Date Action Filed:** **June 14, 2013**
                                        )   **Trial Date:**        **June 8, 2015**
23                                      )
                                        )   [Accompanying Documents:  Declaration of
24  _____)   Attorney Michael C. Crosby; and Proposed Order]

25          Defendants  and  counterclaimants  JOHN  H.  RASNICK  ("JOHN"),  J.  BASIL

26  MATTINGLY ("BASIL"), WILL RASNICK ("WILL"), PARKER MATTINGLY ("PARKER"),

27  and M&R SOLUTIONS, LLC ("M&R") [collectively, "Defendants"] , hereby submit the following

28  points and authorities in opposition to the *Motion To Strike And Exclude Defendants' Expert*

*Testimony, And For Attorneys' Fees Under Fed. R. Civ. P. 37(C)(1)* [the "Motion"] filed by plaintiff CLEAR-VIEW TECHNOLOGIES, INC. ("CVT").

## I.

### STATEMENT OF THE CASE

Defendants and counterclaimants JOHN and BASIL are shareholders of plaintiff CVT. CVT was formed to develop a system (the "BarMaster"), that utilizes a radio frequency identification ("RFID") label/weight displacement measurement system, along with video, to monitor the use of bottles of alcohol for the bar and nightclub industry. Defendants and counterclaimants PARKER, WILL, and M&R agreed to assist in distributing the BarMaster.

As a result of gross mismanagement, CVT does not have a working product, is without capital, and is essentially defunct. CVT raised nearly $9 million of investor money, including over $500,000.00 from JOHN and BASIL, and frittered it away, with no accounting provided as to where and how the $9 million was spent.

After an unsuccessful attempt in January 2011 to install the BarMaster at an investor's restaurant in Virginia, CVT and its Chairman, Paul Mula, II ("Mula"), solicited investor Clyde Berg ("Berg") for additional investment in CVT. Berg declined. Berg testified that nobody influenced his decision.

Around the same time, employees of CVT approached Defendants to seek Defendants' assistance in bringing a working BarMaster product to market. Defendants stated they wanted no part in the day to day operations of CVT, but would assist CVT and Mula as best they could. In response to Mula's repeated requests for additional investment, JOHN and BASIL stated that an independent audit of CVT had to be performed first so the investors would know how their $9 million investment was used.

Two years later, CVT filed this frivolous lawsuit in which it makes the absurd *allegation* that Defendants: (i) dissuaded Berg from making an additional investment in CVT; and (ii) conspired with others to take control of CVT and/or misappropriate its trade secrets. Defendants did not conspire against CVT or dissuade Berg from making an additional investment. In fact, Berg testified under oath at his deposition that he never agreed to make any additional investment in CVT,

1    and Defendants did not dissuade him from doing so.  In the words of Mula, the purpose of this

2    lawsuit is to "unleash very powerful litigation against some very deep pockets with the likelihood

3    of bringing the company back to life rather quickly and force an early settlement once the pleadings

4    are on file with the court."  [See Mula's March 14, 2013 email; Dkt. No. 139-9].

5                                                **II.**

6                                          **INTRODUCTION**

7            In a desperate attempt to avoid the consequences of its own expert's careless and

8    incomplete valuation, CVT seeks to exclude portions of Defendants' expert testimony on the

9    meritless grounds that said testimony is "beyond the scope of rebuttal" and based on "inadmissible

10   hearsay."  Put simply, CVT would have this Court believe that it is supposedly improper to evaluate

11   CVT's only product, the BarMaster, when valuing the business of CVT.

12           CVT's expert, Dr. Jonathan Neuberger ("Neuberger"), purports to value CVT as of

13   June 17, 2011 (the "Neuberger Report").  Defendants' expert witness, James Turner ("Turner"), in

14   a point-by-point rebuttal, also values CVT as of that same date (the "Turner Report").  Neuberger,

15   with full knowledge that CVT made no sales and had no "finished" product, performed his valuation

16   of CVT *without conducting any analysis whatsoever of the BarMaster product*, or any analysis of

17   the intellectual property of CVT.  Turner, in performing his valuation, enlisted the services of radio

18   frequency identification expert, Dr. Earl McCune ("McCune"), to evaluate the wireless

19   communication aspects of the BarMaster.  McCune's evaluation is specifically "to be utilized for

20   purposes of valuation of Clear-View Technologies, Inc." [the "McCune Findings"].

21           It is the custom and practice of valuation analysts to consult with individuals

22   possessing specialized knowledge in a particular field applicable to the business being valued. Both

23   case law and accounting guidelines/standards permit and provide for such consultation for purposes

24   of valuation.  In the matter at hand, evaluation of the BarMaster is indivisible from a proper

25   valuation of CVT.  It is not a separate issue.  It is essential to evaluate the BarMaster in valuing

26   CVT.  Neuberger and Turner, as valuation analysts, are required to evaluate all aspects of CVT to

27   render an appropriate opinion on value.  Neuberger chose not to evaluate CVT's only product.

28   Turner did so, through McCune's services.  Both valuation experts opined as to the value of CVT

1   as of June 17, 2011.  Therefore, the Turner Report's evaluation of the BarMaster is well within the

2   scope of rebuttal.

3           The McCune Findings are based, in part, upon the relevant and admissible statements

4   of three (3) individuals who worked extensively on the failed installation of the BarMaster.  David

5   Cano ("Cano"), James Bryon Wyatt ("Wyatt"), and Hugh Simpson ("Simpson") will be called to

6   testify at trial.  Cano, Wyatt, and Simpson were not disclosed in Defendants' disclosures because

7   their testimony is solely for impeachment purposes, i.e., CVT's Chairman, Mula, testified under oath

8   that the Roanoke Installation was "finished" in January 2011, and was "fully functioning".  ***That is***

9   ***a flat-out lie***.  Cano, Wyatt, and Simpson will provide testimony directly contradicting Mula's false

10  statements.  As their testimony will be admissible at trial, the McCune Findings properly relied upon

11  the statements of these individuals.

