1
2
3          **UNITED STATES DISTRICT COURT**
4          **NORTHERN DISTRICT OF CALIFORNIA**
5          **SAN JOSE DIVISION**
6

7   CLEAR-VIEW TECHNOLOGIES, INC.,              Case No. 13-cv-02744-BLF

8                   Plaintiff,                   **ORDER DENYING PLAINTIFF'S**
                                                 **MOTION TO SET ASIDE JUDGMENT**
9          v.                                    **OR IN THE ALTERNATIVE FOR A**
                                                 **NEW TRIAL AND FOR PERMANENT**
10  JOHN H. RASNICK, et al.,                     **INJUNCTION AND AN AMENDED**
                                                 **JUDGMENT**
11                  Defendants.
                                                 [Re: ECF 288]
12

13

14          Plaintiff Clear-View Technologies, Inc. ("CVT") seeks extraordinary relief from this Court

15  in the form of a request for relief from judgment based upon its view that its second chair counsel

16  was grossly negligent in his questioning of several witnesses and "near catatonic" during portions

17  of the trial. Plaintiff alternatively seeks a new trial on the grounds that the Court committed legal

18  error in its response to a jury question during deliberations. Additionally, raised for the first time

19  in its reply papers, Plaintiff requests a new trial based on the Court's error in excluding from

20  evidence the Order Granting-In-Part Plaintiff's Motion for Sanctions. For the reasons discussed

21  below, the Court DENIES Plaintiff's motion to set aside judgment, or in the alternative a new trial.

22          Plaintiff also asks this Court to amend the judgment and grant it a permanent injunction

23  enjoining Defendants from using CVT's confidential information in connection with any

24  competing business. Having failed to demonstrate irreparable injury, Plaintiff's request for a

25  permanent injunction is DENIED.

26  **I.     BACKGROUND**

27          Plaintiff CVT filed this action on June 14, 2013, alleging that two of its shareholders and

28  their sons, along with the distribution company they formed to distribute CVT's product, the

BarMaster, were part of a conspiracy to steal confidential information, start a competing company, and market a product based on CVT's proprietary information. CVT charged Defendants with interference with an existing contractual relationship, or alternatively with a prospective economic relationship; breach of contract; breach of a distribution agreement and unfair competition under Cal. Bus. & Prof. Code § 17200. First Am. Compl. ("FAC"), ECF 37.

Trial began on June 8, 2015, and over the next eight days the jury heard testimony from a number of witnesses. Before the case was submitted to the jury, CVT voluntarily dismissed its Cal. Bus. & Prof. Code § 17200 claim and all claims against defendant Will Rasnick. The jury began deliberations on June 17, 2015 and returned a unanimous verdict on June 18, 2015, for defendants on all claims. ECF 261-1.

At issue here is Plaintiff's motion for relief from judgment based on Plaintiff's own attorney's misconduct and Plaintiff's motion for a new trial on its claim for intentional interference with prospective economic advantage based on error of law.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 60(b), a court may relieve a party from a final judgment for six reasons, only the last of which is asserted here. Rule 60(b)(6) provides for relief for "any other reason justifying relief." Fed. R. Civ. P. 60(b)(6). Relief under this subdivision is allowed only in "extraordinary circumstances" and it has been applied where a party's own attorney has displayed negligence so gross as to be inexcusable. *See Comm. Dental Servs. v. Tani*, 282 F.3d 1164, 1168 (9th Cir. 2002). Mere dissatisfaction with the court's order, or belief that the court is wrong in its decision, are not grounds for relief under Rule 60(b). *See Twentieth Century-Fox Film Corp. v. Dunnahoo,* 637 F.2d 1338, 1341 (9th Cir. 1981); *Beckway v. DeShong*, Case No. 07-5072-TEH, 2012 WL 1355744, at *2 (N.D. Cal. Apr. 18, 2012).

Federal Rule of Civil Procedure 59(a) allows a court to grant a new trial on some or all issues, including a verdict that is against the weight of the evidence or to prevent a miscarriage of justice as determined in the sound discretion of the court. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 818 (9th Cir. 2001); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) (holding that failure of the court to properly instruct the jury on a

United States District Court
Northern District of California

dispositive issue is grounds for a new trial.) A motion for new trial "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U. S. 243, 251 (1940). "A new trial may be ordered to correct manifest errors of law or fact, but 'the burden of showing harmful error rests on the party seeking the new trial.'" *Boston Sci. Corp. v. Johnson & Johnson,* 550 F. Supp. 2d 1102, 1110 (N.D. Cal. 2008). The authority to grant a new trial under Rule 59 "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

### III.     SUMMARY OF EVIDENCE

Plaintiff's motion pertains only to discreet portions of the evidence, thus, the Court limits its recitation of the trial record to relevant matters. CVT was a start-up company that was in the process of developing and bringing to market a product called the BarMaster, an inventory control system that would assist bar owners in monitoring inventory by automatically measuring and recording each drink pour and customer charge. As testified by Dr. Stephen Rosenoff, a bar owner and CVT shareholder, most restaurants fail due, in part, to theft by employees who retain cash paid by customers and bartenders who give away drinks. The BarMaster would put an end to that theft.

Paul Mula, CVT's founder, CEO and primary shareholder, started the company by raising the capital necessary to hire a staff of engineers that would develop the product and employees who would market and sell it. Mula invested his own and his family's money and raised money constantly, as any CEO of a start-up would do. By 2010, CVT began to demonstrate the BarMaster at trade shows and to beta test it at local bars. Among the early investors, Defendants John Rasnick and Basil Mattingly became shareholders and signed up to be a regional distributor through their company M&R Solutions. As part of their shareholder obligations Rasnick and Mattingly signed five-year non-disclosure/non-circumvention agreements commencing in January 2011 and September 2010, respectively, agreeing, in essence not to disclose CVT's confidential information and not to compete with CVT. Mattingly's son Parker also signed an NDA in January 2011.