12          Again, Neuberger (CVT's expert) values CVT as of June 17, 2011, and Turner

13  (Defendants' expert) does the same on rebuttal.  Neuberger's failure to evaluate the BarMaster for

14  purposes of valuation of CVT does not prevent Turner from evaluating the BarMaster for purposes

15  of valuing CVT.  Rebuttal experts are permitted by law to consider facts, data, and methodology

16  ignored by the opposing party's expert.  As one court stated, "Contradicting expert opinions,

17  questioning methodology, and opining on methods and facts plaintiffs' experts did not consider are

18  precisely the type of rebuttal testimony the court would expect."

19          The Court must deny CVT's Motion and permit the trier of fact access to all relevant

20  information underlying the experts' competing valuations of CVT.

21                                              **III.**

22                        **SUMMARY OF REASONS TO DENY MOTION**

23          1.      The Turner Report is well within the scope of rebuttal as it engages in a point-

24  by-point rebuttal of the Neuberger Report, and it discusses segments of CVT that Neuberger failed

25  to evaluate.  McCune will testify at trial regarding his Findings, and that said Findings are provided

26  explicitly "for purposes of valuation of Clear-View Technologies, Inc."  Opining on methods and

27  facts Neuberger did not consider in his valuation of CVT is precisely the type of rebuttal testimony

28  courts expect.

2.      Neuberger chose to value CVT as of June 17, 2011 under the income method, one of three applicable methods stated by Neuberger to be proper methods of valuation (the other two being the market method and asset method). Under the asset method, valuation of an entity must necessarily embrace an assessment of that entity's product. This is especially so where, as here, the entity (CVT) has no sales. The Turner Report also values CVT as of June 17, 2011, and sets forth the bases for said valuation, which includes evaluating the BarMaster — a proper evaluation of purported CVT assets under the asset method.

3.      CVT improperly attempts to shift the burden of proof to Defendants with regard to the status of the BarMaster. In order to prove its alleged damages, CVT must prove it had a viable product to sell, and customers willing to purchase said product. CVT can prove neither because neither existed. Defendants are under no obligation to "disprove" the BarMaster's viability.

4.      Contrary to CVT's statements, Defendants do not assert that the fatally-flawed BarMaster is what "crippled" CVT. CVT's utter lack of sales, incompetent and untruthful management, and mountains of "crippling" debt saw to that. The unfeasible BarMaster product was just one part of CVT's inevitable demise.

5.      Cano, Wyatt, and Simpson were not required to be disclosed under FRCP - Rule 26(a)(1)(A)(i) because their testimony is to be used solely for impeachment purposes. Mula testified under oath at his deposition that the BarMaster installation in Roanoke, Virginia was "finished" in January 2011 (the "Roanoke Installation"). Cano, Wyatt, and Simpson — all of whom worked extensively on the failed Roanoke Installation — will impeach Mula's statement at the conclusion of CVT's case in chief.

6.      Even if the testimony of Cano, Wyatt, and Simpson were deemed to be "affirmative" and not "impeachment", Defendants have the right to dismiss their counterclaims at any time, thereby rendering said testimony as "impeachment" only.

7.      CVT is not prejudiced by the Turner Report, or the McCune Findings therein, because: (i) CVT has subjected Turner and McCune to thorough examination under oath at their respective depositions; and (ii) CVT had no right to receive impeachment information prior to trial. Nevertheless, CVT received a free "sneak preview" of the impeachment testimony to be offered by

Cano, Wyatt, and Simpson.

8.     The Turner Report does not "tell both judge and jury exactly what they need to do".  The Turner Report clearly sets forth: (i) Turner's valuation of CVT as of June 17, 2011; (ii) the bases for said valuation; and (iii) the components of CVT ignored by Neuberger that are essential for proper valuation.

9.     CVT cannot possibly recover attorneys' fees by way of their meritless Motion because: (i) the testimony of Cano, Wyatt, and Simpson will be permitted at trial to impeach CVT; (ii) McCune is unquestionably permitted to rely upon said testimony; and (iii) the Turner Report's valuation of CVT properly relied, in part, upon the McCune Findings.

10.    CVT wants this Court to exclude relevant, admissible evidence concerning evaluation of the BarMaster's viability (or lack thereof) — specifically for valuation purposes — because CVT knows it cannot refute the testimony of the actual installers.

**IV.**

**SUMMARY OF FACTS**

<u>**Neuberger Report**</u>

Armed with no commercial sales, no finished product, mountains of liabilities, rejected and abandoned patent applications, and a history of failure, CVT enlisted the services of Neuberger to render a report on CVT's purported value as of June 17, 2011.  The Neuberger Report, served on February 17, 2015, sets forth Neuberger's "estimation of the fair market value of CVT as of June 17, 2011." [Ex. C to Tilley Decl., ¶20]. Neuberger purports to use "CVT's expected future cash flows" as the basis of his valuation. [Id. at  ¶21].

In preparing his Report, Neuberger states that he relies upon: (i) CVT's own offering memoranda and business plans [Id. at ¶22 and ¶26]; (ii) CVT's own market research [Id. at ¶23]; (iii) CVT's "non-binding", "preliminary orders" from the 2011 Las Vegas Trade Show [Id. at ¶23]; (iv) CVT's various financial projections [Id. at ¶23]; and (v) conversations with CVT's Chairman, Mula, and CVT's counsel in this matter, Gerald D.W. North [Id. at ¶26].