United States District Court
Northern District of California

1        In 2010 and 2011, CVT displayed the BarMaster at the Las Vegas Bar and Nightclub trade

2   shows. Defendants were present at the 2011 trade show and Mula reported that the demonstrations

3   of the BarMaster garnered tremendous excitement in the bar and restaurant industry and resulted

4   in what Mula called "sales orders" which were non-binding expressions of interest in purchasing

5   the product. Mula admitted that other than the purchase by Dr. Rosenoff, none of the 92 "sales

6   orders" resulted in sales. In late 2010, CVT installed the BarMaster in Dr. Rosenoff's Roanoke,

7   VA restaurant and bar. There was conflicting testimony about the success of that installation.

8        After the Las Vegas trade show, Mula continued to raise money for CVT but the

9   company's spend rate seemed to outpace its revenue rate. On April 26, 2011, Defendants

10  presented Mula with a proposal which he interpreted as an attempt to take over CVT. Separate

11  from Defendants' demands, Mula continued to try to raise money. Mula testified that he had

12  developed a relationship with billionaire investor Clyde Berg and that he had obtained from Berg

13  either a contract or other commitment to invest $3.5 million in CVT in exchange for a 10 percent

14  interest in the company through a stock transfer. Mula testified that he and Berg agreed to the

15  investment in a May 4, 2011, telephone conversation and at Berg's direction, Mula was set to meet

16  with Berg on May 5, 2011, to pick up the check.

17       Mula testified that in a call with Mattingly later in the day on May 4, 2011, he informed

18  Mattingly that he did not need to deal with the April 26 proposal because he had raised the money

19  needed to continue development of the product. Mula told Mattingly that he was going to pick up

20  a check the next day. On May 5, 2011, Mula spoke with Rasnick and Mattingly and told them how

21  insulted he was by their proposal and that he had arranged to obtain the money elsewhere. At that

22  point, according to Mula, Rasnick said he had spoken with Berg and told him not to invest, that

23  there was no product and CVT did not know what it was doing. Upon calling Berg, Mula learned

24  that Berg was not prepared to write the check. Mula testified that his entire two and one half year

25  effort to court and convince Berg to invest had disappeared. The timing of the Berg investment

26  was critical to the success and survival of CVT.

27       In June 2011, Mula again visited Berg after learning from CVT shareholder Bob Comes

28  that Defendants had solicited Berg to invest in their proposed competing enterprise called "Skunk

United States District Court
Northern District of California

Works." Mula testified that he told Berg that Defendants were trying to take over his company and that CVT needed money. Mula testified that Berg told him that if he put in $500,000 of his own money then Berg and Bob Comes would match it. Mula did not have that much cash and so he set about selling personal assets. Mula testified that he was not able to invest $500,000 of his own money. He said that he raised about $350,000 by September 2011 but that Berg declined to match that amount.

For his part, Berg denied that there was ever a contract or understanding to invest $3.5 million or any amount. He testified that he would not even talk about a further investment until there was a working product. He did acknowledge making a personal loan of $20,000 to Mula on July 7, 2011 after Mula came to him "begging for money." Trial Tr. 824:5-7.

In 2011 and 2012, CVT was unable to raise additional revenue, the Roanoke, VA installation was not working, there were no further sales of BarMaster, and CVT laid off its staff.

## IV. "GROSS NEGLIGENCE" OF THE TYPE DESCRIBED BY PLAINTIFF IS NOT GROUNDS FOR RELIEF FROM JUDGMENT

Plaintiff first argues that it is entitled to relief from judgment under Fed. R. Civ. Proc. 60(b)(6) due to the gross negligence of its attorney. Rule 60(b)(6) is considered a catchall provision available in extraordinary circumstances where no other provision in Rule 60(b) would apply. CVT, relying on *Tani*, submits that the conduct of its second chair counsel is just such an extraordinary circumstance.

In *Tani*, the Ninth Circuit held that "where the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to Rule 60(b)(6)." *Tani*, 282 F.3d at 1169. The Court drew a distinction between "run-of-the-mill errors" which would amount to ordinary negligence and neglect so gross that it is inexcusable. *Id*. at 1170. The *Tani* Court found that the attorney had virtually abandoned his client. *Id*. The attorney's misconduct had persisted over an extended period of time and it ultimately resulted in a default judgment against the client that included an award of $2 million and an injunction against using a tradename. *Id*. at 1171. To make matters worse, the attorney had assured the client all along that matters were running smoothly. *Id*. In rejecting the district court's determination that the client's

1   remedy was more appropriately directed to filing a separate malpractice action against the

2   attorney, the Court reasoned that an independent action would not be adequate due to the size of

3   the judgment, the effect of the injunction on the client's ongoing business and the delay in

4   obtaining relief in a further lawsuit.[1] *Id*. at 1172.

5        Defendants urge the Court to deny this motion, arguing that Rule 60(b)(6) is to be applied

6   sparingly. They submit that Rule 60(b)(6) has only been applied in limited circumstances such as

7   where the client has been "virtually abandoned" and default judgment has been entered as in *Tani*,

8   the case has been dismissed for failure to prosecute, *see Lal v. California,* 610 F.3d 518, 520-521

9   (9th Cir. 2010), or where the client lost the case at summary judgment where the attorney failed to

10  oppose the motion after being warned by the court, *see Moore v. United States*, 262 F. App'x 828,

11  829 (9th Cir. 2008).

12       Defendants rely on the holding in *Fruehauf Trailer Corp. v. Harrow*, Case No. 11-09218-

13  DDP, 2013 WL 816446 (C.D. Cal Mar. 5, 2013). In *Fruehauf*, the Court denied relief under Rule

14  60(b)(6) where the case had proceeded to a two-day trial on the merits, including testimony by six

15  witnesses. *Id*. at *11-14. After losing the case on the merits, the client sought relief from judgment

16  on the grounds that his attorney had been absent for a pretrial conference, agreed to stipulated

17  facts against the client's interests and demonstrated incompetent preparation and presentation. *Id*.