Without any independent investigation into the validity of CVT's financial projections, CVT's market research, and/or the viability (or lack thereof) of CVT's product and

1   intellectual property, Neuberger uses CVT's projections as the baseline from which he operates.

2   Then, Neuberger — ignoring that CVT's 2010 trade show "non-binding", "preliminary orders"

3   yielded zero actual sales — states "the starting point for the sales projections is the list of orders

4   taken during the 2011 Las Vegas trade show" and "I assume that all of these materialize in 2012".

5   [Id. at ¶27].  There were no orders.

6           The Neuberger Report wholly rests on CVT's preposterous business forecasts and

7   unrestrained prediction of phenomenal success.  The Neuberger Report, and any testimony by

8   Neuberger with respect thereto, must be excluded pursuant to Defendants' concurrent motion filed

9   herein.

10                              **Turner Report**

11          The Turner Report engages in a direct, surgical rebuttal of the Neuberger Report. The

12  Turner Report mirrors the Neuberger Report in every manner, right down to the table of contents.

13  [See Ex. C to Tilley Decl., p. I; and Ex. D to Tilley Decl., p. I].  The Turner Report destroys

14  Neuberger's unfounded reliance upon CVT's: (i) "non-binding" purported "sales orders" [Ex. D to

15  Tilley Decl. at pp. 4-6]; (ii) lies to shareholders in CVT's 2011 Business Plan regarding these

16  purported "sales orders" [Id. at p. 6]; and (iii) wild "sales projections" not based in reality, but based

17  upon the sham "sales orders" that never materialized before or after Defendants invested in CVT.

18  [Id. at p. 7].

19          The Turner Report next shoots down Neuberger's discount rate as being "too low for

20  the risks associated" with CVT.  [Id. at p. 7].  The Turner Report identifies several risks associated

21  with CVT that contribute to a much higher discount rate, e.g., (i) no working product [CVT admits

22  the product was "unfinished" and "not completed"]; (ii) fatally flawed technology [see McCune

23  Findings]; (iii) poor management [5 years and $9 million raised with no finished product, no sales,

24  outright lies to shareholders regarding purported "sales orders", and ridiculous sales predictions];

25  (iv) no patents [all patents rejected and abandoned]; and (v) no sales. [Id.]

26          The Turner Report then addresses critical analyses Neuberger fails to consider that

27  are "required in any competently prepared business valuation as they have a direct bearing on the

28  value of any company." [Id. at p. 8].  Neuberger fails to evaluate CVT's only product.  [Id. at pp. 8-

9].  Neuberger fails to independently verify CVT's purported "market research".  [Id. at pp. 9-11].
Neuberger fails to evaluate CVT's management.  [Id. at p. 8].  Neuberger ignores numerous risks
identified by CVT, itself, as set forth in CVT's own documentation. [Id. at pp. 12-15].

The Turner Report concludes by attacking Neuberger's current valuation of CVT [Id.
at p. 16], and attacking Neuberger's failure to consider CVT's complete lack of patentable
intellectual property [Id. at pp. 16-17].  It is undisputed that the Turner Report engages in a proper
point-by-point rebuttal of the Neuberger Report.  Further, the Turner Report properly draws attention
to the critical analyses Neuberger ignores.

The McCune Findings are just one piece of the puzzle in Turner's valuation of CVT.
The Turner Report also rests upon the undisputed facts that as of June 17, 2011: (i) CVT had been
in business nearly five (5) years; (ii) CVT raised nearly $9 million in investor money in that
timeframe; (iii) CVT made no commercial sales of the BarMaster; (iv) CVT had no pending
contractual sales; (v) the BarMaster was not "finished" and/or "completed", despite years and
millions of dollars devoted to it; (vi) CVT's liabilities exceeded its assets by nearly $7 million; and
(vii) CVT's international and domestic BarMaster patent applications had been rejected and
abandoned.  [See Defendants' concurrent motion to exclude Neuberger, Dkt No. 170].

**Depositions of McCune and Turner**

CVT deposed McCune on April 13, 2015.  CVT was informed that Defendants will
call McCune to testify at the trial of this matter.

CVT deposed Turner on April 14, 2015.  CVT was informed that Defendants will call
Turner to testify at the trial of this matter.

**V.**

**LEGAL ARGUMENT**

**A.    GENERAL LEGAL PRINCIPLES RE ADMISSIBILITY
OF EXPERT TESTIMONY UNDER FRE - RULE 702
AND DAUBERT.**

Federal Rules of Evidence - Rule 702 provides that expert testimony may be
given by a qualified witness if:

"(a) the expert's scientific, technical, or other specialized knowledge

1  will help the trier of fact to understand the evidence or to determine
   a fact in issue; (b) the testimony is based on sufficient facts or data;
2  (c) the testimony is the product of reliable principles and methods;
   and (d) the expert has reliably applied the principles and methods to
3  the facts of the case."

4       The court in U.S. v. Hankey (9th Cir. 2000) 203 F.3d 1160, 1168, summarized the

5  determinations to be made by the Court in admitting expert testimony as: (i) whether the opinion is

6  based on some specialized knowledge; (ii) whether the expert is appropriately qualified; (iii) whether

7  the expert testimony is relevant and reliable; and (iv) whether the expert's methodology "fits" the

8  conclusions.