18  On these facts, the Court determined that there was no demonstration of gross negligence to

19  support Rule 60(b)(6) relief. *Id.* The Court distinguished the case at hand from *Tani* and *Lal*,

20  finding that counsel's conduct did not amount to abandonment, there had been no default, and the

21  client was able to litigate the claims in a full trial where his attorney had made objections,

22  presented evidence and made arguments on behalf of the client. *Id*. at *11. Finding no

23  abandonment, the Court denied relief.

24       Defendants further note the Ninth Circuit's ruling in *Latshaw v. Trainer Wortham & Co.,*

25  *Inc.,* 452 F.3d 1097 (9th Cir. 2006) where the Court declined to extend relief under Rule 60(b)(6)

26  to vacate acceptance of an offer of judgment under Rule 68. In *Latshaw*, the client argued that she

27

28  _____

[1] Plaintiff acknowledges that *Tani* has been limited to cases where a client suffered a default judgment or other pre-trial disposition. Pl.'s Mot. at 3 n.1, ECF 288.

United States District Court
Northern District of California

accepted an unfavorable compromise based on fraud and coercion by her attorneys. *Id.* at 1099-1100. The Ninth Circuit held "[p]ursuant to *Tani*, in the context of default judgments, we now distinguish between 'a client's accountability for his counsel's neglectful or negligent acts[,which does not merit Rule 60(b)(6) relief,] and his responsibility for the more unusual circumstances of his attorney's extreme negligence or egregious conduct [,which does].'" *Id.* at 1103 (citation omitted). The Court went on to state, "*Tani* was explicitly premised upon the default judgment context of the case." *Id.*

Applying these cases to the facts at hand, the Court has considered the conduct CVT claims to have been grossly negligent under the standards established by the Ninth Circuit. The Court has reviewed these instances in the context of the entire record. The record shows that after an eight day trial, the jury returned a unanimous verdict in favor of Defendants on all claims. CVT was represented throughout trial by a team of lawyers led by Gerald North and supported by two attorneys from Colt/Singer/Bea, including Douglas Colt, a name partner in the firm and an experienced associate attorney. At least two other attorneys from the law firm were present in court throughout the trial. Pre-trial, both sides presented numerous *in limine* motions. At trial, each side was given a full opportunity to present evidence which included testimony from 13 witnesses, each subjected to thorough cross-examination. Dozens of exhibits were admitted. Plaintiff's counsel divided witness examination among its trial attorneys.

Plaintiff now takes issue with the conduct of its co-counsel Mr. Colt. Although referring obliquely to its lurid description of Mr. Colt's behavior during trial by reference to its opposition to Colt/Singer/Bea's Motion to Withdraw as Counsel, CVT's main argument in support of its request for relief from judgment centers on Mr. Colt's questioning of the defense damages expert and Defendant Basil Mattingly. Plaintiff states that this misconduct "resulted in a judgment against it and prevented CVT from prosecuting its claims 'in a proper fashion.'" Pl.'s Mot. at 3, ECF 288.

### A.   Turner Cross Examination

In regard to Mr. Colt's cross-examination of the defense damages expert, James Turner, a

CPA, CVT claims that Mr. Colt "repeatedly opened the door to an area of expert testimony that had been completely excluded." *Id.* at 4. Having obtained an order excluding Turner from referencing in any way the opinion of Defendant's undisclosed technical expert that BarMaster was "fatally flawed" and did not work, *see* ECF 225, Mr. Colt questioned Turner about this very issue. In the portion of the Turner cross-examination referenced by CVT, the Court notes that Mr. Colt queried Turner about his opinion that BarMaster was "fatally flawed" four times.

> Q: Now in your report you made an interesting conclusion. You said that the BarMaster was "fatally flawed." Do you recall that sir?
>
> A: I believe that I am preempted from commenting on that issue."
>
> THE COURT: You may answer the question asked of you.
>
> A: Yes, I recall that
>
> Q: And by fatally flawed you were taking a position that this product could never be brought to market, is that the position that you're taking?
>
> A: I'm not taking any position on that topic."

Trial Tr. 1121:13-23. After lengthy cross-examination on other topics, Mr. Colt returned to the excluded subject:

> Q: Now again, I just want to make sure that we have your testimony clear today. You took the position that the BarMaster was a fatally flawed product, correct?
>
> A: I took that position based on an opinion of a PhD who had written three books on the subject, yes.

Trial Tr. 1130:16-20.

> Q: And sir, just to make sure we have this entirely clear, when you say the product was fatally flawed, are you taking the position that there is nothing the company could have done after that point to bring a product to market?
>
> A: I'm not permitted to testify on that. It's highly unfair of you to keep asking me questions about something that I'm not allowed to testify about.

Trial Tr. 1133:2-8.

Defendants did not seize the opportunity to walk through the door opened by Mr. Colt.

1    Defense counsel did not elicit any testimony from Mr. Turner or any other witness about whether

2    BarMaster was fatally flawed. Moreover, a review of the Turner testimony shows that he only

3    once gave a substantive answer limited to explaining the source of his position.

4           CVT further argues that it was compelled to return to this issue in its closing argument to

5    try to cure the harm inflicted by Mr. Colt. Defendants counter that Turner did not take a position

6    on the viability of BarMaster, and he admitted that he had no technical background or experience

7    to support such a position. Defendants further observe that Mr. Colt's questions took no more than

8    two minutes out of an eight day trial.