9       The threshold for qualification is low, i.e., a nominal foundation of knowledge, skill,

10 and experience is sufficient.  See Hangarter v. Provident Life & Accident Ins. Co. (9th Cir. 2004)

11 373 F.3d 998, 1015-1016.  Courts must determine whether the expert testimony is both reliable and

12 relevant.  See Daubert v. Merrell Dow Pharms., Inc. (1993) 509 U.S. 579, 589.  The reliability

13 requirement is satisfied where: (i) the expert is qualified to render the opinion; and (ii) the opinion

14 has adequate support.  Id. at 588-590.  To be relevant, the testimony must assist the trier of fact in

15 understanding or determining a fact in issue.  Id. at 591.  The court has broad discretion in assessing

16 both requirements.  See U.S. v. Alatorre (9th Cir. 2000) 222 F.3d 1098, 1100.

17      CVT does not attack: (i) Turner's expertise in business valuation and/or McCune's

18 expertise in radio frequency communications; and (ii) the relevance of their testimony. Instead, CVT

19 attempts to refute the reliability of the McCune Findings on the basis that McCune relied upon

20 purportedly inadmissible hearsay.  However, as set forth below, the Roanoke installers will be

21 permitted to testify at trial, thereby satisfying the reliability prong of Daubert.

22      **B.    THE    TURNER    REPORT,    AND    THE    McCUNE
           FINDINGS THEREIN, ARE UNDOUBTEDLY WITHIN
23         THE PERMISSIBLE SCOPE OF REBUTTAL.**

24         **1.    The Scope of Rebuttal Includes Facts and Data Not Considered.**

25      While a rebuttal expert report must address the same subject matter

26 as the report it contradicts, limiting the rebuttal expert's analysis to those methods proposed by the

27 initial expert "would impose an additional restriction on parties that is not included in the Rules."

28 See T.C. Sys. Inc. v. Town of Colonie (N.D. N.Y. 2002) 213 F.Supp.2d 171, 179-180.  "An expert

1   may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut

2   another party's expert."  See In re Genetically Modified Rice Litig. (E.D. Mo.) 2010 WL 4483993

3   at *3; see also In re REMEC Inc. Sec. Litig. (S.D. Cal. 2010) 702 F.Supp.2d 1202, 1220 [allowing

4   a plaintiff's rebuttal expert report containing additional analyses and tasks not undertaken by

5   defendant's initial expert because it contradicted defendant's expert on the same subject matter, i.e.,

6   "assumptions, estimates, and forecasts to evaluate goodwill that complied with GAAP"].  "Rebuttal

7   evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of

8   the adverse party.  See Crowley v. Chait (D. N.J. 2004) 322 F.Supp.2d 530, 531.

9           Rebuttal reports can use additional data not found in the expert's report, so long as

10  it relates to the same subject matter.  See Kirola v. City & County of S.F. (N.D. Cal.) 2010 WL

11  373817 at *2.  Courts have wide discretion in determining what may be presented as rebuttal

12  evidence.  See U.S. v. Armstrong (9th Cir. 1981) 654 F.2d 1328, 1336.  An expert "may need to

13  include significant elaboration in a rebuttal report to challenge the asserts of the opponent's expert

14  reports."  See Pakootas v. Teck Cominco Metals, Ltd. (E.D. Wash.) 2012 WL 1833390 at *1.  In

15  Perez v. State Farm (N.D. Cal.) 2011 WL 8601203 at *8, the court allowed a rebuttal expert report

16  that criticized ratemaking processes, regression models, and methodology selected by an

17  econometrist.  In denying a motion to exclude rebuttal economic experts, the court in Laflamme v.

18  Safeway, Inc. (D. Nev.) 2010 WL 3522378 at *3 held as follows:

19          "Contradicting expert opinions, questioning methodology, and
            opining on methods and facts plaintiffs' experts did not consider are
20          precisely the type of rebuttal testimony the court would expect."

21          **2.    Neuberger Sets Forth Multiple Applicable Methodologies.**

22          The Neuberger Report sets forth three (3) general methodologies used

23  by valuation analysts to value a business, i.e., (i) income approach; (ii) market approach; and (iii)

24  asset approach. [Ex. C to Tilley Decl, ¶20].  Neuberger values CVT as of June 17, 2011 using the

25  income approach, and only the income approach. [Id. at ¶21]  Neuberger's selection of the income

26  approach ***does not preclude Turner from utilizing other applicable methodologies***, especially those

27  specifically set forth by Neuberger.  See, e.g., Perez, In re Genetically Modified Rice Litig., and

28  Laflamme, supra. See also Deseret Mgmt. Corp. (2011) 97 Fed. Cl. 272, 274 [holding that it is

1    improper to limit a rebuttal expert's methodology to that advanced by the first expert].  Turner also

2    valued CVT as of June 17, 2011.  Turner criticizes the methodology and data relied upon by

3    Neuberger, and sets forth additional factors not considered by Neuberger, including the failure to

4    evaluate the BarMaster. CVT's BarMaster and intellectual property would necessarily be evaluated

5    under the applicable asset approach — where value is determined by assets minus liabilities —

6    because they are considered potential assets of CVT.  Turner's critique of the methodology utilized

7    by Neuberger "is precisely the sort of rebuttal testimony the court would expect."

8           Neuberger selects the income method in order to cherry-pick the only purported data

9    he could find to conjure value for CVT — CVT's own speculative, bogus sales projections.

10   Neuberger did not select the market approach because that would involve comparing CVT to other

11   companies with no completed product and no sales.  Neuberger did not select the asset approach for

12   the obvious reason that he could not assign a positive value to either the BarMaster or any of CVT's

13   purported intellectual property (all patent applications had been rejected).  Turner, in rebutting

14   Neuberger's valuation, is absolutely permitted to consider facts and data ignored by Neuberger, as

15   well as opine on applicable methodologies (asset method) Neuberger did not consider.  An analysis

16   of CVT's BarMaster and intellectual property are obviously within the scope of business valuation.