9           More to the point, Defendants argue that CVT permitted Mr. Colt to examine the witnesses

10   on June 15, 2015, after it was aware of his troubling conduct on June 12, 2015. In CVT's own

11   papers, it acknowledges that Mr. North, who served as lead counsel, approved Mr. Colt's

12   participation after receiving written assurances and explanations over the weekend and observing

13   Mr. Colt to be "lucid and functional" on Monday morning. Pl's Mot. at 4.

14          In response to Plaintiff's argument that it was unable to rebut the damaging testimony by

15   Turner regarding the functionality of the product, Defendants identify significant portions of the

16   record where Mula and Bailey, the inventor, testified that BarMaster worked "like magic." *See*

17   *e.g.*, Trial Tr. 298:15.

18          **B.    Mattingly Cross Examination**

19          CVT contends that Mr. Colt further "depart[ed] from the agreed upon strategy for the

20   cross-examination of Defendant Basil Mattingly by opening the door for Mr. Mattingly to offer

21   exculpatory testimony that his document destruction had been inadvertent." Pl.'s Mot. at 4, ECF

22   288. CVT fails to direct the Court to any specific portion of the record. In its reply papers, CVT

23   generally references the transcript at pages 944-956. Pl.'s Reply at 5, ECF 292. Having reviewed

24   that entire portion of the record, the Court finds no glaring example of gross negligence and

25   further notes that Mr. Colt questioned the witness about his failure to maintain records after he

26   was on notice of the potential for litigation and quotes from the forensic report and Judge Grewal's

27   order granting sanctions to impeach the witness. Mr. Mattingly generally acknowledged that he

28   had to pay $212,000 for that report, responds to the questions, sometimes offering excuses for not

United States District Court
Northern District of California

9

retaining the records. Although CVT may be unhappy with the witness's responses, to say that the questions amounted to gross negligence would be tantamount to sanctioning a do-over every time cross examination does not turn out as hoped.

### C. Analysis

As the Ninth Circuit noted in *Latshaw*, "[g]enerally speaking, Rule 60(b) is not intended to remedy the effects of a deliberate and independent litigation decision that a party later comes to regret…" 452 F.3d at 1099. This is just such a case. At most, the Court can classify the defects CVT's points to as strategic blunders by Mr. Colt. Certainly Mr. Colt is not the first attorney to open the door to previously excluded evidence. Such mistakes do not rise to the level of what the Ninth Circuit described as gross negligence that would qualify as an extraordinary circumstance under Rule 60(b). *See Tani* 282 F.3d at 1170. Expanding the reach of Rule 60(b)(6) in this way would invite counsel to strategically engage in questioning harmful to their client's case whenever they believe they may be losing in an attempt to pitch an unfavorable verdict.

Another issue raised in CVT's motion but not expressly made a ground for relief is CVT's reference to Mr. Colt's personal conduct at trial. CVT describes Mr. Colt's apparent display of bizarre and aberrant behavior on the days leading up to the harmful questioning of defense witnesses. Pl.'s Mot. at 3-4, ECF 288. Plaintiff's lead counsel Mr. North describes co-counsel as "exhibiting troubling signs, and an apparent inability to focus or concentrate on the tasks at hand, in the presence of the jury during trial, beginning on Friday, June 12." Pl.'s Mot. at 4, ECF 288. Mr. North states that Mr. Colt arrived one and one half hours late for trial on June 12, 2015, "reeked of alcohol and was completely unable to respond to my questions. His condition could best be described as near-catatonic." Decl. of Gerald North at ¶ 16, ECF 276-1. Plaintiff further describes that lead trial counsel precluded Mr. Colt from participation throughout the day but allowed him to resume his planned witness examination by the end of the day. *See generally id*. Over the weekend, lead counsel Mr. North received a "written explanation" and "assurances" that Mr. Colt was fit to resume his work and Mr. North accepted the explanation and approved Mr. Colt's continued participation at trial. *Id.* at ¶¶ 21, 24, 25. The alleged damaging conduct occurred the following Monday, after Mr. North confirmed that Mr. Colt showed up at court and "appeared

1    functional." *Id.*at ¶ 25.

2        CVT does not contend that it mistook Mr. Colt's health or sobriety on June 15, 2015 but

3    rather, that after North and Colt agreed that Colt would take responsibility for cross examination

4    of Mattingly and Turner, Colt "depart[ed] from the agreed upon strategy." Pl.'s Mot. at 4, ECF

5    288.

6        The Court notes that at no time during the Mattingly or Turner testimony did CVT"s lead

7    counsel ask for a recess or side bar to address the problem it now claims was caused by Mr. Colt.

8    If, as Plaintiff now argues, Mr. Colt was ill or otherwise incapacitated and there was insufficient

9    time for lead counsel to step in and conduct the remaining witness examinations, the Court would

10   surely have looked favorably on a brief recess on June 12, 2015, when Mr. Colt was unable to

11   function. The trial had proceeded apace and was ahead of the published schedule. Additionally,

12   once Mr. Colt went off the rails in his witness examination, as Plaintiff now argues, lead counsel

13   could have asked for a recess to talk to Mr. Colt or a sidebar to alert the court to the problem and

14   request that the Court strike the testimony that Plaintiff felt was prejudicial and issue a curative

15   instruction. *See U.S. v. Washington,* 462 F.3d 1124, 1136 (9th Cir. 2006).

16       Plaintiff has cited no case in which the party seeking relief from judgment was represented

17   by a team of lawyers throughout trial, the evidence was fully presented to a jury and that jury

18   reached a unanimous verdict on all claims. This case simply does not present the "extraordinary

19   circumstances" encompassed in Rule 60(b)(6). In fact, it appears to be little more than a situation

20   where co-counsel disagreed on trial strategy and where certain strategic decisions backfired.

21   Under these circumstances, it would be fundamentally unfair to Defendants to wipe out the

22   favorable verdict they obtained due to no fault of their own and cause them to suffer the

23   extraordinary expense of time and money to retry the case due to opposing counsel's mistakes. On

24   this basis, Plaintiff's Motion for Relief from Judgment is DENIED.