17          Strangely, CVT asserts that the McCune Findings purport to offer "an alternative

18   theory of causation" for the unavoidable, "crippling" downfall of CVT.  See the Motion at 14:12-13.

19   That is clearly not the case, and no amount of distortion can wring any truth out of that assertion.

20   CVT's utter lack of sales, incompetent and untruthful management, and mountains of "crippling"

21   debt led to its inevitable demise.  The McCune Findings are set forth strictly for purposes of Turner's

22   valuation of CVT as of June 17, 2011.  The unfeasible BarMaster product contributed to Turner's

23   valuation of CVT as being worthless, but it was just one factor among a litany of factors.

24          Neuberger chose not to evaluate CVT's only product for the obvious reason that said

25   product had no value.  Turner performed his due diligence in evaluating all aspects of CVT.  The

26   McCune Findings (and the impending trial testimony of the Roanoke installers) shine a spotlight on

27   the withered carcass that was the BarMaster.  Neuberger, himself, identifies the asset method as an

28   applicable methodology for valuing CVT — a methodology that requires analysis of all potential

assets of CVT to properly determine value (if any).  Said analyses would necessarily include evaluating the BarMaster.  CVT cannot hide behind the very door Neuberger opened.

### 3.    Neuberger Makes Repeated Assumptions Re the BarMaster.

The Neuberger Report implicitly assumes that CVT can "finish" the BarMaster, without any discussion as to what was necessary to "finish" the BarMaster, how long it would take to "finish", or even whether it could be "finished".  The following are excerpts taken directly from the Neuberger Report regarding representations about the BarMaster, which Neuberger relies upon for purposes of his valuation of CVT:

> "CVT needed this investment to complete development of the product".  [Ex. C to Tilley Decl., ¶2].

> "CVT would have secured the necessary funding to ... bring its product to market".  [Id. at ¶18].

> "According to CVT's promotional materials and offering memoranda, existing products were capable of addressing only limited aspects of inventory management or loss controls; there was no product that handled all of the various aspects of liquor inventory management, was sophisticated enough to interact with existing point-of-sale systems, and could combine the data to generate useful real-time reports for venue owners.  CVT's product, the BarMaster, was intended to address this market by combining these various capabilities into one integrated system."  [Id. at ¶22].

> "CVT conducted substantial market research to support and refine the product."  [Id. at ¶23].

> "CVT also presented early versions of the BarMaster at trade shows ..."  [Id.].

> "I understand from my interviews with CVT executives that CVT was about to implement more efficient versions of its technology to drive down COGS."  [Id. at ¶30].

Setting aside the fact that the applicable asset approach provides for proper evaluation of the BarMaster, evaluation of the BarMaster on rebuttal is also proper for the elementary reason that the Neuberger Report sets forth numerous assumptions concerning: (i) CVT's purported ability to complete the BarMaster; and (ii) the BarMaster's purported capabilities.  Having opined that CVT could complete the BarMaster, and having opined that the BarMaster possessed certain desirable features, CVT cannot now prevent Defendants from producing relevant, admissible rebuttal evidence.

1

**4.      The McCune Findings Are Properly Relied Upon by Turner.**

2    Turner is not the "mouthpiece" for McCune.  ***McCune has been***

3  ***thoroughly examined by CVT under oath at deposition, and McCune will be called to testify at***

4  ***trial***.  The McCune Findings are part of the basis for Turner's valuation of CVT.  Turner does not

5  opine that the BarMaster is "fatally flawed" — he opines that CVT is worthless, based in part on the

6  McCune Findings concerning the "fatally flawed" BarMaster.

7    Importantly, case law holds that an expert's testimony may be formulated by the use

8  of facts, data, and conclusions of other experts.  See <u>Ohio Envtl. Dev. Ltd. P'ship. v. Envirotest Sys.</u>

9  <u>Corp.</u> (N.D. Ohio 2007) 478 F.Supp.2d 963.  For valuation analysts, the use of consultants is a

10  widely-held custom and practice, one that is permitted under accounting guidelines and case

11  authority.  An "expert is free to give his opinion relying upon the types of data an expert would

12  normally use in forming an opinion in his area of expertise."  See <u>Mannino v. Int'l. Mfg. Co.</u> (6th

13  Cir. 1981) 650 F.2d 846, 851.  "[O]bjections to the manner in which expert formed his opinion —

14  rather than on the facts on which the opinion is based — go to weight, not admissibility, of opinion."

15  See <u>Glass v. Anne Arundel County</u> (D. Md. 2014) 38 F.Supp.3d 705, 716.  The <u>Ohio</u> case is

16  particularly instructive.  There, an appraiser opining on the diminution in market value of property

17  was permitted to rely upon the opinion of an architect regarding repair estimates.  The court in <u>Ohio</u>

18  held as follows:

19    "If an expert's consultation of another expert's opinion is a resource
     'reasonably relied upon by experts in the particular field in forming

20    opinions or inferences upon the subject, <u>the facts or data need not be</u>
     <u>admissible in evidence in order for the opinion or inference to be</u>

21    <u>admitted</u>.' Fed. R. Evid. 703.

22    ...

23    The Court finds that [architect's] calculations are <u>precisely the source</u>
     <u>of data 'reasonably relied upon' by experts in [appraiser's] field of</u>

24    <u>appraisal in forming opinions on the diminution of the market value</u>
     <u>of property</u> resulting from deferred maintenance.

25    ...