25   **V.    CVT IS NOT ENTITLED TO RELIEF BASED ON THE COURT'S REFUSAL TO
         PUBLISH THE SANCTIONS ORDER TO THE JURY**

26

27       In its reply papers, CVT raises for the first time an additional ground for relief. It argues

28   that the Court's order sustaining Defendant's objection to CVT's request to read portions of the

1    Court's sanctions order or instruct the jury on the specific factual findings as to Defendants'

2    culpable state of mind with respect to their destruction of evidence was error and alternatively

3    grounds for a new trial, Pl. Reply at p. 1, fn. 2, or relief from judgment under Rule 60(b)(6). Pl.

4    Reply p. 5:6-10. CVT devotes a scant seven lines to this argument and cites no authority.

5         Defendants object to introduction of a new basis for relief not raised in Plaintiff's moving

6    papers. The Court agrees with Defendants. Plaintiff has improperly raised for the first time in its

7    Reply a wholly new ground for relief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 1990). A

8    written response by Defendants is not necessary because the claim lacks merit.

9         Pre-trial, in the midst of a discovery dispute, Magistrate Judge Grewal found that

10   Defendants had intentionally destroyed evidence. Judge Grewal issued monetary sanctions and an

11   adverse inference jury instruction for spoliation. ECF 196. This Court concurred with Judge

12   Grewal, ECF 213, and instructed the jury as follows:

13                Defendants have failed to prevent the destruction and loss of
             relevant evidence for CVT's use in this litigation. This is known as
14           the 'spoliation of evidence.' I instruct you, as a matter of law, that
             Defendants failed to preserve evidence after their duty to preserve
15           arose. This failure resulted from their failure to perform their
             discovery obligations. You also may presume that CVT has met its
16           burden of proving the following two elements by a preponderance of
             the evidence: *first*, that *relevant* evidence was destroyed after the
17           duty to preserve arose. Evidence is relevant if it would have clarified
             a fact at issue in the trial an otherwise would naturally have been
18           introduced into evidence. And, *second*, the lost evidence was
             favorable to CVT.
19
20               Whether this finding is important to you in reaching a verdict in this
21           case is for you to decide. You may choose to find it determinative,
             somewhat determinative or not at all determinative in reaching your
22           verdict.

23   Special Jury Instruction No. 1, ECF 260.

24

25        At trial, during the presentation of CVT's rebuttal case Plaintiff sought to read virtually the

26   entire 14 page discovery sanctions order to the jury. Defendants objected under Fed. R. Evid 403

27   claiming that reading the Order would be unduly prejudicial because Judge Grewal would

28   effectively be a witness against Defendants. Trial Tr. 1176:8-12. The Court sustained the objection

United States District Court
Northern District of California

based on its consideration of a balancing of the probative value of the evidence and the unfair prejudice to Defendants under Fed R. Evid. 403. The Court found that the tone of the Order and its effect on the jury would be prejudicial. The Court further found that the adverse inference instruction itself contained all of the necessary findings made by Judge Grewal. The Court determined that the adverse inference instruction along with Plaintiff's previous extensive questioning of defense witnesses about their destruction of evidence, which included questions taken directly from the sanctions order, CVT's visual demonstration of the quantity of documents recovered as a result of the discovery sanctions order and the Court's allowance of unfettered closing argument regarding the discovery order were adequate to address Plaintiff's concerns. Trial Tr. 1175-1181.

Upon review, the Court finds no error in its evidentiary ruling. Moreover, even if the ruling were erroneous, relief from judgment and new trial would not be appropriate remedies. Such relief is available only where a party is substantially prejudiced. *Ruvalcaba v. City of Los Angeles* 64 F.3d 1323, 1328 (9th Cir. 1995). This requires the moving party to demonstrate that it is "more probable than not" the evidentiary error "tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). A harmless error by the district court does not justify disturbing a jury's verdict. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434,1439 (9th Cir. 1990).

Plaintiff has made no showing whatsoever that the evidentiary ruling "tainted the verdict." Additionally, the Court's review of the entire record shows that CVT was not substantially prejudiced. To the contrary, CVT was permitted to use the Sanctions Order without restriction in formulating cross examination questions posed to Defendants, it was permitted unfettered closing argument on the issue and the Court read the adverse inference instruction to the jury. CVT's motion for new trial or relief from judgment is DENIED on this ground.

## VI.    MOTION FOR NEW TRIAL

Alternatively, Plaintiff requests a new trial on its claim for intentional interference with prospective economic advantage based on an error of law made by the Court in responding to a jury question posed during deliberations. During deliberations the jury submitted four questions to the Court. One of the Court's responses to the jury was made over Plaintiff's objection and it is the

subject of this motion.

The jury's question was:

> "Verdict Form Number Three, Question One. First question, does question one only refer to the $3.5 million investment discussed on May 4th-5 or is the 'economic benefit' also referring to potential contributions in the future."

Trial Tr. 1382:17-21. The Court's response to the jury was:

> "Question one only refers to the $3.5 million investment discussed on May 4th-5."

Trial Tr. 1385:1-2.

Plaintiff objected to the Court's response and argued that the evidence at trial showed that the economic relationship between Mr. Berg and CVT "could incorporate potential contributions beyond the investment discussed on May 4th and 5." Trial Tr. 1384:3-5. Plaintiff's counsel reiterated three times that "*potential* contributions in the future" should be considered by the jury. *See* Trial Tr. 1384. In rejecting CVT's argument, the Court stated that it based its decision on the precise language of the verdict form regarding an economic relationship "that probably would have resulted in an economic benefit." Trial Tr. 1385:3-9.[2] Additionally, the Court stated that "there was absolutely no evidence of any other economic benefit from Mr. Berg that probably would have resulted, and therefore I will limit the jury to that consideration." *Id.* at 1385:6-9.