26

27    Furthermore, even if [architect's] calculations were inadmissible,
     Fed.R.Evid. 703 would still allow [appraiser] to rely upon them in

28    forming his own expert opinion.  Consistent with the Uniform
     Standards of Professional Appraisal Practice, [appraiser] explicitly

---

1
2
3
4

> stated his reliance upon the 'extraordinary assumption' that [architect's] report was accurate and supportable. Throughout his practice [appraiser] has regularly relied upon the types of information contained in [architect's] report.
> See Ohio Envtl. Dev. Ltd. P'ship, supra, 478 F.Supp.2d at 974-975. (emphasis added)

5  Further, the Neuberger Report refers to the processes used by "valuation analysts" in

6  valuing an entity.  [Ex. C to Tilley Dec., ¶¶20 and 32].  The American Institute of Certified Public

7  Accountants (AICPA), which oversees the work of certified specialists like Turner, sets forth the

8  following in its *Statements On Standards For Valuation Services* at Section 100.20, i.e., *Valuation*

9  *Of A Business, Business Ownership Interest, Security, Or Intangible Asset*:

10
11
12
13
14

> "In performing an engagement to estimate value, the valuation analyst may rely on the work of a third party specialist (for example, a real estate or equipment appraiser).  The valuation analyst should note in the assumptions and limiting conditions the level of responsibility, if any, being assumed by the valuation analyst for the work of the third party specialist.  At the option of the valuation analyst, the written report of the third party specialist may be included in the valuation analyst's report."

15  A valuation analyst routinely relies on the opinions of others in valuing a business.

16  A valuation analyst cannot possibly have an expert's understanding of every aspect in every business

17  in every industry.  Turner, in relying upon the McCune Findings, is no different than a business

18  valuation analyst using a real estate appraiser to value real property owned by a business, or using

19  a machine and equipment (M&E) appraiser to value heavy-duty machinery owned by a

20  manufacturing company. It is fundamentally necessary for a valuation analyst (Turner) to consult

21  with other experts (McCune) for purposes of a full and complete valuation of an entity (CVT).

22  In People ex rel. Dept. of Pub. Works v. Flintkote Co. (Ct. App. 1968) 264

23  Cal.App.2d 97, 103, the court permitted a valuation witness to rely upon the opinion of a consulting

24  engineer as to the economic feasibility of underwater mining because it was relevant to the issue of

25  valuation of the subject property.  The court stated as follows:

26
27
28

> "In a variety of situations courts have admitted opinion evidence from witnesses who were not appraisers in order to establish facts which the appraiser assumed to be true as a basis for his opinion as to value."

1    The court then listed a number of such cases, e.g., PG&E v. W. H. Hunt Estate Co.

2  (1957) 49 Cal.2d 565 [proper to receive testimony regarding increased cost of irrigation as an

3  element to be considered by the expert in forming severance damages]; City of Los Angeles v. Cole

4  (1946) 28 Cal.2d 509, 519 [testimony of architect was admissible to prove characteristics of property

5  as fact affecting its use]; and County of Santa Clara v. Ogata (Ct. App. 1966) 240 Cal.App.2d 262,

6  269 [defendant permitted to produce city officials to opine upon zoning practices as foundation for

7  opinion of appraiser as to property value].

8    Contrary to CVT's assertion, the McCune Findings do not have to refer directly to

9  Neuberger's Report.  The Turner Report does so.  The Turner Report engages in a point-by-point

10  rebuttal of the Neuberger Report, including setting forth facts and data ignored by Neuberger.  The

11  facts and data ignored by Neuberger include analysis of the BarMaster.  The McCune Findings are

12  specifically for the purpose of valuation of CVT, and the Turner Report incorporates the McCune

13  Findings as part of Turner's valuation and rebuttal of the Neuberger Report.

14    The McCune Findings, and the Turner Report's incorporation thereof, are well within

15  the scope of rebuttal in performing a business valuation of CVT.  As set forth above in Ohio Envtl.,

16  the McCune Findings **need not even be admissible** in order for Turner's opinion to be admissible.

17  **C.    CANO, WYATT, AND SIMPSON WERE NOT REQUIRED TO BE DISCLOSED UNDER FRCP - RULE 26(a)(1)(A)(i) BECAUSE THEIR TESTIMONY IS SOLELY TO IMPEACH CVT'S ASSERTIONS THAT THE BARMASTER WAS "FULLY FUNCTIONING".**

20  **1.    Testimony of Roanoke Installers Solely For Impeachment.**

21    FRCP - Rule 26(a)(1)(A)(i) provides for the disclosure of individuals

22  with discoverable information, "unless the use would be solely for impeachment."

23    Here, the testimony of Cano, Wyatt, and Simpson are to be used solely to impeach:

24  (i) CVT's statements that the Roanoke Installation was "finished" in January 2011; and (ii) any other

25  statements set forth by CVT regarding a "fully functioning" or "finished" installation thereto.  Mula

26  testified at deposition as follows:

27    "Q.  So let me back up then and ask my question.  Was there ever a point in time when the BarMaster was installed and functioning
28          in a bar or restaurant?

1     A.   Yes.

2     Q.   When was that process --- when was that installation completed?

3

4     A.   January of 2011.

...

5

6     Q.   I'm just asking how many fully-functioning, installed BarMasters were in operation in 2011?

7     A.   Can you clarify functioning?

8     Q.   I mean actually functioning in a bar as in a bar/restaurant paid you for the product, it was fully installed, and they were using it.  It was actually in use, bottles on it.

9

10    A.   There are two locations.

11    Q.   Where were those two locations?

12    A.   Virginia, Roanoke, and San Jose, California.

13    ...