### A.    The Parties' Contentions

Plaintiff now argues that there was substantial evidence in the record establishing a broader scope to Berg's prospective economic relationship with CVT than just the $3.5 million investment. CVT points to several places in the record, including: (1) Mr. Rasnick's testimony that Berg told him that he would consider investing more money once CVT had several working installations at Trial Tr.714:19-24; (2) Mr. Bailey's testimony that on May 19, 2011, he was present when Mr. Berg "was talking about investing more money in the company." Trial Tr. 544:9-12; (3) Mr. Berg's testimony:

---

[2] Verdict Form No. 3, Question 1 provides: "Did CLEAR VIEW TECHNOLOGIES, INC. and Clyde Berg have an economic relationship that probably would have resulted in an economic benefit to CLEAR VIEW TECHNOLOGIES, INC.?" ECF 261-1 at 7.

> Q: [by defense counsel] You just testified that you would always tell Mr. Mula that if he had a working product you would consider further investment, correct?
>
> A: Yes."

Trial Tr. 790:1-4; (4) Mr. Berg testified "[W]ell put in that half million and [Bob Comes] and I, we will match the $500,000." Trial Tr. 356:11-15; *see also* Trial Tr. 356:16-18, 20-22; (5) Mr. Berg made a $20,000 loan to Mr. Mula on July 7, 2011. Trial Tr. 803:1-3; 824:5-9.

Plaintiff further supports its request for new trial on an inferences it draws from the jury question, suggesting that based on the jury question itself that "[o]bviously, the jury heard the evidence establishing a broader scope of the relationship with the potential for 'economic benefit' to CVT beyond just a $3.5 million investment made on a particular day." Pl.'s Reply at 6, ECF 292.

Defendants argue that the $3.5 million further investment was the sole basis for CVT's damages request. They contend that Plaintiff's assertion that the "prospect" for future economic benefit misstates the law. Defendants contend that the legal requirement is that there be a reasonable probability of future economic benefit. Additionally, Defendants show that CVT's entire case was tried on the basis of the failed $3.5 million investment. Pointing to the First Amended Complaint, the Joint Pre-Trial Statement, CVT's Trial Brief, CVT's opening statement, its expert witness testimony, its motion for judgment as a matter of law, and its closing argument Defendants demonstrate that CVT consistently alleged that the prospective economic benefit was related to the alleged $3.5 million Berg investment. Defs.' Opp. at 14-15, ECF 291..

Further, Defendants argue that there was no other evidence of "expectancy." They take issue with the CVT's mischaracterization of the evidence cited, and refer to other evidence supporting their view that there was no other probable economic benefit. *Id*. at 16-19, ECF 291.

## B.   Analysis

California courts have long held that in order to prove intentional interference with prospective economic relations, there is a threshold causation requirement of "proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987) (emphasis in original) (citing

*Buckaloo v. Johnson,* 14 Cal. 3d 815 (1975), *overruled on other grounds by Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 393 n.5 (1995)). In *Buckaloo*, the California Supreme Court stated that the first element of the tort required the probability of future economic benefit. *Buckaloo*, 14 Cal. 3d. at 827. *See also, Worldwide Commerce, Inc. v. Freuhauf Corp.*, 84 Cal. App. 3d 803, 811 (1978).

Defining the degree of probability has proved more difficult. Relying on state appellate jurisprudence, one federal court has defined *Youst's* "reasonable probability" standard to require "a reasonable certainty of a future economic benefit." *Comput. Scis. Corp. v. Comput. Assocs., Int'l, Inc.*, Case No. 98-1374-WMB-SHX, 1999 WL 675446, at *23 (C.D. Cal. Aug. 12, 1999). The *Computer Associates* court reasoned that "[t]his reasonable certainty standard does much to prevent a plaintiff from obtaining a windfall in the form of damages for interference with an economic opportunity that it would not have obtained even without defendant's alleged interference." *Id.*; *see also Temple Cmty. Hosp. v. Superior Court*, 20 Cal. 4th 464, 475 (1999) ("[W]e have been cautious in defining the interference torts [interference with contract and interference with prospective economic advantage], *to avoid promoting speculative claims*.") (emphasis in original); *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal.App.4th 579, 601 (1996) ("The tort of interference with prospective business relations protects nonformalized or anticipated business relations which are reasonably certain to occur, but which are nonetheless *prospective*.") (emphasis in original).

Upon a review of the law on the elements of the tort of interference with prospective economic advantage, the jury instruction and verdict form that are fully consistent with the law, the court finds that there was no error of law. In fact, it appears that until the jury asked the disputed question, Plaintiff had not seen its claim any differently either.

As Defendants point out, the FAC alleges that the interference was related to the potential $3.5 million Berg investment. *See* FAC ¶ 63, ECF 37 ("As a direct and proximate result of Defendants' conduct, CVT's economic relationship with Berg was in fact interfered with and disrupted and CVT lost a capital infusion of $3.5 million…"; *see also* FAC ¶¶ 4-6, 41, 47-48, 53, 56. The Joint Pre-Trial Statement reiterates that Plaintiff filed a claim for interference "with a

16

prospective $3.5 million investment by Clyde Berg." ECF 197 at 1:25-28. Plaintiff's trial brief reiterates the potential $3.5 million investment. ECF 216 at 2:3-7.