14    Q.   When was the BarMaster installed at 202 Market in Roanoke, Virginia?

15

16    A.   Can you define installed?

Q.   When did CVT begin installation of the BarMaster at Roanoke, Virginia?

17

18    A.   December of 2010.

19    Q.   When was the installation complete?"
          [Objection inserted.]

20

A.   The installation finished in January of 2011."

21   See the Crosby Decl. at Ex. A.

22         Clearly, the testimony of Cano, Wyatt, and Simpson, as set forth in the McCune

23 Findings, would be used to impeach Mula's testimony regarding the Roanoke Installation.

24 Impeachment witnesses need not be disclosed under FRCP - Rule 26.  Further, the McCune Findings

25 cannot be excluded because it relies upon relevant, admissible testimony. Cano, Wyatt, and Simpson

26 set forth the myriad unresolved issues the BarMaster encountered, including, but not limited to: (i)

27 "RFID communication was problematic"; (ii) the number of USB cables (two per Well) increases

28 very quickly" [with supporting photographs]; (iii) the "design implementation utilized by the

---

1    BarMaster is hard to scale up to large installation size"; (iv) the "Top Shelves didn't work"; (v) the

2    small "demonstration units also had reliability problems"; (vi) the bar mirrors "caused

3    communication problems ... due to the metal used in the mirror's reflecting material"; and (vii)

4    "attaching defined shelf copper loop antennas to a metal shelf would never work" because the metal

5    interferes with the passive RFID communications.

6        As set forth above, when CVT presents testimony at trial regarding the "fully

7    functional" or "finished" Roanoke Installation, the testimony of the installers will absolutely be

8    permitted for impeachment purposes.

9        **2.**    **Defendants Can Dismiss Counterclaims.**

10        Should the Court be inclined to grant CVT's Motion, even in part, on

11    the basis that the trial testimony of Cano, Wyatt, and Simpson is "affirmative", Defendants have the

12    right to dismiss their counterclaims. Such a dismissal would undisputedly render said testimony as

13    "solely for impeachment". In light of the fact CVT is defunct with millions of dollars in liabilities,

14    a judgment in favor of Defendants as to their counterclaims would be uncollectable, in any event.

15        **3.**    **No Prejudice to CVT.**

16        Defendants were, and are, under no duty to disclose impeachment

17    witnesses. CVT does not have the right to such disclosures. However, CVT has now received, in

18    advance of trial, substantive information pertaining to the impeachment witnesses' impending trial

19    testimony. CVT is now privy to information to which it would not have been privy absent the Turner

20    Report and McCune Findings therein, and CVT can prepare for trial accordingly. Defendants do not

21    have such a luxury. Moreover, the probative value of the testimony of Wyatt, Cano, and Simpson

22    would far outweigh the alleged prejudice to CVT thereto — an alleged prejudice resulting solely

23    from the untruthful testimony of Mula.

24      **D.**    **CVT BEARS THE BURDEN OF PROOF WITH**
               **RESPECT TO THE VIABILITY OF THE**

25                **BARMASTER.**

26        **1.**    **CVT Cannot Shift Its Burden to Defendants.**

27        CVT bizarrely attempts to shift the burden of proof to Defendants as

28    to the viability of the BarMaster. CVT's Motion states that the McCune Findings "speak exclusively

1  to an issue on which Defendants bear the burden of proof."  See the Motion at 13:11-12. CVT then

2  cites to Defendants' counterclaims, as if Defendants' allegations that the BarMaster did not work

3  somehow shift the burden of proof away from CVT in proving its alleged damages. However, in

4  order to prove its damages, CVT has the burden of proving it had a viable product to sell, and

5  customers ready to purchase said product.  CVT cannot prove either.

6          The Neuberger Report implicitly assumes that CVT can "finish" the BarMaster,

7  without any discussion as to what was necessary to "finish" the BarMaster, how long it would take

8  to "finish", or even whether it could be "finished".  Neuberger ignores the undisputed fact that $9

9  million was spent over a span of nearly five (5) years with no "completed" product to show for it.

10  Neuberger did not engage in any effort to determine the viability of the BarMaster.  He simply took

11  CVT at its word that CVT could "complete development of the product".  Why didn't the Neuberger

12  Report evaluate the admittedly "unfinished" and "not completed" BarMaster when CVT bears the

13  burden of proof on viability?  In light of the undisputed fact that nearly five (5) years and $9 million

14  in investor money went into a product that CVT admits was "not finished", "not completed", not

15  purchased, and not in use anywhere, the answer is that CVT cannot meet that burden of proof.

16          Further, the fact that evidence may be offered in a party's case-in-chief does not bar

17  its admission by a rebuttal expert.  See <u>Pakootas</u>, supra, 2012 WL 1833390 at *2.  As stated in

18  <u>Hellmann-Blumberg. v. Univ. of Pac.</u> (E.D. Cal.) 2013 WL 3422699 at *5, "Thus, although

19  [Defendant] could have used the proposed expert testimony of [doctors] in support of its affirmative

20  defenses, the same testimony may be introduced as rebuttal testimony if it refutes the subject matter

21  of Plaintiff's expert witness testimony."

22          Defendants are under no obligation to disprove the functionality and/or viability of

23  the BarMaster. The Court must not permit CVT to improperly shift that burden to Defendants.

24              **2.      Defendants Can Dismiss Counterclaims.**

25          Again, should the Court be inclined to grant CVT's Motion, even in

26  part, on the basis that Defendants are under some purported obligation to disprove the viability of

27  CVT's BarMaster, Defendants have the right to dismiss their counterclaims.  Such a dismissal would

28  undisputedly place said burden of proof where it belongs, and where it currently resides — on CVT.