In fact, the parties provided the Court with a neutral statement of the case which was read to the jury during voir dire which stated "Plaintiff contends that one of its shareholders, Clyde Berg, agreed to make a $3.5 million further investment in Plaintiff, Plaintiff claims Defendants unlawfully dissuaded Mr. Berg from making the alleged further investment." ECF 211 at 1. Plaintiff's opening statement was consistent with the neutral statement. Its damages expert Dr. Neuberger based his opinion on the measure of damages on the failed $3.5 million investment, Trial Tr. 640:13-19, and Mr. North's closing argument discussed repeatedly the failed $3.5 million investment, and no other. Trial Tr. 1294:3-8 ("[A]nd if you have any doubt whether there was a contract that was already formed, clearly there was an expectation that their economic relationship between Mr. Berg and [CVT] and Mr. Mula would lead to that investment, otherwise, why did Mr. Berg tell him to come over the next day and pick up the check."); *see also* Trial Tr. 1286-1294, 1297, 1299, 1357.

Against all of its own statements to the Court and jury to the contrary, Plaintiff argues that there was substantial evidence to support a broader scope to the prospective economic relationship. CVT bases this argument primarily on inferences it draws from the jury question itself, not the actual evidence submitted to the jury.

Reviewing all of that evidence, the Court concludes that the references to other investments Berg might have been persuaded to make were vague, *see* Trial Tr. 714:19-24; 790:1-4 (consideration of future investment only once CVT had several working installations or once there was a working product), rested on circumstances that never occurred, *see* Trial Tr. 356:10-18, 357:19-25, 358:1 (indicating that only if Mula invested $500,000 of his own money, then Berg and Bob Comes would match that investment and that Mula never invested $500,00 and Berg never matched the lesser amount), or unrelated to Berg's probability of investing with CVT . *See* Trial Tr. 803:1-3, 824:5-9 (testimony that Berg made a personal loan to Mr. Mula on July 7, 2011, which Mr. Berg described alternatively as a loan "to keep to doors open" and that "[h]e came into my office begging for money so I did make a personal loan to him.").

Thus, after a thorough review of the entire record and the law regarding the essential elements of the tort of interference with prospective economic relations the Court finds that there was no legal error in its response to the jury's question. The law clearly limits a jury's consideration to an economic benefit that was probable, or reasonably certain and not speculative or potential as CVT now urges the court to consider. *See Pac. Gas and Elec. Co. v. Bear Stearns & Co.,* 50 Cal. 3d 1118, 1136-37 (1990) ("We have been cautious in defining interference torts to avoid promoting speculative claims."); *see also Youst*, 43 Cal. 3d 64; *PMC*, 45 Cal.App.4th 579. A response to the jury that would have had the effect of broadening the scope of its review would have encouraged the jury to speculate about other, future, possible investments Mr. Berg might have considered that were not pled, presented in evidence nor argued to the jury at trial.

## VII.   PLAINTIFF HAS NOT ESTABLISHED ENTITLEMENT TO A PERMANENT INJUNCTION

CVT now seeks to invoke the Court's equitable jurisdiction by requesting a permanent injunction. Plaintiff asks the Court to amend the judgment pursuant to Fed. R. of Civ. Proc. 59(e). The court is surprised by this request insofar as Plaintiff voluntarily dismissed its claim under Cal. Bus. & Prof. Code § 17200, which provides for injunctive relief, it never prosecuted a trade secret claim and in its final pretrial statement it did not request injunctive relief. *See* ECF 197 at 15. However, even assuming that CVT has preserved its right to seek this extraordinary relief, the Court finds that CVT has not demonstrated its right to such relief.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Federal courts apply a four-factor test to determine whether to award a permanent injunction. As the Supreme Court reiterated in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006):

> "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a

United States District Court
Northern District of California

permanent injunction."

*See also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). The decision to grant or deny a permanent injunction is vested in the sound discretion of the trial court. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Typically, it is a prevailing plaintiff who seeks an injunction. *See eBay*, 547 U.S. at 390. Here, CVT is trying to bootstrap itself into that classification by requesting a permanent injunction in a case where it did not prevail on any claim.

Both parties presume that California law, as opposed to federal law, governs the issuance of a permanent injunction. Choice of law principals, however, dictate that federal law determines the issuance of a permanent injunction. *See e.g.*, *Kane v. Chobani Inc.*, No. 12-02425-LHK, 2013 WL 3776172, at *3 (N.D. Cal. July 15, 2013) (determining that choice of law supports applying federal law for injunctive relief). However, "[i]n applying the federal injunction standard, courts recognize that state law would control on the issue of whether a plaintiff is entitled to seek injunctive relief on the claim." *Anselmo v. Mull*, Case No. 12-1422-WBS-EFB, 2012 WL 5304799, at *5 (E.D. Cal. Oct. 25, 2012) (citing *Sims Snowboards, Inc. v.* Kelly, 863 F.2d 643, 645-46 (9th Cir. 1988)). If state law allows a party to seek injunctive relief, the federal standard then governs a court's exercise of discretion in determining whether to grant an injunction. *See United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*, Case No. 07-2172-AJB, 2012 WL 3861946, at *4 (S.D. Cal. Sept. 5, 2012). Here, Cal. Civ. Code 3422 allows a party to seek injunctive relief, and the Court will apply the federal standard in determining whether to issue a permanent injunction.[3]

Plaintiff argues that under the Non-Disclosure Agreement ("NDA") it is entitled to a permanent injunction. It argues that having proved that Defendants breached the NDA, injunctive

---

[3] At the hearing, counsel agreed that there was no conflict with state law and that state and federal standards were identical as to issued involved here.