1

2

**E.    NO PORTIONS OF THE TURNER REPORT SHOULD BE STRICKEN.**

3       Aside from Turner's proper reliance upon the McCune Findings, CVT asserts

4   that portions of the Turner Report purportedly "usurp the role of judge and jury". The Turner Report

5   does no such thing. As with CVT's previous assertions, this, too, is meritless, and nothing more than

6   a red herring. Experts must necessarily make certain assumptions upon which to base their opinions.

7   For example, Neuberger assumes: (i) Defendants' liability [Ex. C to Tilley Decl., ¶3]; (ii) CVT's

8   ability to complete the BarMaster [Id. at ¶18]; (iii) CVT's ability to implement its business plan [Id.];

9   (iv) the BarMaster contains numerous desirable features [Id. at ¶22]; (v) a large potential market for

10  the BarMaster [Id. at ¶23]; (vi) every "non-binding" purported "sales order" comes to fruition [Id.

11  at ¶27; (vii) international sales of the BarMaster [Id. at ¶28]; (viii) a "more efficient version" of the

12  admittedly "unfinished" BarMaster will be implemented [Id. at ¶30]; and (ix) hundreds of millions

13  of dollars in sales within a few years [Id. at Ex. 3].

14      A review of the Turner Report's statements cited by CVT reveal the foundation for

15  Turner's assumptions: (i) "capitalized with IP that did not exist" [all patent applications rejected, and

16  not filed at time of incorporation - Ex. D to Tilley Decl., ¶V(C) and p. 13 of Turner Report]; (ii)

17  "elements of a ponzi scheme" [by manufacturing the appearance of value that never existed, e.g., no

18  patents, no sales, lies to shareholders in 2011 Business Plan, etc. - Id. at pp. 4-6 of Turner Report];

19  (iii) "the BarMaster failed in every attempted installation" [see McCune Findings and statements of

20  installers thereto - Id.]; (iv) "junk science and no relationship to "fair market value" [CVT's own

21  document states that its share price bears no relationship to any "economic or recognized criteria of

22  value"- Id. at p. 16 of Turner Report] (v) "does not have a working product [BarMaster

23  "unfinished"], fatally flawed technology [see McCune Findings], poor management [five years, $9

24  million in investor money, no sales, no finished product, and lies to shareholders regarding purported

25  "sales orders" that were "non-binding" and never materialized]; no patents [undisputed], and has

26  never made a bonafide sale from inception in 2006 through June of 2011 [undisputed]."

27      All of these statements by Turner are assumptions upon which he relies in valuing

28  CVT at $0.00 — assumptions completely supported by the record herein and in Defendants'

1   concurrent motion to exclude Neuberger.   FRE - Rule 704 holds that "[a]n opinion is not

2   objectionable just because it embraces an ultimate issue."

3          Therefore, the Court should leave the Turner Report intact, and permit all testimony

4   thereto.

5          **F.      NO BASIS FOR SANCTIONS.**

6          For the reasons set forth above, the Court should not impose any sanctions

7   against Defendants under FRCP - Rule 37.  The testimony of Wyatt, Cano, and Simpson is relevant

8   and admissible.  Said witnesses are to be used for impeachment purposes to contradict the untruthful

9   testimony of CVT's Chairman, Mula.  Said impeachment witnesses were not required to be disclosed

10  under FRCP - Rule 26.  The McCune Findings' recitation of the statements of said impeachment

11  witnesses is also proper.  McCune relies upon relevant, admissible testimony from actual hardware

12  and software technicians who devoted considerable time to the Roanoke Installation.  The Turner

13  Report's reliance on the McCune Findings is unequivocally proper for purposes of business

14  valuation.   In light of the foregoing, there is no basis for the imposition of sanctions against

15  Defendants.

16         Defendants have elected to call McCune and Turner to testify at the trial of this

17  matter.  CVT is not prejudiced by Defendants' election because CVT thoroughly examined McCune

18  and Turner under oath at their depositions regarding the McCune Findings, the Turner Report, and

19  the bases thereto.

20                                      **VI.**

21                                  **CONCLUSION**

22         For all of the reasons set forth above, the Court should deny CVT's Motion.  The

23  testimony of Wyatt, Cano, and Simpson is admissible at trial to impeach the lies of CVT's Chairman,

24  Mula.  The McCune Findings properly rely on said admissible statements.  The Turner Report

25  properly critiques the facts, data, and methodologies employed — and ignored — by Neuberger.  The

26  McCune Findings are absolutely admissible both: (i) as an opinion "reasonably relied upon" by

27  Turner in valuing CVT; and (ii) under the asset method specifically identified by Neuberger as a

28  proper method of valuation.

---

1         Neuberger values CVT as of June 17, 2011, and Turner does the same on rebuttal.

2    Neuberger's choice to value CVT without evaluating the BarMaster — CVT's only product — does

3    not prevent Turner from relying upon the McCune Findings in evaluating the BarMaster for purposes

4    of valuing CVT.

5    Dated: April 14, 2015                                        CROSBY & CROSBY,
                                                                  A PROFESSIONAL LAW CORPORATION
6
                                                    By:     /s/ Michael C. Crosby
7                                                         _____
8                                                         MICHAEL C. CROSBY
                                                          Attorney for Defendants
9                                                         JOHN H. RASNICK, J. BASIL MATTINGLY,
                                                          WILL RASNICK, PARKER MATTINGLY,
                                                          and M&R SOLUTIONS, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   OppositionToMotionToStrikeExperts-MemoPA-rev.041415.wpd