United States District Court
Northern District of California

relief automatically follows. CVT argues that the jury found that Defendants engaged in a conspiracy to breach the NDA and that under paragraph 3.3 of the NDA, the parties agreed that:

> "due to the unique nature of the Disclosing Party's proprietary information, there can be no adequate remedy at law for any breach of its obligations hereunder, which breach may result in irreparable harm to the Disclosing Party, and therefore, that upon any such breach or any threat thereof, in addition to all other remedies the Disclosing Party shall be entitled to seek appropriate equitable relief, including without limitation, specific performance and/or injunctive relief, without the requirement of posting a bond…"

Pl.'s Reply at 10-11 (quoting the NDA), ECF 292. CVT does not submit any evidence or argument under the well-established four-factor test for injunctive relief. It appears to argue that injunctive relief is automatic. It relies on Cal. Civ. Code 3422 and *DVD Copy Control Ass'n v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 725-726 (2009). Alternatively, and in the event that the Court is not inclined to issue an injunction beyond the term of the NDAs, Plaintiff requests that the Court order Defendants to return all confidential information, material and copies thereof in their possession. Pl.'s Reply at 10, ECF 292.

Defendants argue Rule 59(e) is not so broad as to allow amendment to the judgment to add injunctive relief. They further argues that under California law, in order to obtain injunctive relief, Defendants must prove the elements of a cause of action involving the wrongful act to be enjoined and grounds for equitable relief. *Art Movers, Inc. v. Ni West, Inc.*, 3 Cal. App. 4th 640, 646 (1992). Defendants contend that CVT did not prevail on its cause of action for breach of the NDA, showing that the jury found that CVT was not harmed by Defendants' conduct. Defendants also point out that the NDAs are due to expire shortly. Basil Mattingly's NDA expires on September 3, 2015, and Parker Mattingly's NDA expires on January 3, 2016, and John Rasnick's NDA expires on January 6, 2016. They finally argue that CVT is defunct and CVT's pursuit of an injunction is "a vain effort to proclaim itself the 'prevailing party' entitled to recover attorneys' fees." Defs.' Opp. at 25, ECF 291.

The Court finds Defendants' argument persuasive. First, Plaintiff did not prevail on its claim for breach of contract. Although the jury expressly answered "YES" in regard to each Defendant on the question: "Did [Defendant] fail to do something the non-disclosure and non-circumvention agreement required him to do, or did [Defendant] do something that the non-disclosure and non-circumvention agreement prohibited him from doing?" , *see* Verdict Form No. 4, Question 4, ECF 261-1, the jury then answered "NO" in regard to each Defendant on the next question: "Was Clear View Technologies, Inc. harmed by that failure as to [Defendant]?" *Id.*

Second, contrary to Plaintiff's argument, the NDA does not compel issuance of an injunction in all cases of breach and the holding in *DVD Copy Control* does not direct a different result. Looking at the NDA, Plaintiff overstates the parties' agreement. The NDA provides that a breach "*may* result in irreparable harm" to CVT and that upon such breach, CVT "shall be entitled *to seek* appropriate equitable relief, including…injunctive relief." (emphasis added). Thus, the NDA merely acknowledges that in certain circumstance injunctive relief may be appropriate; it is not compelled.

Plaintiff's reliance on the holding in *DVD Copy Control* is also unavailing. In *DVD Copy Control,* the contract provided "[i]n the event Licensee breaches its obligations…, money damages alone *will not* adequately compensate an injured party… [and,] upon showing to the relevant court's satisfaction that applicable factors *other than the fact that the harm will be irreparable* and that monetary damages are not sufficient to remedy the injury have been fulfilled, will be entitled to …injunctive relief." *DVD Copy Control*, 176 Cal. App. 4th at 878. Notably, the *DVD Copy Control* contract expressly provided that monetary damages "will not" adequately compensate an injured party and the contract removed from a court's consideration the issue whether the resulting harm would be irreparable. Under the NDA here at issue, the parties recognized that some breaches "may result in irreparable harm," reserving for the court the determination whether such harm is in fact irreparable.

21

In this case, the jury answered that question, finding that Defendants' conduct caused no harm to CVT. CVT does not ask for judgment as a matter of law or a new trial on the claim for breach of contract and thus, the court finds the jury's determination conclusive. Additionally, Basil Mattingly's NDA will expire in three days and Parker Mattingly and John Rasnick's NDAs will expire within 120 days. Taking these factors together, the Court finds that Plaintiff has failed to demonstrate irreparable harm.

As to the second factor, that monetary damages are inadequate, there being no harm, then it is axiomatic that no damages are appropriate and this factor is concluded in Defendants favor. This was not a case where the jury found harm but could not determine the proper sum to compensate CVT.

The third factor requires a balancing of hardships between plaintiff and defendants. Neither party has analyzed this factor. It seems to the court that there would be no hardship on Defendants insofar as they claim that they do not intend to compete with CVT. Def. Opp. at 24. The fourth factor, that the public interest would not be disserved by a permanent injunction does not weigh in favor of either party. The NDA is a private agreement between the parties.

Balancing all of the factors, it is clear that CVT is not entitled to injunctive relief. As noted above, Plaintiff did not prevail on its claim for breach of contract. The Court is unaware of any case where a permanent injunction was awarded to the losing party. Although Plaintiff established some of the essential elements of its claim, the fact remains that it did not prove breach of contract. Under this circumstance the contract does not compel an injunction and irreparable injury has not been demonstrated. CVT is not entitled to a permanent injunction.

In regard to CVT's alternative request that the Court order Defendants to turn over all confidential materials in their possession, the Court notes that section 1.4 of the NDA provides "Immediately upon request by the Disclosing Party at any time, the Receiving Party will turn over to the Disclosing Party all Proprietary Information of the Disclosing Party and all documents or

media containing any such Proprietary Information and any or all copies or extracts thereof." The Court noted at the hearing that there was no evidence that CVT has made such a demand or that Defendants had failed to comply. The Court suggested that CVT make such a demand before the NDAs expired. If there were a breach, that would necessarily be the subject of a separate lawsuit. Injunctive relief is simply not available on this record.

## VIII.    CONCLUSION

For the reasons discussed above, the Court DENIES Plaintiff CVT's Motion for Relief from Judgment, Motion for New Trial and Motion for Permanent Injunction.

**IT IS SO ORDERED.**

Dated: August 31, 2015

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California